27/06 2007 14:34 FAX 44 207 190 2966    BJMACFARLANEANDCO                    ☒004
Case 1:07-cv-04528-MGC    Document 24-7    Filed 07/02/2007    Page 1 of 9

Ex. F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

TRANSFIELD ER CAPE LIMITED

                Plaintiff,

- against -

FUCHUEN DIHAI SHIPPING CO. LTD.,
AND ZHEJIANG FUCHUEN CO. LTD.

                Defendants.

----------------------------------------------------------X

ECF CASE

07 cv 4528 (MGC)

**Declaration of Paul R. Rodgers
in Support of Motion
to Vacate Maritime Attachment**

**PAUL ROBERT RODGERS** hereby declares pursuant to 28 U.S.C. Section 1746:

1. I am an English Solicitor and Managing Director of the law firm, Rodgers & Co Solicitors (Asia) Pte Ltd.

2. I qualified as an English solicitor in 1989 and have practiced shipping law since that time. As a former partner of the International Law Firm, Watson Farley & Williams and in charge of my own law firm since 2000, I have substantial experience of English Shipping Law. I also lecture widely on Shipping Law and am an external Lecturer of Law at the Metropolitan University of London. I am authorized to make this declaration in support of my client, Fuchuen Dihai Shipping Co Ltd's ("FD") application to dismiss the Verified Complaint and vacate Plaintiff's Rule B attachment.

3. I have read the Verified Complaint of the Plaintiff and where appropriate will comment by reference to its paragraph numbering. Whilst I accept that the original dispute arose out of a charter party dated 28 November 2003 between Plaintiff and Fuchuen Dihai Shipping Co Ltd ("FD"), it is unfortunate that the Plaintiff has omitted to mention highly relevant facts which, had

the court been made aware of from the outset, would I submit, not have granted the motion in the first place. In particular:

(a) The underlying claim has no merit whatsoever. The Plaintiff persistently failed, through its English solicitors Messrs Winter Scott of London, to particularize its claim at any time to the solicitors previously appointed by FD, Messrs Ince & Co London.

(b) Both the Plaintiff and FD reached a **full and final** binding settlement agreement of the charter party dispute and the arbitration proceedings were consequently withdrawn by the Plaintiff. Contrary to paragraph 15 of the Verified Complaint, that settlement was not dismissed "without prejudice" but was unconditional. Consequently there is NO live dispute for which the Plaintiff can litigate under Clause 42 of the charter party or demand security.

(c) The Plaintiff has purported to commence a second arbitration under the same charter party, against the same Defendant and for the same claims. However as a matter of English law, and I believe New York law, there is no residual cause of action post settlement and Plaintiff's remedy, to the extent they believe FD breached the separate and distinct settlement agreement, is to sue on the settlement agreement subject to what I have to say below.

(d) Contrary to the Plaintiffs assertion in paragraph 16 of the verified Complaint, FD does not deny the existence of the settlement agreement. It positively asserts it. Furthermore FD has not refused to pay any sums owing under the settlement agreement. Indeed, no amount was payable under the settlement agreement. This fact alone confirms that Plaintiff's principal claim of $2,475,000.00 for which it sought and obtained an ex parte order of maritime attachment from this court has absolutely no merit.

(e) Contrary to paragraph 17 of the Verified Complaint, FD adhered to the terms of the original settlement and honoured the terms of that agreement. Ironically it is Plaintiff who has

sought to deny the existence of the settlement agreement whilst FD has sought to perform its obligations under the Settlement Agreement.

4. I will now elaborate on the above submissions:

   (a) **Underlying Claim Has No Merit**

   The correspondence exchanged between Winter Scott, representing Plaintiffs and Ince & Co. previously representing FD, shows that the Plaintiff's case was based on an assertion that FD failed to discharge the cargo on a customary quick dispatch 'CQD' basis because the receivers allegedly did not have sufficient storage space or adequate transportation to remove the cargo from the port and/or that an unspecified party "may" not have had import/export documentation or did not pay import tax. Copies of the correspondence are attached to my declaration as *Exhibit 1*. However, no evidence has been produced to date to substantiate these allegations, or even quantify the losses, notwithstanding Ince & Co's request for the Plaintiff's solicitors to do so. No steps whatsoever were taken by the Plaintiff's solicitors in prosecuting the arbitration other then to simply commence proceedings in 2004 at a cost of around US$200. As will be clear in Ince & Co's fax of 4 June 2004, FD were not prepared to spend money in defending a "nuisance claim" where the Plaintiff failed to even particularize or substantiate their losses in any way whatsoever. *(Exhibit 1, p. 7)*. Notwithstanding, two months later, and without any prior notice, the Plaintiff commenced arbitration proceedings on 3 August 2004 by appointing Mr. Mackenzie as Arbitrator. *(Exhibit 1, p. 8)*. Ince & Co responded by appointing their own arbitrator on behalf of FD and expressed their "surprise and disappointment" that proceedings were commenced notwithstanding Ince & Co's request for the Plaintiff to particularize their claim. *(Exhibit 1, p. 10)*. I should explain that under the English arbitration procedure, it is normal procedure, for a Plaintiff to particularize and substantiate the claim and then for the Defendant to respond to the claim in an attempt to resolve the matter commercially BEFORE proceedings are commenced.

3

Failure to do so can have severe "costs" consequences should the Plaintiff ever succeed, although in this case, that was not a consideration of the Plaintiff given the poor merits.

No further steps were taken in the arbitration notwithstanding that the procedural rules governing the arbitration required the Plaintiffs to serve their points of claim within 28 days of the appointment. Nothing further was heard from the Plaintiff's solicitors although we now know that on 10 June 2004, the Plaintiffs obtained, ex parte a Rule B attachment against FD which they subsequently voluntarily dismissed on 17 September 2004 without attaching any funds. It is therefore clear to me that the sole purpose of commencing the first arbitration proceedings was to keep their first Rule B attachment alive in New York. As an aside the first Rule B attachment makes no reference to the serious allegation that FD is somehow controlled by Zhejiang Fuchuen Co Ltd ("ZF") or somehow connected to FD. As a further aside the court will note that the Plaintiff claim has purportedly increased from US$1,980,000, in the first Rule B, to US$2,475,000, together with a huge increase in interest (from 2 years to 5 years) and costs/attorneys/arbitrators costs from US$85,000 to US$210,000 which is a further indication of bad faith. Should there be any doubt as to the merits of the original claim I would refer the Court to the terms of the settlement agreement reached between the Plaintiffs and FD in early 2005. Contrary to Plaintiff's assertion, it did not require FD or any party to make payments to them. Plaintiff simply dropped the claim in the hope of future unspecified business.

(b)     **The Settlement Agreement**

In early 2005 settlement negotiations took place directly between Plaintiff and FD. Copies of the settlement communications, which are in Chinese together with their English certified translations are attached to my declaration as *Exhibit 2.* On 23 February 2005, Plaintiff made a proposal to "terminate the arbitration proceedings" and for FD to maintain business transactions in the future. *(Exhibit 2, p. 1).* On 28 April 2005 Plaintiff advised FD that pursuant

4

to "friendly" discussions between the companies' managers, "we both reached the same agreement" that Plaintiff would immediately terminate the London arbitration proceedings and try to resolve their differences and strengthen business cooperation. *(Exhibit 2, p. 3)*. Further discussions took place between the parties on the basis of the Plaintiff's proposal, leading to a full and final settlement confirmed in a fax from FD to the Plaintiff on 21 July 2005 whereby FD agreed to the arbitration proceedings being terminated immediately and whereby FD agreed not to recover its costs. *(Exhibit 2, p. 5)*. I should explain that in English proceedings, where the plaintiff abandons proceedings for substantial damages and withdraw those proceedings, the plaintiff would normally be obliged to pay the defendants their reasonable legal costs of both investigating and defending those proceedings.

As a matter of English law, there is no doubt that this was a legally binding settlement agreement, recorded in writing and for which parties gave good consideration. Indeed the Plaintiff admits that a valid settlement agreement was reached in paragraph 15 of the Verified Complaint. Furthermore, Winter Scott, the Plaintiff's solicitors wrote to the arbitrator, Mr Mackenzie, on 6 July 2006 (sic) in which they confirmed that "the matter has now been amicably settled and we should therefore be grateful if the Tribunal would close this file". *(Exhibit 3)*. Similarly, on July 8 2005 FD's solicitor wrote to the arbitrator confirming that the claim had been settled and thanked him for his appointment in the matter. *(Exhibit 4)*.

As a matter of English law the original cause of action has been extinguished by reason of that settlement and it is not possible to "recommence" arbitration proceedings for the same cause of action under the same contract and between the same parties as the Plaintiffs have tried to do on 28 May 2007. Indeed I believe the only reason for commencing the second fresh arbitration proceedings is in order to use that as a basis for the latest Rule B attachment in the

same way that the Plaintiff did in 2004. I would regard that, from the English law prospective, as an abuse of the process.

    (c)    **FD asserts the validity of the Settlement Agreement**

The Plaintiff asserts that FD had denied the existence of the agreement but as can be seen from Plaintiff's fax to FD of 7 March 2006, it is the Plaintiff who asserted that there was no settlement agreement (they argue to the contrary in the latest Rule B). A copy of Plaintiff's fax in Chinese together with its English translation is attached as *Exhibit 5*.

    (d)    **Breach of Settlement Agreement**

In response to that allegation that there was no settlement agreement, my firm was appointed (in lieu of Ince & Co) to write to the Plaintiff pointing out the existence of the settlement agreement which FD considered to be valid. A copy of my fax dated 17 March 2006 is attached as *Exhibit 6*. I should mention that at that time, I had not seen the correspondence from Winter Scott to the Arbitrator. Suffice to say I did not receive any reply from the Plaintiff although I note that Plaintiff now asserts the existence of a settlement agreement (no doubt to suit its own purposes). Furthermore, Plaintiff alleges that FD did not honor the settlement agreement notwithstanding that FD did in fact have further business dealings with the Plaintiff, including a further charter party dated 5 October 2006, a copy of which is attached as *Exhibit 7* to my declaration. In any event, as previously explained, to the extent that Plaintiffs believe that the settlement agreement has been breached, their remedy is to enforce that settlement agreement which is a separate and distinct contract to the original charter party and not even a maritime contract.

    (e)    **Purported Second Arbitration**

On 28 May 2007 the Defence Club of the Plaintiff (Skuld) purported to commence new arbitration proceedings under the original charter party dated 28 November 2003 against FD for

6

the same claim albeit that they appointed a different arbitrator, (Mr O'Donovan), on this occasion (clearly they could not appoint the first one as he knew of the settlement). A copy of that letter of appointment is attached to my declaration as *Exhibit 8*. As a matter of English law, this appointment is clearly invalid and it is simply not possible for the Plaintiff to "recommence" the London arbitration proceedings contrary to their assertion in paragraph 18 of the Verified Complaint. In this connection I have written to Plaintiff's arbitrator, Mr. O'Donovan with a copy to Skuld (Plaintiff) emphasizing the fact that there is no subsisting agreement to arbitrate as all disputes between the parties have already been resolved. Furthermore, I have advised the arbitrator that he has no jurisdiction over FD and that should Plaintiff refuse to withdraw and/or abandon the arbitration, FD will make an application to the English High Court challenging the jurisdiction of Mr O'Donovan (given there is no longer any cause of action or dispute under the said charter party) or simply challenge any award that he may make. A copy of my fax dated 25 June 2007 is attached as *Exhibit 9*. In short, there is NO "dispute" for which new arbitration proceedings can now be commenced and NO cause of action, and hence No basis for the present maritime attachment.

**Alter Ego**

5. I note from paragraph 20 of the Verified Complaint that Plaintiff now alleges for the first time in 4 years, that the co-Defendant Zhejiang Fuchuen Co Ltd ("ZF"), is the "alter ego" of FD, is interchangeable with ZF and that FD has no separate identity from ZF. It is difficult to respond in detail given the usual lack of particularity by the Plaintiff, but from my own knowledge of Hong Kong and Asia it is extremely common for several companies to share one office address and/or office space on the basis that office rentals in Hong Kong are substantially higher than found in most European or, I suspect, American cities. To my own knowledge FD is a separate legal entity, recognized as such by all the appropriate authorities and I am able to

7

report and obtain instructions from the managers of FD without any difficulty and without their having to check with ZF. I have had no dealings with ZF to date although I have discussed the matter with their US attorneys and to anticipate the Plaintiff's logic, they are in no way connected to our US attorney, Mr Rahul Wanchoo,

6. With regard to paragraph 23 of the Verified Complaint, again it is difficult to respond in detail but understand that FD operate their own bank account in Hong Kong from which 95% of the freight was paid under the original charter party with the exception of a small amount being US$284,000 (5%), which I believe was paid by ZF on behalf of FD. I would make the point that the money was debited from different accounts and at no stage did the Plaintiff ever assert that FD was controlled by ZF or any other company. Indeed if Plaintiff genuinely believed that, why did they contract with FD? I disagree with paragraph 24 and 25 of the Verified Complaint. It is by no means uncommon whether in maritime business or otherwise for one company to pay on behalf of another. The mere payment on behalf of another does not establish that the two companies are not at "arm's length" and would respectfully suggest that the Plaintiff is clutching at straws. Certainly I am not aware of any joint venture/partnership arrangements or that the companies are affiliated given that FD is a separate legal entity. Indeed, FD regularly charters vessels and enters into maritime contracts in its own name. For example, FD entered into a contract of affreightment with Shenzhen Ocean Shipping Co. Ltd. in September 2004 and a charter party with Sinoeast Shipping Ltd. in August 2006. Copies of the former contract, which is in Chinese along with its English translation and the charter party, are attached to my affidavit as *Exhibits 10 and 11*, respectively.

8

## Conclusion

7.   As I have stated above, the original charter party claim has no merit and was settled in 2005 for a NIL payment, whereupon the arbitration proceedings commenced by the Plaintiff (but never prosecuted) were abandoned in return for the possibility of future business from FD (not ZF). At no stage in the original charter party negotiations or subsequent settlement negotiations was it ever suggested that FD did not have its own legal identity and was somehow subordinated to ZF. Indeed, I believe ZF has been introduced into the present Rule B attachment simply because the original Rule B attachment failed to catch any funds in August 2004. No doubt ZF is a larger and more attractive target for the Plaintiffs but that is a long way short of establishing that ZF is somehow dominating FD or that FD has no identity of its own. I therefore respectfully request the court to vacate the Rule B attachment against FD. Indeed if the Plaintiff had genuinely a good or arguable claim against FD, I would pose the question, why did the Plaintiff voluntarily dismiss its original Rule B attachment in 2004 and why did they abandon what they claim to be damages of over US$2 million (now reformulated at over US$3 million) simply in return for potential further business.

8.   I declare under penalties of perjury under the laws of the United States of America that the foregoing is true and correct.

By: _____

PAUL ROBERT RODGERS

27 June 2007.

Executed on 25 June 2007

9