LENNON, MURPHY & LENNON, LLC
Attorneys for Plaintiff
TRANSFIELD ER CAPE LIMITED
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone:    (212) 490-6050
Facsimile:    (212) 490-6070
Patrick F. Lennon (PL 2162)
Charles E. Murphy (CM 2125)


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
TRANSFIELD ER CAPE LIMITED,                          :
                                                     :        07 CV 04528 (MGC)
                              Plaintiff,             :
                                                     :        ECF CASE
          - against -                                :
                                                     :
FUCHUEN DIHAI SHIPPING CO. LTD. and ZHEJIANG :
FUCHUEN CO. LTD.,                                    :
                                                     :
                                                     :
                              Defendants.            :
------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO VACATE MARITIME ATTACHMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS ..................................................................................5

ARGUMENT .....................................................................................................5

POINT ONE
TRANSFIELD HAS SATISFIED ITS BURDEN OF PROOF
UNDER SUPPLEMENTAL ADMIRALTY RULES B AND E(4)(f)..............................5

POINT TWO
TRANSFIELD'S VERIFIED COMPLAINT ALLEGED A VALID *PRIMA FACIE*
ADMIRALTY CLAIM AGAINST FUCHUEN DEFENDANTS .....................................9

POINT THREE
DEFENDANT ZHEJIANG FUCHUEN IS NOT ENTITLED TO THE
PROTECTIONS OF THE U.S. FOREIGN SOVEREIGN IMMUNITIES ACT ..............13

POINT FOUR
AS ALL OTHER REQUIREMENTS OF RULE B ARE SATISFIED,
TRANSFIELD NEED ONLY ALLEGE A *PRIMA FACIE* VALID
ALTER-EGO CLAIM TO SUSTAIN THE ATTACHMENT ........................................19

POINT FIVE
THAT THE PARTIES MAY BE PRESENT IN THE SAME FOREIGN COUNTRY
IS IRRELEVANT TO THE *AQUA STOLI* ANALYSIS BECAUSE THE SECOND
CIRCUIT SPOKE OF U.S. FEDERAL JUDICAL DISTRICTS WHEN IT HELD
THAT VACATUR IS APPROPRIATE WHEN PARTIES ARE PRESENT IN
THE SAME "DISTRICT" .................................................................................25

POINT SIX
UNDER THE SECOND CIRCUIT COURT OF APPEALS' DECISIONS IN
*WINTER STORM* AND *AQUA STOLI*, EFTs TO OR FROM A DEFENDANT
ARE ATTACHABLE AS THEY PASS THROUGH BANKS IN THE DISTRICT .............29

POINT SEVEN
EVEN UNDER NEW YORK LAW THE FUCHUEN DEFENDANTS
HAVE ATTACHABLE PROPERTY INTERESTS IN THE EFTs.................................38

CONCLUSION ..............................................................................................43

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
TRANSFIELD ER CAPE LIMITED,                          :
                                                     :        07 CV 04528 (MGC)
                              Plaintiff,             :
                                                     :        ECF CASE
        - against -                                  :
                                                     :
FUCHUEN DIHAI SHIPPING CO. LTD. and ZHEJIANG :
FUCHUEN CO. LTD.,                                    :
                                                     :
                                                     :
                              Defendants.            :
------------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO VACATE MARITIME ATTACHMENT

        Plaintiff, Transfield ER Cape Limited (hereinafter "Transfield"), by its undersigned

counsel, Lennon, Murphy & Lennon, LLC, respectfully submits the within Memorandum of Law

as a consolidated opposition to the Motion to Vacate Maritime Attachment filed by Defendant

Zhejiang Fuchuen Co. Ltd. (hereinafter "Zhejiang Fuchuen") and to the Motion to Dismiss and

Vacate Maritime Attachment filed by Defendant Fuchuen Dihai Shipping Co. Ltd. (hereinafter

"Fuchuen Dihai")(collectively as "Fuchuen Defendants").

### PRELIMINARY STATEMENT

        Concisely stated, Transfield's attachment should be sustained because this Court validly

issued the attachment order pursuant to Supplemental Admiralty Rule B of the Federal Rules of

Civil Procedure and in accord with the United States Court of Appeals for the Second Circuit's

binding decision in *Aqua Stoli Shipping Ltd. v. Gardner Smith*, 460 F.3d 434 (2d Cir. 2006). The

attachment order was proper because: (1) Transfield has a valid *prima facie* admiralty claim

against the Fuchuen Defendants arising from a breach of a charter party contract dated

November 28, 2003 or, alternatively, from a breach of a settlement agreement of an admiralty

claim that is itself a maritime contract, *see e.g. Brown v. M.V. "GLOBAL LINK"*, 2003 U.S. Dist. LEXIS 14723 at *5; 2004 AMC 1614 (S.D.N.Y. 2003)(a settlement agreement in respect of a maritime claim is itself a maritime contract); (2) the Fuchuen Defendants cannot be found within the Southern District of New York or within any other federal judicial district; (3) each Fuchuen Defendant concedes that it has a property interest in at least a portion of the funds attached in the District; and (4) there is no statutory bar under the Foreign Sovereign Immunity Act ("FSIA") or otherwise, to the attachment. Accordingly, for the reasons set forth at length herein, Transfield has satisfied its burden under Supplemental Admiralty Rule E(4) to show cause why the attachment should not be vacated.

Significantly, in light of the raft of factual allegations advanced by the Fuchuen Defendants in support of their motions, it is appropriate to extrapolate on the nature of the limited inquiry that the Court must conduct at the Supplemental Rule E(4)(f) post-attachment hearing. Stated differently, the fact-intensive inquiry that Fuchuen Defendants ask this Court to undertake is precisely the sort of review that the Second Circuit Court of Appeals explicitly prohibited in *Aqua Stoli* where it reversed a district court that engaged in such an improper analysis. Last week Judge Preska summarized the state of the law in this regard in upholding a maritime attachment in *Transportes Navieros Y Terrestes, S.A. de C.V. v. Fairmount Heavy Transport, N.A.*, 07 CV 3076 (LAP) (S.D.N.Y. July 6, 2007). Judge Preska held that "[a]lthough the Court of Appeals has not stated exactly what a plaintiff must show to make out a 'prima facie admiralty claim,' many district courts that have examined this issue since Aqua Stoli have adopted the 'limited inquiry contemplated by Aqua Stoli' and have adopted a basic definition of the term prima facie." *Transportes Navieros Y Terrestes, S.A. de C.V. v. Fairmount Heavy Transport, N.A.*, 07 CV 3076 (LAP) (S.D.N.Y. July 6, 2007). Judge Preska reconfirmed that a

2

plaintiff need not prove its case or present evidence at the Supplemental Admiralty Rule E(4)(f)

hearing because a proper Verified Complaint is all that is required to satisfy Rule B and to

withstand a motion to vacate attachment. The *Transportes Navieros Y Terrestes* court held as

follows:

> The Court of Appeals in <u>Aqua Stoli</u> stated that "our conclusion leads us to reject the reasoning of the more recent district court decisions that have engaged in a broader Rule E(4)(f) inquiry" including a district court vacatur inquiry that would impose a "fact-intensive inquiry" into a Rule E(4)(f) vacatur hearing. 460 F.3d at 445, 447.

> In examining <u>Aqua Stoli</u>, Chief Judge Wood stated that the "Court of Appeals' holding and rationale in <u>Aqua Stoli Shipping Ltd.</u> also strongly undermine the standard, stated in a number of cases that the hearing pursuant to Supplemental Rule E (4)(f) is intended to make a preliminary determination whether there were reasonable grounds for issuing the warrant of the attachment." <u>Tide Line, Inc. v. Eastrade Commodities, Inc.</u>, No. 06-1979, 2006 U.S. Dist. LEXIS 95870 at *14 (S.D.N.Y. Aug. 15, 2006)(internal citations and quotations omitted). Although <u>Aqua Stoli</u> did not explicitly address the "probable cause" or "reasonable grounds" standard, which would place a higher burden of proof on a plaintiff to justify an attachment, the <u>Aqua Stoli</u> Court did state that a fact-intensive inquiry is "improper because Rule B specifies the sum total of what must be shown for a valid maritime attachment" and that implies that the "probable cause" or "reasonable grounds" standard is improper insofar as it purports to go beyond this limited inquiry. <u>Tide Line Inc.</u>, 2006 U.S. Dist. LEXIS 95870 at *15 (quoting <u>Aqua Stoli</u>, 460 F.3d at 445). Using the less burdensome <u>prima facie</u> standard, Judge Wood explained that *a proper Verified Complaint is all that is required to satisfy Rule B and to prevail against a Rule E(4)(f) motion to vacate. <u>Id.</u> at \*15-16 ("Thus to show that it has a <u>prima facie</u> claim, a plaintiff seeking a maritime attachment need not provide any supporting evidence; its complaint should suffice.* Furthermore <u>Aqua Stoli</u> implies that a plaintiff is likewise not required to provide evidence showing that it has a claim against defendant, to carry its burden under Supplemental Rule E(4)(f).")(internal footnote omitted).

> Thus, maritime plaintiffs are not required to prove their cases at this stage of a Rule E(4) hearing. <u>SPL Shipping Ltd.</u>, 2007 WL 831810 at *2 (internal citation omitted). [Plaintiff] TNT submitted a Verified Complaint in which it alleged a proper admiralty claim against [defendant] FHT and fulfilled all of the other filing and service requirements of Rules B and E. Based on the <u>prima facie</u> standard approved by the Court of Appeals and employed by other district courts, TNT's maritime attachment satisfies the requirements of the admiralty rules that govern maritime attachment matters and is thus sufficient.

*Transportes Navieros Y Terrestes, S.A. de C.V. v. Fairmount Heavy Transport, N.A.*, 07 CV
3076 (LAP) (S.D.N.Y. July 6, 2007)(emphasis added). When Fuchuen Defendants' proffers of
evidence in the form of hearsay statements and unauthenticated exhibits are viewed against this
legal backdrop, it becomes clear that the majority of Fuchuen Defendant's factual allegations are
of no moment in the context of the pending motions. It is the legal sufficiency of Transfield's
Verified Complaint that matters.

Even assuming *arguendo* that Fuchuen Defendants' factual allegations were appropriate
to consider at this stage, and assuming further that Rule E(4)(f) contemplated the type of
evidentiary hearing that Fuchuen Defendants now seek, their proffers of evidence prior to the
commencement of fact discovery are inadequate in any event. This is because Fuchuen
Defendants' declarations and exhibits take the form of hearsay statements prepared by
understandably biased witnesses who remain safely tucked away in such places as Hong Kong
and Singapore, and who are presently beyond the reach of Transfield's right of cross-
examination. By way of example, the need for fact discovery and cross-examination of Mr.
Weng Changrong, the Managing Director of Zhejiang Fuchuen, is manifest given his conclusory
allegation that his company is entitled to FSIA protection. Significantly, this allegation is
directly contradicted by evidence from *inter alia* the Hong Kong Companies Registry that shows
his company to be owned by three men and not by any foreign sovereign. The Declaration of
Song Dihuang offered by Transfield makes clear that there exist genuine issues of fact, *i.e.*,
Zhejiang Fuchuen is at most a subsidiary of other state owned entities, and that Zhejiang
Fuchuen has not provided the full panoply of its relevant corporate documentation. Under these
circumstances, summary dismissal and vacatur are inappropriate.

4

## STATEMENT OF FACTS

Reference is made to Transfield's Arbitration Submission dated July 16, 2007, a copy of which is attached to the Declaration of Charles E. Murphy as Exhibit 1. Additionally, reference is made to the accompanying Declarations of Song Dihuang and Chris Howse. Finally, Transfield has reprinted below the pertinent paragraphs from its Verified Complaint. All those statements of fact are incorporated by reference.

## ARGUMENT

### POINT ONE

### TRANSFIELD HAS SATISFIED ITS BURDEN OF PROOF UNDER SUPPLEMENTAL ADMIRALTY RULES B AND E(4)(f)

Transfield has carried its burden to demonstrate that this Court's attachment order was validly issued. Under Supplemental Rule B, an order of maritime attachment must issue upon a minimal prima facie showing provided that the defendant cannot be found within the district in which the assets are sought to be attached. Supplemental Rule B provides, in relevant part:

> If a defendant is not found within the district..., a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property – up to the amount sued for – in the hands of garnishees named in the process. The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district. The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

Fed. R. Civ. P. Supp. Rule B(1). As recently summarized by the Court of Appeals for the Second Circuit:

> To begin the process, a plaintiff must file a verified complaint praying for an attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district. [Fed.R.Civ.P. Supp. Rule B(1).] If the plaintiff's filings comply with these conditions, the court must

> enter an order authorizing the attachment, which the plaintiff may then serve on
> any persons in possession of the defendant's property located within the district.
> The order of attachment may be requested and granted ex parte, though notice of
> the attachment to the defendant via appropriate service is required.  Id.  Supp.
> Rules B(2), E(3).

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 438 (2d Cir. 2006).  "The

power to grant attachments in admiralty is an inherent component of the admiralty jurisdiction

given to the federal courts under Article III of the Constitution," and its "historical purpose has

been two-fold:  first, to gain jurisdiction over an absent defendant; and second, to assure

satisfaction of a judgment."  *Id.  Accord Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 268

(2d Cir. 2002).

Furthermore, in respect of a defendant's right to challenge the validity of a maritime

attachment under Rule E(4)(f), the Second Circuit held in *Aqua Stoli* that a plaintiff need only

demonstrate that the attachment order was properly issued, *i.e.*, (1) that it has a valid *prima facie*

admiralty claim; (2) the defendant cannot be found within the district; (3) the defendant's

property may be found in the district; and (4) there is no statutory bar.  Once the plaintiff has

made such a showing, a properly issued attachment order may be vacated only if the defendant

can prove any of four limited circumstances, none of which Fuchuen Defendants have alleged or

proved in this case.  This standard, first announced by the Second Circuit last summer, was more

recently restated and followed by Chief Judge Wood in *Tide Line, Inc. v. Eastrade Commodities,*

*Inc.*, 2006 U.S. Dist. LEXIS 95870 (S.D.N.Y. 2006) where the court held:

> Furthermore, "[w]henever property is arrested or attached, any person claiming an
> interest in it shall be entitled to a prompt hearing at which the plaintiff shall be
> required to show why the arrest or attachment should not be vacated or other
> relief granted consistent with these rules."  Rule E(4)(f) of the Supplemental
> Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil
> Procedure (Supplemental Rule E(4)(f)").  The Court of Appeals for the Second
> Circuit has recently, for the first time, spoken "directly on the showing necessary
> to vacate a maritime attachment under Rule E," Aqua Stoli Shipping Ltd., 2006

6

WL 2129336, at *4, 2006 U.S. App. LEXIS 19302, at *12 -- holding that "once a plaintiff has carried his burden to show that his attachment satisfies the requirements of Supplemental Rule B, a district court may vacate an attachment only upon [certain] circumstances," which "can occur where 1) the defendant is present in a convenient adjacent jurisdiction; 2) the defendant is present in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for a judgment." *Id.,* 2006 WL 2129336, at *1, 2006 U.S. App. LEXIS 19302, at *2.

*Id.* at 8. More specifically, in *Aqua Stoli* the Court of Appeals held at greater length that while it

is a plaintiff's burden to prove that it has complied with the technical requirements of Rule B, it

is the moving party's burden to prove one of the limited equitable bases for vacatur. The Court

of Appeals held as follows:

> We therefore hold that, in addition to having to meet the filing and service requirements of Rules B and E, an attachment should issue if the plaintiff shows that 1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment. Conversely, a district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E. We believe vacatur is appropriate in other limited circumstances. While, as we have noted, the exact scope of a district court's vacatur power is not before us, we believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. n.5.

> n.5 Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rule B and E. Although Rule E does not explicitly mention a district court's equitable power to vacate an attachment or who bears such a burden, former Local Rule 12 required the defendant to establish any equitable grounds for vacatur, and we believe that defendants still bear that burden under the Supplemental Rules.

*Aqua Stoli,* 460 F.3d at 445. Former Local Rule 12, to which the Second Circuit cited in note 5

of *Aqua Stoli,* provided as follows:

> Where property is arrested or attached, any person claiming an interest in the property arrested or attached may, upon showing of any improper practice or a

> manifest want of equity on the part of the plaintiff, be entitled to an order
> requiring that plaintiff to show cause why the arrest or attachment should not be
> vacated or other relief granted, consistent with theses rules or the supplemental
> rules.

*Id.*

The Second Circuit emphasized that "Rule B specifies the sum total of what must be shown for a valid maritime attachment." *Id.* at 447. Moreover, the Second Circuit held that upon the plaintiff's showing that the attachment was properly ordered, and that it complied with the requirements of Rules B and E, the "defendant bears the burden of "establish[ing] any equitable grounds for vacatur." *Id.* at 436. As explained above, the Rule(E)(4)(f) hearing is not intended to resolve the dispute between the parties, but merely to determine if the technical requirements of the Rule were met. Thus, as long as the plaintiff establishes that it has alleged a *prima facie* maritime claim, the defendant is not present in the district, the defendant's property has been restrained in the district and no other statutory bar to the attachment exists, the attachment should be upheld. *Id.* at 444. Once a plaintiff has established the technical requirements required by Rule B, the burden then shifts to the defendant to establish the three limited bases for vacatur. *Id.*

Transfield has carried its burden to demonstrate that this Court's attachment order was validly issued because: (1) Transfield's Verified Complaint alleges a valid *prima facie* admiralty claim against the Fuchuen Defendants for breach of a charter party contract or, alternatively, for the breach of a settlement agreement, which is itself a maritime contract, *see e.g. Brown v. M.V. "GLOBAL LINK"*, 2003 U.S. Dist. LEXIS 14723 at *5; 2004 AMC 1614 (S.D.N.Y. 2003); (2) it is undisputed that Fuchuen Defendants, who are foreign companies, cannot be "found" within the Southern District of New York or any other U.S. judicial district; (3) it is undisputed that Fuchuen Defendants each have an interest the attached funds; and (4) there is no statutory bar to

8

the attachment, *i.e.*, there is insufficient evidence to conclude as a matter of law that Defendant Zhejiang Fuchuen is entitled to FSIA protection.

POINT TWO

**TRANSFIELD'S VERIFIED COMPLAINT ALLEGED A VALID**
***PRIMA FACIE* ADMIRALTY CLAIM AGAINST FUCHUEN DEFENDANTS**

Transfield's Verified Complaint alleged a valid *prima facie* admiralty claim against the Fuchuen Defendants for breach of a charter party contract or, alternatively, for the breach of a settlement of an admiralty claim, which is itself a maritime contract. In its Verified Complaint Transfield alleged, *inter alia*, the following:

6.  On or about November 28, 2003, Plaintiff and Defendant Fuchuen Dihai entered into a charter party whereby Plaintiff agreed to supply a sea going vessel to Defendant Fuchuen Dihai to carry a total volume of 170,000 metric tons of iron ore from one safe berth, one safe port at Ponta Do Ubu, Brazil to a final discharge at one or two safe berths, one safe port at Beilun, Peoples Republic of China.

7.  Defendant Fuchuen Dihai was required to pay Plaintiff $33.50 per metric ton of cargo carried on the performing vessel. Defendant Fuchuen Dihai was further required to pay demurrage, or additional hire for use of the Plaintiff's vessel in excess of the time permitted under the contract of charter, at a rate set forth in the contract depending on the gross tonnage of the performing vessel. Detention of the vessel required that Defendant Fuchuen Dihai pay Plaintiff $100,000 per day.

8.  Plaintiff nominated the M/V "Alina" to perform the carriage of the cargo contemplated by the charter party.

9.  Pursuant to the aforesaid agreement the Plaintiff employed the M/V "Alina" to perform the carriage of Defendant Fuchuen Dihai's cargo and thus vessel arrived at the discharge port of Beilun, China on March 14, 2004.

10.  Due to a shortage of storage capacity and barge availability the Defendant Fuchuen Dihai's cargo was not fully discharged from the M/V "Alina" until April 8, 2004 in breach of the agreement.

11.  Disputes arose among the parties regarding Defendant Fuchuen Dihai's failure to pay detention due and owing to Plaintiff under the agreement.

9

12.    As a result of Defendant Fuchuen Dihai's breach of the agreement, as best as may be reasonably approximated, Plaintiff sustained damages in the total principal amount of $2,475,000.00, exclusive of interest, arbitration costs and attorney's fees.

13.    Pursuant to the agreement, all disputes arising thereunder are to be submitted to arbitration in London with English Law to apply.

14.    Plaintiff commenced a prior action in this court under docket # 04 Civ. 4395 (WHP) and obtained an Ex-Parte Order of Maritime Attachment and Garnishment attachment against Defendant Fuchuen Dihai pursuant to Rule B of the Supplemental Admiralty Rules on June 17, 2004.

15.    Subsequently, the parties negotiated a compromise settlement and the action was voluntarily dismissed *without prejudice*.

16.    However, Defendant Fuchen Dihai has now denied the existence of the settlement and refused to pay the sum owed to Plaintiff under the agreement. The settlement agreement did not contain a jurisdiction clause.

17.    Despite due demand Defendant Fuchuen Dihai has failed to pay the amounts due and owing under the agreement and has failed to adhere to the terms of the settlement.

18.    In consequence of Defendant's denial of the settlement agreement, Plaintiff is in the process of recommencing the London arbitration under the November 28, 2003 charter party, pursuant to which all disputes between the parties are to be submitted to arbitration in London with English Law to apply.

*See Verified Complaint, Docket Entry #1.*  As part of its prayer for relief in its Verified

Complaint, Transfield prayed as follows:

C.    That the court enter a judgment against the Defendant(s) on the parties' settlement agreement;

D.    That in the alternative and in the event that the court determines there is no settlement agreement between the parties that the Court recognize and confirm any arbitration award or judgment rendered on the claims had herein as a Judgment of this Court.

*Id.*

Transfield agrees with Zhejiang Fuchuen's citation to *Norfolk Southern Ry v. James N.*

*Kirby, Pty Ltd.*, 543 U.S. 14, 23-24 (2004), where the Supreme Court case examined the

boundaries of admiralty jurisdiction over contracts and held "[t]he answer depends upon … the nature and character of the contract, and the true criterion is whether it has reference to maritime service or maritime transactions." *Id.* (internal quotations and citation omitted). Importantly, under *Kirby*, both the charter party and settlement agreement, if any, between Transfield and Fuchuen Dihai constitute maritime contracts over which the Court has admiralty jurisdiction pursuant to 28 U.S.C. § 1333.

There is no dispute that the court had admiralty jurisdiction over the original claim assigned to Judge Pauley. Fuchuen Defendants do not contend otherwise. Transfield dismissed that action without prejudice in anticipation of a finalized settlement. The Verified Complaint, the relevant paragraphs of which are reprinted above, alleged that Fuchuen Defendants breached a settlement and denied that any settlement existed. During the pendency of this action, however, Fuchuen Defendants have for the first time argued the existence of a settlement. Also for the first time, Fuchuen Defendants have maintained that the settlement agreement, unlike the charter party, was not a maritime contract. Fuchuen Defendants are wrong both conceptually and as a matter of law.

First, the suggestion that a defendant may divest a federal court of admiralty jurisdiction simply by agreeing to settle a maritime claim is illogical and contrary to public policy. This is especially true where the settlement effected vacatur of an attachment order. The settlement of a Rule B attachment action necessarily requires the release of any attached funds and vacatur of the attachment order. Accordingly, under Fuchuen Defendants' false logic a defendant would gain from its breach of a settlement by divesting the Court of authority to re-order the attachment.

Second, Fuchuen Defendants cannot reasonably dispute that under the law of this Circuit settlements of maritime contract cases are themselves considered maritime contracts when the settlements are between the parties to the underlying maritime contract. Judge Chin so held in *Brown v. M.V "GLOBAL LINK,"* 2003 U.S. Dist. LEXIS 14723 at *5; 2004 AMC 1614 (S.D.N.Y. 2003). The *Brown* court reasoned as follows:

> Under 28 U.S.C. § 1333, federal district courts have the power to decide "any civil case of admiralty or maritime jurisdiction." Although the "boundaries of admiralty jurisdiction over contracts … have always been difficult to draw [,]" *Atlantic Mut. Ins. Co. v. Balfour MacLaine Int'l,* 968 F.2d 196, 199 (2d Cir. 1992), a contract is considered maritime if it "relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment." *Smith v. Mitlof,* 198 F. Supp. 2d 492, 499 (S.D.N.Y. 2002) (internal quotation and citation omitted).

> The instant controversy arises under admiralty jurisdiction. The settlement agreement is a "Red Letter Release," relating to maritime employment. It is a maritime contract extinguishing plaintiff's claims against defendants for injuries sustained while employed on a maritime vessel. Hence, this Court has jurisdiction to enforce its terms.

> The cases cited by the defendants are not persuasive. Unlike *Fednav Ltd. v. Isoramar, S.A.,* 925 F.2d 599 (2d Cir. 1991), where admiralty jurisdiction was never "properly invoked because Isoramar was not a party to the underlying maritime action," here the litigants were both parties to the underlying action. Moreover, courts in the Second Circuit have exercised jurisdiction over settlement disputes in maritime cases. *See Capotorto v. Compania Sud Americana de Vapores,* 541 F.2d 985 (2d Cir. 1976); *Sagastume v. Lampsis Nav. Ltd., Drosa,* 579 F.2d 222 (2d Cir. 1978).

> For the foregoing reasons, I hold that this Court has jurisdiction to decide the parties' settlement dispute.

*Brown v. M.V "GLOBAL LINK,"* 2003 U.S. Dist. LEXIS 14723 at *5. That *Brown* involved the settlement of a seaman's claim instead of the settlement of a charter party claim is a distinction without a difference. This is because the relevant inquiry is whether the settlement extinguished plaintiff's claims against the defendant for damages sustained from the breach of any sort of maritime contract, whether it be for a vessel charter, maritime employment or for other maritime

services. Furthermore, the Fuchuen Defendants' reliance upon *Fednav, Ltd. v. Isoramar*, 925

F.2d 599 (2d Cir. 1991) is misplaced for the identical reason explained by Judge Chin in *Brown*.

As in *Brown*, in this case *Fednav* is distinguishable because *Fednav* involved the situation where

a third party had agreed to contribute, as a surety, to the settlement of a maritime claim between

parties to a maritime contract. That is, in *Fednav* a third party, who was not a party to the

maritime contract, had merely agreed to pay damages for another's breach of a maritime charter.

As such, *Fednav* is distinguishable.

Third, unlike *Fednav* and unlike Fuchuen Defendants' reliance on the Pennsylvania case

of *Westvaco Worldwide Corp. v. M/V NIGER BASIN*, 1989 U.S. Dist. LEXIS 5323 (E.D.Pa.

1989) and *United Philippine Lines v. Metalrussia Corp.*, 1997 U.S. Dist. LEXIS 5616 (S.D.N.Y.

1997), Transfield's settlement proposals in this case specifically contemplated ongoing maritime

transactions with Fuchuen Dihai. Stated differently, the proposed settlement did not provide for

the payment of monies but, instead, contemplated that Transfield would be made whole through

additional maritime contractual business with Fuchuen Dihai.

Specifically, Transfield's settlement proposal dated February 23, 2005 read, in part, that

"Fuchuen Dihai Company agrees to continue to maintain the business relations between both

parties as usual, and on the principles of equality and priority, it would give Transfield ER the

final right of first refusal on chartering in any subsequent negotiations on spot and long-term

marine carriage contracts." Similarly, Transfield's settlement proposal of April 28, 2005 read, in

part, that "Fuchuen will…give priority to consider Transfield ER's rates for chartering vessels

and give the last opportunity in future maritime transport negotiations." *See Transfield's*

*Arbitration Submission dated July 16, 2007 attached to Murphy Declaration as Exhibit 1.* Thus,

even assuming the existence of a settlement, that agreement was a maritime contract over which

this Court has jurisdiction, *i.e.*, the subject matter of the settlement, if any, related directly to maritime services, commerce on navigable waters, and transportation by sea. Consequently, Transfield has alleged a valid maritime claim for either breach of the charter party or breach of settlement. In sum, whether Transfield's claims as alleged in the Verified Complaint are viewed as a straightforward breach of charter party claim, or as a breach of a maritime claim settlement, they constitute *prima facie* valid maritime claims.

## POINT THREE

### DEFENDANT ZHEJIANG FUCHUEN IS NOT ENTITLED TO THE PROTECTIONS OF THE U.S. FOREIGN SOVEREIGN IMMUNITIES ACT

Zhejiang Fuchuen Co. Ltd. asserts that the attachment of its assets in this action should be vacated because, it claims, it is "***wholly owned***" by a Province of The People's Republic of China," and thus entitled to the protections of the U.S. Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq. See Zhejiang Memo of Law at 31*. Zhejiang Fuchuen is not entitled to immunity, however, because (a) it is not itself a foreign sovereign; (b) it is not itself an agency or instrumentality of a foreign sovereign; and (c) it is not directly owned by a foreign sovereign or agency or instrumentality of a foreign sovereign. Rather, the confusing and desultory evidence submitted by Zhejiang Fuchuen at most suggests that it may be owned by other entities, which in turn may be owned by agencies or instrumentalities of provincial governments within the People's Republic of China.

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) is the starting point for analyzing sovereign immunity issues under the FSIA in cases involving a party alleged to be indirectly owned by a foreign sovereign.[1] In *Dole,* the Supreme Court held:

---

[1]        Interestingly, Zhejiang Fuchuen cites *Dole*, but for an entirely different proposition, *i.e.* "instrumentality status for the purpose of the immunity exception of § 1603(b) . . . is defined at the time suit is filed." *Zhejiang Memo of Law at 33*. Zhejiang Fuchuen's reference to the timing issue suggests that it is concerned that perhaps at

The Dead Sea Companies say that the State of Israel exercised considerable
control over their operations, notwithstanding Israel's indirect relationship to
those companies. They appear to think that, in determining instrumentality
status under the Act, control may be substituted for an ownership interest.
**Control and ownership, however, are distinct concepts**. See, *e.g.*, *United
States* v. *Bestfoods*, 524 U.S. 51, 64-65, 141 L. Ed. 2d 43, 118 S. Ct. 1876
(1998) (distinguishing between "operation" and "ownership" of a subsidiary'
assets for purposes of Comprehensive Environmental Response, Compensation,
and Liability Act of 1980 liability). The terms of § 1603(b)(2) are explicit and
straightforward. **Majority ownership by a foreign state, not control, is the
benchmark of instrumentality status**. We need not delve into Israeli law or
examine the extent of Israel's involvement in the Dead Sea Companies' rations.
Even if Israel exerted the control the Dead Sea Companies describe, that would
not give Israel a "majority of [the companies' shares or other ownership
interest." The statutory language will not support a control test that mandates
inquiry in every case into the past details of a foreign nation's relation to a
corporate entity in which it does not own a majority of the shares. The better
rule is the one supported by the statutory text and elementary principles of
corporate law. A corporation is an instrumentality of a foreign state under the
FSIA only if the foreign state itself owns a majority of the corporation's shares.

*Dole*, 538 U.S. at 477. The situation with regard to Zhejiang Fuchuen is identical to that of the

"Dead Sea" companies involved in *Dole*. Zhejiang Fuchuen has introduced absolutely no

evidence to establish that the People's Republic of China or the Zhejiang Provincial Government

directly own Zhejiang Fuchuen. Thus, regardless of the level of control that either of those

government bodies may exercise over Zhejiang Fuchuen, if any, it is not entitled to immunity

regardless of the authorities upon which it relies, every last one of which pre-date the Supreme

Court's decision in *Dole*.

The Second Circuit Court of Appeals has ascribed to the *Dole* holding. In *Filler v.*

*Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004), the court held read *Dole* as holding that based "on the

elementary principle of corporate law that corporations are distinct from their shareholders to

---

the time the dispute arose between the parties it was a non-governmental entity. Nonetheless, as set forth in detail
herein and in the accompanying declarations of Song Dihuang and Christopher Howse, Zhejiang Fuchuen is not
directly owned by any governmental entity and, thus, timing issues are irrelevant.

conclude that 'only direct ownership of a majority of shares by the foreign state satisfied the statutory requirement' of majority ownership." *Filler*, 378 F.3d at 218.

Transfield relies on the Declaration of Song Dihuang, its Chinese legal expert, to refute Zhejiang Fuchuen's claim of sovereign immunity. As Mr. Song indicates, Chinese corporate legal concepts are somewhat different from those employed in the United States. For example, he states that there is no official definition of "state owned enterprise" under the laws of the People's Republic of China ("PRC"). *Song Decl.¶ 12.* Nonetheless, he indicates that it is generally accepted that a state owned enterprise is one that: (1) is "registered under Company Law of PRC"; or (2) "any non-corporate enterprise which 'is owned by the whole people' which is registered under the Law on Industrial Enterprises owned by the Whole People of PRC ("EWP") and/or other laws." *Id.*

Against the foregoing legal background, Mr. Song reviewed the evidence submitted by Zhejiang Fuchuen with the Declaration of Mr. Weng Changrong submitted by Zhejiang Fuchuen. Mr. Song makes clear that contrary to Mr. Weng's suggestion,
Zhejiang Fuchuen's own documents indicate that as opposed to direct investment in Zhejiang Fuchuen, the Bureau of Finance of Zhejiang Province made at least an $8.65 million "long term loan" to Zhejiang Fuchuen. *Song Decl. ¶ 19(a).*

Likewise, Mr. Song indicates that a crucial document submitted by Zhejiang Fuchuen, as Exhibit "D" to Mr. Weng's Declaration is entitled, in Chinese, an
"Agreement of Fu Chun Co. Ltd," which indicates that Zhejiang Fuchuen is a joint-venture established by various capital contributors. *Song Decl. ¶ 19(c).* Although Zhejiang Fuchuen has refused to produce the entirety of this document *(see July 13. 2007 letter submitted by Zhejiang Fuchuen counsel to the Court attached hereto as Exhibit "1"),* Mr. Song verifies that this

"Agreement" as a matter of PRC law means that Zhejiang Fuchuen is not directly owned by Zhejiang Provincial Government and it very likely means that the beneficial shareholders of Zhejiang Fuchuen are different enterprises which may be enterprises "owned by the whole people, or subsidiaries of such companies." *Song Decl. ¶ 19(c).* In Zhejiang Fuchuen counsel's July 13, 2007 letter to the Court, Zhejiang Fuchuen attempted to distance itself from the "Agreement." However, as Mr. Song makes clear, this document indicates that Zhejiang Fuchuen (and/or its predecessor, Fu Chun, was established as a joint venture by various investors, not solely by any government entity as Zhejiang Fuchuen wrongly claims.

According to Mr. Song, further evidence that Zhejiang Fuchuen is not directly owned by any governmental body is found at Exhibit B of Mr. Weng's Declaration, which is a document entitled "Approval Reply: Regarding Approval for Establishing Fu Chun Company as a Foreign Trade Agency Based in Hong Kong." *See Weng Decl. Exh. "B."* Mr. Song highlights the fact that the document provides that "it is necessary for all foreign trade enterprises in our province to jointly re-establish a Hong Kong-based foreign trade agency," which he posits suggests that Zhejiang Fuchuen was indeed set up by a number of foreign trade enterprises of Zhejiang Province, which was approved by the Zhejiang Provincial Government. *Song Decl. ¶ 19(d).*

Exhibit "B" further contains a document entitled Approval Notice of Agreement of Fu Chun Co. Ltd. by the Zhejiang Provincial Government." This document further indicates that subject to approval by the Hong Kong and Macao Affairs Office, Zhejiang Fuchuen may, as scheduled and dominated, arrange for those capital contributors to select personnel to work in the Company (i.e. Zhejiang Fuchuen). Therefore, it seems that the management staff is not directly appointed by the Zhejiang Provincial Government, as Mr. Weng claims. He goes on to highlight that this same Exhibit "B" to Mr. Weng's Declaration includes a document entitled "Approval

Notice of Agreement of Fu Chun Co. Ltd. by the Zhejiang Provincial Government." Mr. Song

explains that this document further indicates that subject to approval by the Hong Kong and

Macao Affairs Office, Zhejiang Fuchuen may, arrange for its capital contributors to select

personnel to work in the Company (*i.e.* Zhejiang Fuchuen). Mr. Song opines that Zhejiang

Fuchuen's own document suggests that, contrary to Mr. Weng's claims, the management staff of

Zhejiang Fuchuen is not directly appointed by the Zhejiang Provincial Government. *Song Decl.*

¶ *19(d)*.

Even more illustrative of the obscure nature of Zhejiang Fuchuen's ownership is the

apparent fact that as from November 1999 the Hangzhou Iron and Steel Company took over the

operations of Zhejiang Fuchuen in Hong Kong. *Song Decl.* ¶ *20.*

Finally, there is the matter of Zhejiang Fuchuen's own corporate registry documentation

on file in Hong Kong (as contradistinguished from the PRC), and a matter of public record.

According to Mr. Song, there is no indication in those records that Zhejiang Fuchuen is a "state-

owned enterprise." *Song Decl.* ¶ *21, Howse Decl.* ¶ *2, Exh. 2.* Rather, these records show that

its shares are held by individuals, with no reference to ownership by any governmental entity and

not in accordance with any arrangement indicating indirect governmental ownership (which in

any case would be entirely insufficient to entitle Zhejiang Fuchuen to sovereign immunity under

*Dole* and *Filler, supra.*.

Mr. Song concludes his Declaration by providing his opinion that "the available

documentary evidence has strongly suggested that Zhejiang Fuchuen is NOT a company directly

owned by the state or Zhejiang Provincial People's Government. It appears that it is a subsidiary

or joint venture owned by a few EWPs, in other words several tiers removed from the Zhejiang

Provincial People's Government and even further removed from the PRC." *Song Decl.* ¶ *22.*

In sum, Zhejiang Fuchuen's own submission of evidence fails to establish, even as a *prima facie* matter, that it is a either a "foreign state" or a corporation "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof" under 28 U.S.C. § 1603(b). Moreover, as the accompanying Declarations of Song Dihuang and Christopher Howse establish, the ownership interest, if any, the Zhejiang Provincial and PRC governments may have in Zhejiang Fuchuen is indirect and tiered. Thus, under *Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) and *Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004), Zhejiang Fuchuen is not entitled to immunity under the FSIA and, accordingly, the attachment of its property in this action should not be vacated on this (or any other) basis.

**POINT FOUR**

**AS ALL OTHER REQUIREMENTS OF RULE B ARE SATISFIED, TRANSFIELD NEED ONLY ALLEGE A *PRIMA FACIE* VALID ALTER-EGO CLAIM TO SUSTAIN THE ATTACHMENT**

In a Rule B case, if all other requirements are satisfied a plaintiff must only allege the nature of its alter-ego claim, particularly whether its claim is based on domination and control or fraud, to successfully sustain the attachment. Applying the corporate law of New York, the Second Circuit has identified several factors that can be considered when alter-ego status has been pleaded, to wit: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity; and (10) intermingling

of property between the entities. *See MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001).

 *Aqua Stoli* rejected the prior "probable cause/reasonable basis standard" that certain district courts previously applied. As confirmed by Chief Judge Wood in *Tide Line, Inc. v. Eastrade Commodities, Inc.*, 2006 U.S. Dist. LEXIS 95870 (S.D.N.Y. 2006), and Judge Castel in *Route Holding, Inc. v. Int'l Oil Overseas, Inc.*, No. 06-3428 (S.D.N.Y. Sept. 29, 2006)(copy attached to Murphy Declaration as Exhibit 2), a plaintiff no longer needs to show that it had "reasonable grounds" or "probable cause" to make alter-ego claims against a defendant to maintain the attachment. Rather, at the Rule E(4)(f) hearing a plaintiff must only show that its Verified Complaint has alleged a *prima facie* valid maritime alter-ego claim to satisfy Rule B. Both the *Tide Line* and *Route Holding* cases are instructive on this point and are briefly summarized below.

 In *Tide Line* the plaintiff obtained a Rule B order of maritime attachment and garnishment against both Eastrade Commodities Inc. as the named entity in the charter party, and Transclear S.A. as its alter-ego. Transclear moved to vacate the attachment claiming that it was not an alter-ego of Eastrade. Tide Line then produced evidence that Transclear occasionally paid Eastrade's debts where it had no connection to the underlying contract. Transclear then claimed that is had a legal basis upon which to make the payments on Eastrade's behalf.

 Judge Wood found the factual arguments irrelevant for the purposes of the motion to vacate the attachment of the alter-ego's property. Particularly, she found that in light of *Aqua Stoli*, the district court's inquiry into plaintiff's veil piercing allegations was extremely limited. She reasoned that when applying for a Rule B attachment, a plaintiff need not provide any supporting evidence because its complaint should suffice. In keeping with this principle, she

held that *Aqua Stoli* implies that a plaintiff is not required to provide evidence to carry its burden at the post-attachment hearing.

Judge Wood noted that in seeking to have an attachment vacated, a defendant may argue that a plaintiff does not have a valid prima facie admiralty claim against the defendant. However, she elaborated further that such a challenge must be based on insufficiency of pleading. "It does not appear that the basis of defendant's argument may be that plaintiff has not provided sufficient evidence of such a claim." *Tide Line*, 2006 U.S. Dist. LEXIS at \*22. Thus, the only way for a defendant to show that a plaintiff does not have a maritime claim against an alter-ego is to prove that the pleadings themselves are insufficient to state such a claim.

In *Route Holding*, following the *Tide Line* precedent the district court limited its analysis to determining whether the plaintiffs, Route Holding and Beam Company, had sufficiently pled their alter-ego claims against Marina World Shipping ("MWS"). The plaintiffs had alleged that MWS was an alter-ego because it dominated and controlled the principal, IOOI. The district court found that the pleadings were sufficient to uphold the attachment, and found that "the plaintiff alleges that MWS is the alter-ego of IOOI, but it does not simply leave it as a conclusory allegation. It goes on to allege that the reason it believes it is the alter-ego is because IOOI dominates an disregards MWS' corporate form to the extent that MWS is actually carrying on IOOI's business and operations as if the same were its own. It further goes on to allege that MWS, acting as paying agent, acts a paying agent or arranges for other nonparties to satisfy the debts and obligations of IOOI. It seems to me a sufficient allegation." *See Route Holding, Inc. v. Int'l Oil Overseas, Inc.*, No. 06-3428 (S.D.N.Y. Sept. 29, 2006). Thus, in light of the decisions in *Aqua Stoli, Tide Line*, and *Route Holding*, the current state of the law in this Circuit

is that a plaintiff need only allege a *prima facie* maritime claim against the principal defendant and a *prima facie* alter-ego claim against the alleged alter-ego entity to satisfy its burden.

Similarly, Judge Hellerstein denied a near identical alter-ego challenge raised by defendant Zhejiang Fuchuen's counsel herein in regards to a maritime attachment action in *Secil Maritima U.E.E. v. Malev Shipping Co. Ltd.*, No. 06-6345 (S.D.N.Y. Oct. 10, 2006 hearing transcript)(copy attached to Murphy Declaration as Exhibit 3). In *Secil Maritima* the court denied defendants' motion to vacate an attachment under Rule B based on the relaxed post-*Aqua Stoli* standard.

Additionally, in *SPL Shipping Ltd. v. Gujarat Cheminex Ltd.*, No. 06-15375, 2007 U.S. Dist. LEXIS 18562 (S.D.N.Y. March 15, 2007), Judge Karas recently summarized the standard for pleading alter-ego in the context of Rule B attachment actions. The court sustained a maritime attachment against an alter ego defendant where the Verified Complaint had alleged that: (1) one defendant made payments on behalf of the other; (2) there existed such unity of ownership and interest that no separation existed between them and such that the corporate form had been disregarded; and (3) that one dominated and controlled the other. Consistent with *Aqua Stoli, Tide Line, Route Holding,* and *Secil Maritima,* the *SPL Shipping Ltd.* court properly looked to the Verified Complaint to determine that plaintiff had properly pleaded an alter-ego claim. The *SPL Shipping* court held that "this Court will look only to Plaintiff's pleadings, and not to any evidence submitted by the Parties, to determine whether Plaintiff has made a legally sufficient claim for piercing the corporate veil." *SPL Shipping Ltd.*, 2007 U.S. Dist. LEXIS at *10. Judge Karas reasoned as follows:

> The next question the Court must consider is whether Plaintiff's alter-ego allegations against Nirma state a prima facie admiralty claim. The Court holds that Plaintiff has stated a valid claim against Defendant. Plaintiff has essentially made three allegations against Nirma: first, that Nirma has in this case, and in

other cases, made payments on behalf of Gujarat to third parties (Verified Compl. P27); second, that "there existed such unity of ownership and interest . . . that no separation exists between" Nirma and Gujarat, such that the "corporate form has been disregarded" (id. P25); and third, that Nirma has "dominated and used" Gujarat "for their [sic] own purposes such that there us no meaningful difference between the three entities and there has been an intermingling of funds between the several entities" (id. P28). Both factors are found among the list of factors a court may consider when alter ego status has been pled, *see MAG Portfolio*, 268 F.3d at 63, and are sufficient to state a valid admiralty claim.

*SPL Shipping Ltd.*, 2007 U.S. Dist. LEXIS 18562 at *11.

In the case at hand, Transfield has adequately alleged an alter-ego claim against Zhejiang

Fuchuen. Particularly, Transfield made the following alter-ego allegations in its Verified

Complaint:

20.    Zhejiang Fucheun is the alter-ego of Fuchuen Dihai because it dominates and disregards Fuchuen Dihai's corporate form to the extent that Zhejiang Fucheun is actually carrying on Fuchuen Dihai's business and operations as if the same were its own, or vice versa.

21.    Upon information and belief, Fuchuen Dihai has no separate identity from Zhejiang Fuchuen.

22.    Defendants have the exact same address: United Centre 35th Floor, Room B, 95 Queensway Admiral, Hong Kong.

23.    Upon information and belief, Fuchuen Dihai uses Zhejiang Fuchuen as a "paying agent" or "pass through" entity such that it can insulate itself from creditors relating to its contracts.

24.    It is not general practice in the maritime community, nor any where else, for independent companies to make large payments on behalf of other independent companies.

25.    Payments sent or received on behalf of another independent company are suggestive of a relationship that is not "arms length."

26.    Upon information and belief, Zhejiang Fuchuen makes payments on Fuchuen Dihai's behalf where Zhejiang Fuchuen has absolutely no contractual obligation to Fuchuen Dihai's creditors.

27.    Upon information and belief, Zhejiang Fuchuen made a payment on Fuchuen Dihai's behalf with regards to the above agreement on May 18, 2004 in the amount of S284,192.56.

28.    In the further alternative, Defendants are partners and/or joint venturers.

29.    In the further alternative, Defendants are affiliated companies such that Zhejiang Fuchuen is now, or will soon be, holding assets belonging to Fuchuen Dihai, or vice versa.

30.    In the alternative, "FUCHUEN DIHAI" is an alias of "ZHEJIANG FUCHUEN."

*See Verified Complaint, Docket Entry #1.*

Transfield has properly alleged the basis of its alter-ego claim, *i.e.* domination and control, but also it has set forth facts upon which its claim is based. In *Route Holding, supra,* Judge Castel found that allegations with less detail than those listed above satisfied the plaintiff's burden to allege a claim sufficient to withstand a challenge such as the one Defendants make here. In addition to the pleadings, Transfield has provided extrinsic evidence in the accompanying Declaration of Chris Howse to support its alter-ego allegations, despite the fact that it was not required to do so at this early stage of the case. *Aqua Stoli* held that it is inappropriate for a court to conduct a fact-intensive inquiry regarding the specifics of a plaintiff's claim at a post-attachment hearing. This means that the Rule E(4)(f) does not afford a defendant the opportunity to challenge the sufficiency of plaintiff's evidence. A defendant may, if it wishes, raise such issues by way of a Rule 12(b)(6) motion to dismiss or Rule 56 motion for summary judgment but it may not do so in the context of an emergency hearing pursuant to Supplemental Rule E(4)(f). *See, e.g., Maersk, Inc. v. Neewra, Inc.,* 2006 U.S. Dist. LEXIS 53395 (S.D.N.Y. 2006) (refusing to apply the higher pleading standard used in a motion to dismiss in a post-attachment hearing "lest Rule 12(b)(6) be completely subsumed by

Supplemental Rule E(4)(f)"). Thus, the limited question presented to the Court is, "has

Transfield adequately pled a *prima facie* alter-ego claim?" The answer is an unqualified yes.

## POINT FIVE

### THAT THE PARTIES MAY BE PRESENT IN THE SAME FOREIGN COUNTRY IS IRRELEVANT TO THE *AQUA STOLI* ANALYSIS BECAUSE THE SECOND CIRCUIT SPOKE OF U.S. FEDERAL JUDICIAL DISTRICTS WHEN IT HELD THAT VACATUR IS APPROPRIATE WHEN PARTIES ARE PRESENT IN THE SAME "DISTRICT"

Regrettably, the Fuchuen Defendants devote entire sections of their memoranda to a

tortured argument premised upon definitions of the words "district" and "jurisdiction" that are

different from the definitions employed by the Second Circuit in *Aqua Stoli*. As such, their

argument is based on the logical fallacy of equivocation and, therefore, entitled to no weight. In

*Aqua Stoli*, the Second Circuit held *inter alia* that once a plaintiff had carried its burden to show

that the attachment satisfied the requirements of Supplemental Rule B, a district court could

vacate only if one of the following three bases for vacatur could be established by the Defendant:

(1) the defendant is present *in a convenient adjacent jurisdiction to the district* where the

attachment proceedings have been filed; (2) defendant is present in the *district* where plaintiff is

located; or (3) plaintiff has already obtained sufficient security. *See Aqua Stoli, supra* (emphasis

added). Here, Fuchuen Defendants put forth no evidence to establish any of these factors. Even

a cursory review of *Aqua Stoli* reveals that the entire discussion of "districts" and "jurisdictions"

was in the context of "across the river cases." For example, the *Aqua Stoli* Court cited with

approval then-district Judge Leval's holding in *Integrated Container Serv. Inc. v. Starlines

Container Shipping, Ltd.*, 476 F.Supp. 119 (S.D.N.Y. 1979). Specifically, the discussion of

"district" and "jurisdiction" was in the context of explaining that a defendant who is found in the

Southern District of New York cannot have its property attached "across the river" in the Eastern

District of New York and *vice versa*. As such, the Fuchuen Defendants' contention that Hong

Kong constitutes a "district" or "jurisdiction" for the purposes of an *Aqua Stoli* analysis requires this Court to accept improper definitions of the words "district" and "jurisdiction." *Aqua Stoli* provided that a Supplemental Rule B attachment may be vacated upon a showing by the defendant that "… the plaintiff could obtain *in personam* jurisdiction in the district where the plaintiff is located …" *Aqua Stoli*, at 460 F.3d at 445. This aspect of the *Aqua Stoli* analysis, which is centered on the Rule B plaintiff's location within the Unites States, does not concern itself with where the defendant is located elsewhere around the globe.

First, the *Aqua Stoli* court did not come to its conclusion about prohibiting attachments when both parties are located in the same judicial district in a vacuum. Rather, the Second Circuit carefully considered Rule B precedent and, in particular, the fact that for a long period of time, prior to the creation of Supplemental Rule E(4)(f), the only viable ground upon which to challenge a Rule B attachment was to show to the court that the attachment should not have issued because the defendants could be found in the district. Starting with consideration of *Antco Shipping v. Yukon Compania Naviera, S.A.*, 318 F. Supp. 626 (S.D.N.Y. 1970), the *Aqua Stoli* court reviewed how courts presented with motions to vacate Rule B attachments analyzed a defendant's purported presence within the district. Following *the Antco Shipping* case the court then cited to nine additional cases in which "presence in the district" analysis was the stated basis for consideration of motion to vacate. A review of all the cases cited by the *Aqua Stoli* court fails to identify a single case in which the defendant obtained vacatur of the attachment by showing it was present in the same foreign jurisdiction as the plaintiff.

The following language from *Aqua Stoli* is particularly relevant.

> If Gardner Smith's assets are presently located in the Southern District and Gardner Smith cannot be "found" within the district, Aqua Stoli is entitled under Rule B to attach those assets in aid of jurisdiction and to serve as security… ***Federal admiralty law allows a plaintiff to seize assets and bring suit wherever***

*such assets may be found precisely because, while other assets may be available, plaintiffs may encounter difficulties in tracking them down. Should it wish, Gardner Smith has the option of relieving itself of this particular attachment by posting other security. Rule E does not require Aqua Stoli to go to Australia or any other country to sue Gardner Smith or to obtain security as long as Gardner Smith's assets are available to Aqua Stoli here.*

\* \* \*

It does not follow, however, that district courts are without any equitable discretion to vacate maritime attachments that comply with Rule B. *Following Integrated and the other pre-Rule E(4)(f) cases, we believe that an attachment may be vacated only in certain limited circumstances. Although the precise boundaries of a district court's vacatur power are not before us, we are persuaded that vacatur may be warranted when the defendant can show that it would be subject to in personam jurisdiction in another jurisdiction convenient to the plaintiff. See Integrated, 476 F. Supp. at 124*; cf. Det Bergenske Dampskibsselskab v. Sabre Shipping Corp., 341 F.2d 50, 52-53 (2d Cir. 1965) (discussing, but not resting on, the district court's vacatur of an attachment issued in the Eastern District because the defendant was present in the Southern District). *The concept of "convenience," however, is a narrowly circumscribed one: A district court may vacate a maritime attachment only if the defendant would be subject to an in personam lawsuit in a jurisdiction adjacent to the one in which the attachment proceedings were brought. An "across the river" case where, for example, assets are attached in the Eastern District but the defendant is located in the Southern District is a paradigmatic example of a case where an attachment should be vacated. It is less clear to us that a district court could vacate an attachment on convenience grounds where the adjacent district is more remote and therefore less obviously "convenient" to the plaintiff. A maritime attachment would likewise be properly vacated if the plaintiff and defendant are both present in the same district and would be subject to jurisdiction there, but the plaintiff goes to another district to attach the defendant's assets...*

\* \* \*

While, as we have noted, the exact scope of a district court's vacatur power is not before us, we believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a *convenient adjacent jurisdiction*; 2) the plaintiff could obtain in personam jurisdiction over the defendant *in the district where the plaintiff is located*; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

*Aqua Stoli Shipping Ltd.*, 460 F.3d at 444 (emphasis added).

Based on the foregoing unambiguous directive by the Second Circuit, the Fuchuen

Defendants cannot assign new meanings to the terms "district" and "jurisdiction" when the

Second Circuit specifically employed those terms to describe U.S. federal judicial districts. In

this regard, the Fuchuen Defendants' suggestion that the parties are located in the same "district"

of Hong Kong is a red herring. Notwithstanding the foregoing, their contention does beg the

academically interesting, albeit irrelevant, question: does the island of Hong Kong even

constitute a single jurisdiction or district under the Chinese judicial system and, if so, how many

adjacent Chinese jurisdictions or districts might there be? To answer such a question would

require the very sort of fact-intensive inquiry prohibited by *Aqua Stoli*. In any event, as set forth

above the premise of the argument is fallacious.

In respect of the above-quoted language by the Second Circuit, *i.e.,* that "[t]he concept of

'convenience,' however, is a narrowly circumscribed one," Transfield respectfully suggests that

it was Judge Stein in *Aifos Trade SA v. Midgulf Int'l Ltd.*, 06-203 (S.D.N.Y. May 1, 2006)(copy

attached to Murphy Declaration as Exhibit 4) and not Judge Sweet in *OGI Oceangate*

*Transportation Co. Ltd. v. RP Logistics Pvt. Ltd.*, 06-9441 (S.D.N.Y. June 21, 2007)(order under

reconsideration), who correctly analyzed the concept of "convenience" in the Rule B setting.

Judge Stein's *Aifos Trade* holding is entirely consistent with *Aqua Stoli* and reads as follows:

> Defendant also asserts that the case should be dismissed and the attachment
> vacated on the ground of forum non conveniens. However, Rule B contemplates
> a measure of inconvenience for the defendant. See Linea Bavira De Cabotaje,
> C.A. v. Mar Caribe De Navegacion, C.A., 169 F. Supp. 2d 1341, 1352-1353
> (M.D. Fla 2001)("the very nature of Rule B assumes that the defendant cannot be
> found in the district...Supplemental Rule B is premised upon and exists only if it
> is inconvenient. If complaints of inconvenience could remove an action from this
> forum, then the Rule would be rendered hollow.") The only case relied upon by
> the defendant, SMT Shipmanagement & Transport Ltd. v. Maritima Ordaz C.A.,
> et al., Nos. 00 Civ. 5789, 00 Civ 6352, 01 Civ. 0013, 2001 WL 930837 (S.D.N.Y.
> Aug. 15, 2001), is inapposite because the district court ruled on the question of
> forum non conveniens in that case not on an expedited motion to vacate the

attachment, as is the state of affairs here, but rather on the basis of motions to dismiss and for summary judgment.

*Aifos Trade SA v. Midgulf Int'l Ltd.*, 06-203 (S.D.N.Y. May 1, 2006). Based on the foregoing, the attachment should be sustained where none of the parties can be found in the Southern District of New York, Eastern District of New York, Northern District of New York, District of New Jersey or District of Connecticut, which would be the only arguably "convenient adjacent districts" under *Aqua Stoli*.

## POINT SIX

### UNDER THE SECOND CIRCUIT COURT OF APPEALS' DECISIONS IN *WINTER STORM* AND *AQUA STOLI*, EFTs TO OR FROM A DEFENDANT ARE ATTACHABLE AS THEY PASS THROUGH BANKS IN THE DISTRICT

The EFTs attached by Transfield at intermediary banks in New York, which were either to of from the Fuchuen Defendants, constitute attachable property under two decisions by the United States Court of Appeals for the Second Circuit, *i.e.*, *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006) and *Winter Storm Shipping, Ltd. v. TPI*, 310 F. 3d 263 (2d Cir. 2002). These holdings stand for the propositions that debts owed to a defendant are attachable and that EFTs sent to or from a defendant constitute attachable property as they pass through banks located in that court's jurisdiction. "Under the law of this circuit, EFTs to or from a party are attachable by a court as they pass through banks located in that court's jurisdiction." *Aqua Stoli Shipping Ltd.*, 460 F.3d at 436 (*citing Winter Storm Shipping, Ltd.*, 310 F.3d at 263).

Recently, Judge Hellerstein's eloquent holding in *Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.*, 485 F. Supp. 2d 399 (S.D.N.Y. 2007) confirmed that *Winter Storm* is controlling and confirmed that electronic fund transfers through intermediary banks are subject to maritime attachments. Judge Hellerstein held as follows:

In *Seamar Shipping*, the district court ruled that it did not have to follow *Winter Storm* with regard to an attachment of an EFT passing through an intermediary bank in New York for ultimate credit to a foreign defendant. United States District Judge Jed S. Rakoff considered that the footnote dictum in *Aqua Stoli* narrowed Winter Storm to its facts, and cited both cases for the proposition that 'state law may be borrowed if there is no federal admiralty law on point on the particular question presented." *Seamar Shipping*, 461 F. Supp. 2d at 225. Having determined that *Winter Storm* was not on point, Judge Rakoff turned to New York law and, relying on the Official Comment to N.Y. U.C.C. § 4-A-502, held that "until the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary, the beneficiary has no property interest in the funds transfer which the beneficiary's creditor can reach." *See id.* at 226 (quoting N.Y. U.C.C. § 4-A-502 cmt. 4).

This deference to the policy interests of the State of New York, in my opinion, is misplaced, for it contradicts the historic purposes of maritime law, and the clear authority of *Winter Storm*. Maritime law deals with transitory items; "[t]hus, the traditional policy underlying maritime attachment has been to permit the attachments of assets wherever they can be found and not to require the plaintiff to scour the globe to find a proper forum for suit or property of the defendant sufficient to satisfy a judgment." *Aqua Stoli*, 460 F.3d at 443. As long as maritime interests find it suitable to settle transactions in United States dollars, and as long as banks in New York provide the clearances for such payments, there will be a flow of those dollars through the New York banks. The federal interest in maintaining the "proper harmony and uniformity" of maritime law must prevail, and any contradictory interest of New York law should not be followed. *See Winter Storm*, 310 F.3d at 279-80 (*quoting American Dredging Co. v. Miller*, 510 U.S. 443, 446-47, 114 S. Ct. 981, 127 L. Ed. 2d 285 (1994)); *Noble Shipping, Inc. v. Euro-Maritime Chartering Ltd.*, No. 03 Civ. 6039, 2003 U.S. Dist. LEXIS 23008 at *10 (S.D.N.Y. 2003); *see also Palestine Monetary Auth. v. Strachman*, 2005 N.Y. Misc. LEXIS 3517 at *34 n.13 (N.Y. Sup. Ct. 2005) (observing that under *Winter Storm*, admiralty law preempts Article 4-A); N.Y. U.C.C. § 4-A-107 cmt. 3 (raising possibility of preemption by Federal Reserve Board regulations).

Even if *Winter Storm* did not resolve this issue--and a growing consensus asserts that *Winter Storm* resolved the issue and remains controlling, *see Compania Sudamericana de Vapores S.A. v. Sinochem Tianjin Co.*, 2007 U.S. Dist. LEXIS 24737 (S.D.N.Y. Apr. 4, 2007) (collecting recent cases)--I would not necessarily follow N.Y. U.C.C. § 4-A-502. The drafters of the Uniform Commercial Code, taking a policy position that favors an uninterrupted flow of EFTs, provided that creditors' levies should be honored only at the originating and receiving banks, and stated in a Comment that an EFT in the hands of an intermediary bank is not a "property interest" that the "beneficiary's creditor can reach." N.Y. U.C.C. § 4-A-502 cmt. 4. But clearly it is property, for the money belongs to someone, either the originator of the funds transfer, or the beneficiary, directly or through their banks. The statement of the drafters is a statement of state legislative policy, not

an analysis to declare, or negate, property rights. Indeed, the policy position
adopted by the drafters departs from common law understanding of property, for
certainly the funds, in temporary possession of the intermediary bank, are subject
to rights of another "to possess, use, and enjoy" those funds. BLACK'S LAW
DICTIONARY 1232 (7th ed. 1999). The bank's obligation to comply with
instructions it receives from originating and beneficiary banks is contractual, and
a contract expectancy constitutes a property interest so long as it is not contingent
on future events. *See Supreme Merchandise Co. v. Chemical Bank*, 70 N.Y.2d
344, 350, 514 N.E.2d 1358, 520 N.Y.S.2d 734 (N.Y. 1987). The same flow of
funds, in temporary possession of the intermediary bank, is subject to forfeiture,
*see Daccarett, supra*; 18 U.S.C. § 981(b)(2)(A), an application very difficult to
distinguish from this case. *See Winter Storm*, 310 F.3d at 277-78. As *Chemical
Bank, supra*, makes clear, however, the analysis of intangible expectancies as
property does not resolve all questions, for, as with all property, tangible and
intangible, the holder enjoys a "bundle of rights" whose contours may be shaped
by what state policy is ready, willing, and able to enforce, subject to constitutional
limitations. See U.S. Const. amend. V.

The case before me presents a clash of policies: state law protections of banking
and commercial interests, and federal law which, in this instance, is protective of
admiralty interests. In the absence of federal legislation on this subject, the
admiralty interests, and the law of *Winter Storm* must prevail, as a matter of
federal supremacy. See U.S. Const. art. VI, cl. 2.

*Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.*, 485 F. Supp. 2d 399, *24-28

(S.D.N.Y. 2007).

Relying upon *Seamar v. Kremikovtzi Trade Limited*, 461 F.Supp. 2d 222 (S.D.N.Y.

2006), Fuchuen Zhejiang argues that because it was the beneficiary and not the remitter of

certain of the EFTs initiated by third-parties, such EFTs were therefore wrongfully attached.

Specifically, Fuchuen Zhejiang asserts "there is another more discrete issue presented in the case

at hand, which is whether any of the EFTs being remitted to the Defendant Zhejiang were

lawfully attached…[because] a portion of the funds under attachment represent monies that were

being wire transferred from H&C S Holdings Pte. Ltd. to Zhejiang Fuchuen Co. Ltd. as

beneficiary." *See Zhejiang Fuchuen Memo. at 28.* Importantly, the *Seamar* decision runs

contrary not only to *Aqua Stoli* and *Winter Storm* but also to all other post-*Aqua Stoli* decisions

that have addressed the attachment of EFTs. *See e.g., AET Inc. Ltd. v. Procuradoria de Servicos Martimos Cardoso & Fonesca,* 2006 U.S. Dist. LEXIS 89628, 06-6845 (S.D.N.Y. Dec. 7, 2006)(sustaining attachment of an EFT en route from a third party to the defendant, holding that under *Aqua Stoli* EFTs to or from a defendant are attachable, and rejecting *Seamar's* narrow reading of *Winter Storm*); *Tide Line v. Eastrade Commodities, Inc.,* 2006 U.S. Dist. LEXIS 95870 (S.D.N.Y. 2006)(holding that EFTs are property of the beneficiary or sender and stating that "the Court of Appeals [in *Aqua Stoli*] has not overturned *Winter Storm*" such that "this Court therefore continues to be bound by that decision"); and *Allied Marine Services Ltd. v. LMJ International Ltd.,* 06-3641 (S.D.N.Y. December 8, 2006)(Judge Kaplan holding that "[a]lthough a recent Second Circuit decision questioned the correctness of *Winter Storm's* holding that 'EFTs are property of the beneficiary or sender of an EFT,' rather than the property of neither while present in an intermediary bank, *Aqua Stoli,* 460 F.3d at 445 n.6, *Winter Storm* remains binding in this Circuit."). *See copy of Order and Hearing Transcript in Allied Marine Services Ltd. v. LMJ International Ltd. attached to Murphy Declaration as Exhibit 5.*

It is reasonable to characterize the *Seamar* holding as a rogue decision because it finds no support in the other post-*Aqua Stoli* decisions and, more importantly, it rejected the explicit holdings of *Aqua Stoli* and *Winter Storm.* Most importantly, it bears underscoring that the Second Circuit has itself declared that "under the law of this Circuit. *EFTs to or from a party are attachable* by a court as they pass through banks located in that court's jurisdiction." *Aqua Stoli,* 460 F.3d at 2006 U.S. App. LEXIS 19302 at 436 (*citing Winter Storm,* 310 F.3d at 263 (emphasis added).[2] This binding directive cannot be ignored.

---

[2] *Aqua Stoli* relied on and cited directly to *Winter Storm* when making this assertion. This simple fact lends further support to the Plaintiff's assertion that Fuchuen Defendants' reading of *Winter Storm* is misguided.

In *HBC Hamburg Bulk Carriers GmbH & Co. KG v. Proteinas Y Oleicos S.A. de C.V.*,
2005 U.S. Dist. LEXIS 8009 (S.D.N.Y. 2005), the court followed *Winter Storm* and *Noble
Shipping Inc. v. Euro-Maritime Chartering, Ltd.*, 2003 U.S. Dist. LEXIS 23008, No. 03 Civ.
6039 (S.D.N.Y. Dec. 24, 2003), and rejected the defendant's argument that "the EFTs attached
by Citibank were not its "property" at the time of attachment." *Id.* at *9-*10. Like this case, in
*HBC Hamburg* the "EFTs in question had been sent by third parties as payments to [the
defendant] with their ultimate destination being one of [defendant's] Mexican Banks." *Id.* at
*10. Also like this case, "[t]he attachment of the EFTs . . . occurred at an intermediary bank
prior to [the defendant's] receipt of the funds in its Mexican bank accounts" and the defendant
argued that "the EFTs attached were still property of the sending-payors." *Id.*

    In rejecting the defendant's "property" argument, the court reasoned:

> The issue is whether, for purposes of Rule B attachment, an EFT remains the
> exclusive property of the sending-payor until it enters one of the banks associated
> with the recipient-beneficiary. We hold that it does not. Rule B permits a plaintiff
> "to attach intangible items, such as debts owed to the defendant. Such items may
> be attached even if they have not yet matured or have only partially matured."
> *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 276 (2d Cir. 2002) (quoting
> Jarvis, supra, at 530). The only limitation on such attachment is that "the
> defendant's entitlement to the credit or interest in the debt must be clear." *Id.*
> Because Proteinas has a clear property interest in the debt owed to it, and because
> the EFT in the hands of the intermediary bank is intended to satisfy that debt,
> Proteinas has a property interest in the EFT before it is technically possessed by
> its bank. In so holding, we adopt the reasoning of Judge Cote in *Noble Shipping,
> Inc. v. Euro-Maritime Chartering, Ltd.*, 2003 U.S. Dist. LEXIS 23008, No. 03
> Civ. 6039, 2003 WL 23021974 (S.D.N.Y. Dec. 24, 2003).

*HBC Hamburg*, 2005 U.S. Dist. LEXIS 8009 at *10-*12.

    Furthermore, in *AET Inc. Ltd. v. Procuradoria de Servicos Maritimos Cardoso &
Fonesca*, Judge Chin held that EFTs going to or from a party are attachable. *AET Inc. Ltd. v.
Procuradoria de Servicos Maritimos Cardoso & Fonesca*, 464 F.Supp. 2d 241 (S.D.N.Y. 2006).
In so finding, Judge Chin held that an EFT is the property of a beneficiary while in transit and

denied the defendant's motion to vacate stating that "even though the funds were in an

intermediary bank" and "intended for Proc" they "are Proc's property and therefore subject to

AET's Order of Attachment." *Id.* at 245. Of note, *AET* was decided after *Seamar* and reiterated

that "defendant's speculation that the Second Circuit at some future time may reverse course and

find that EFTs are not attachable is not helpful. *Aqua Stoli* and *Winter Storm* are binding on this

Court, and I will not stay the instant attachment pending some possible future Second Circuit

decision changing the law otherwise." *Id.* The *AET Inc. Ltd.* court further explained as follows:

> I disagree with [defendant] Proc's position that I must look to New York state law, for in
> my view <u>Winter Storm</u> answers the question here. In <u>Winter Storm</u>, the defendant had
> chartered a vessel from the plaintiff shipowner but had breached the charter party by
> failing to pay the full freight. 310 F.3d at 265. The defendant had funds wired from its
> Bangkok bank to pay an unrelated debt owed to a third party. <u>Id.</u> at 266. The funds were
> wired through an intermediary bank in New York and were held pursuant to a maritime
> attachment. <u>Id.</u> The Second Circuit held that even thought the funds were intended as
> payment to a third party, they were still property of the defendant subject to attachment.
> <u>See Winter Storm</u>, 310 F.3d at 266, 273, 276; accord <u>Ythan Ltd. v. Am. Bulk Transp.
> Ltd.</u>, 336 F.Supp.2d 305, 309 (S.D.N.Y. 2004). This was so even though the funds were
> in an intermediary bank. Under <u>Winter Storm</u>, the EFTs, which were intended for Proc,
> are Proc's property and therefore are subject to [plaintiff] AET's Order of Attachment.

*AET Inc. Ltd.,* 464 F.Supp.2d at 245.

Similarly, in *Maersk, Inc. v. Neewra, Inc.,* 2006 U.S. Dist. LEXIS 73096, 05 Civ. 4356

(RCC)(S.D.N.Y. Oct. 5, 2006), Judge Casey made it plain that footnote 6 of *Aqua Stoli* leaves no

room for any "difference of opinion... in this Circuit as to whether Winter Storm will be

followed. It remains binding precedent. As a result, EFTs remain attachable assets." *Maersk,*

*Inc. v. Neewra, Inc.,* 2006 U.S. Dist. LEXIS 73096, *5-6. Judge Casey continued, stating that

"under the law of this circuit, EFTs *to or from* a party are attachable by a court as they pass

through banks located in that court's jurisdiction." *Id.* at *3-4; *quoting Aqua Stoli* 460 F.3d at

436 (emphasis added).

The *Seamar* decision has also recently been criticized by Judge Marrero. Specifically,

Judge Marrero rejected *Seamar* in *General Tankers Pte. Ltd. v. Kundan Rice Mills Ltd.*, 475

F.Supp. 2d 396, 398 (S.D.N.Y. 2007) where he held that an EFT en route to a defendant is

attachable at an intermediary bank because the defendant holds a property interest in those funds.

More specifically, Judge Marrero held as follows in *General Tankers:*

> The first question for this Court is whether Kundan Care received a property
> interest in the EFT funds while the money was in transit from Zeyad. It is clear that
> "under the law of this Circuit, EFTs to or from a party are attachable by a court as they
> pass through banks located in that court's jurisdiction." Aqua Stoli, 460 F.3d at 436
> citing Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002)). However,
> Zeyad points to what he contends represents a change in direction in the Second Circuit
> based on analysis put forth in Seamar Shipping Ltd. Kremikovtzi Corp., 461 F. Supp. 2d
> 222 (S.D.N.Y. 2006). Seamar posits that a footnote in Aqua Stoli implicitly requires a
> narrow application of the attachment rule, finding a property interest only in the
> originator of an EFT while the funds are in transit. See id. at 225. Although the text of
> Aqua Stoli, quoted above, plainly states that both the originator and the beneficiary of the
> EFT hold a property interest warranting attachment, footnote 6 of that opinion notes that
> the Winter Storm decision was open to question, particularly with regard to "whose assets
> [the EFTs] are while in transit." Aqua Stoli, 460 F.3d at 446 n.6. According to the
> Seamar court, that footnote made it "illogical to construe other statements in Aqua Stoli
> to broaden Winter Storm," which determined that only the originator had a property
> interest in an EFT while the funds are in transit. Seamar, 461 F.Supp. 2d at 225.

> Other district court decisions since Aqua Stoli have not followed Seamar. See
> e.g., Maersk, Inc. v. Neewra, Inc., 2006 WL 2854298, at *2 (S.D.N.Y. Oct. 6,
> 2006)("That the court of appeals made mention, in a footnote, of a reason why Winter
> Storm might have been incorrectly decided is of no moment. Indeed, Aqua Stoli can only
> be read to reaffirm Winter Storm as the law of this circuit."); AET Inc. Limited v.
> Procuradoria de Servicios Maritimeos Cardoso & Fonesca, 464 F. Supp. 2d 241, 244
> (S.D.N.Y. 2006)("Defendant's speculation that the Second Circuit at some future time
> may reverse course and find that EFTs are not attachable is not helpful. Aqua Stoli and
> Winter Storm are binding on this Court, and I will not stay the instant attachment pending
> some possible future Second Circuit decision changing the law otherwise."). Seamar is
> thus alone in its interpretation of Aqua Stoli as impliedly restricting Winter Storm
> attachments only to originators.

> In fact, Aqua Stoli's full import is perhaps best understood by examining the
> district court's implementation of Winter Storm. Between Winter Storm and Aqua Stoli,
> courts in this Circuit quickly accepted that beneficiaries as well as the originators of EFTs
> have a property interest in those funds while in transit. See, e.g., Noble Shipping, Inc. v.
> Euro-Maritime Chartering Limited, 2003 WL 23021974, at *3 (S.D.N.Y. Dec. 24, 2003).

35

Further, the general proposition held that a debt which is attachable by the beneficiary's creditors applied to the EFT context as well. See id. The decision to treat EFTs as debt acknowledged the ability to attach an EFT as a concurrent property interest held by both the originator and beneficiary. See HBC Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas Y Oleicos A.S. de C.V., 2005 WL 1036127, at *3-*4 (S.D.N.Y. May 4, 2005). The result, allowing the attachment of an EFT against both the originator and beneficiary, was readily accepted by reason of the broad terms of Rule B's attachment language which does not require exclusive property interests. Seamar does not question the correctness of these rulings, nor does it point to how Aqua Stoli overrules them, but instead states that the cases were decided prior to Aqua Stoli, implying that they are inapplicable. See 461 F.Supp. 2d at 225 n.3.

This Court does not view the reasoning of Noble and HBC as inapposite, as it is not persuaded that the footnote in Aqua Stoli implies a restrictive reading of Winter Storm. While the footnote may query the appropriateness of any attachment of an EFT at an intermediate bank, whether against the originator or the beneficiary, it cannot be read unequivocally to overrule Winter Storm, nor to undermine the clear language of the balance of the decision in Aqua Stoli.

The Second Circuit has established a clear procedure in overruling prior panel decisions. It "is bound by a decision of a prior panel unless and until its rationale in overruled, implicitly or expressly, by the Supreme Court or [the Second Circuit] en banc." United States v. Ianniello, 808 F.2d 184, 190 (2d Cir. 1986), rev'd on other grounds, United States v. Indelicato, 865 F.2d 1370 (2d Cir. 1989). A panel that wishes to record an implicit overruling by the Second Circuit en banc of an opinion which departs from or calls into question a prior panel's ruling, has traditionally circulated the opinion to all active members of the court to express approval of the ruling. See Adeleke v. United States, 355 F.3d 144, 155 n.9 (2d Cir. 2004); United States v. Taylor, 464 F.2d 240, 244 (2d Cir. 1972); but see Burda Media Inc. v. Viertel, 417 F.3d 292, 298 n.5 (2d Cir. 2005)(circulating the opinion only to those members of the court who were empaneled for the cases being departed from). Seamar concedes that this procedure is well-settled and was not followed in Aqua Stoli. See 461 F.Supp. 2d at 225. Hence, the current interpretation of Aqua Stoli—that EFTs to and from a party are attachable— remains undisturbed. Therefore, the Court finds that Kundan Rice had a property interest in the EFT from Zeyad to Kundan Rice and that the EFT was appropriately attached.

*General Tankers Pte. Ltd.*, 475 F.Supp. 2d at 398.

Moreover, Judge Preska reached the identical conclusion in *Sarku Engineering Services*

*Sdn Bhd v. Pt Jawa Tirtamarine*, No. 06-13359 (S.D.N.Y. Jan. 22, 2007)(copy attached to

Murphy Declaration as Exhibit 6), where she held as follows:

First, Defendant contends that the attachment should be vacated under Seamar Shipping Corp. v. Kremikovtzi Trade Ltd., No. 06 Civ. 5507, 2006 WL 3335578, at *4 (S.D.N.Y.

> Nov. 17, 2006), because the disputed funds did not belong to the Defendant. Specifically, Defendant asserts that the disputed funds were the property of a third party-transferor at the time of the attachment, notwithstanding the fact that the Defendant-transferee was the ultimate beneficiary of the transaction. This argument is misplaced because, under <u>Winter Storm Shipping Ltd. v. TPI</u>, 310 F.3d 262, 276 (2d Cir. 2002), and its progeny, electronic funds transfers to or from a party are attachable as they pass through intermediary banks in the court's jurisdiction. <u>See, e.g.</u>, <u>Dominion Bulk Int'l, S.A. v. Naviera Panoceanica, S.A.C.</u>, No. 06 Civ. 6854, 2006 WL 3408799, at *3 (S.D.N.Y. Nov. 21, 2006).

*Sarku Engineering Services*, No. 06-13359 (S.D.N.Y. Jan. 22, 2007).

In the case at hand, the Fuchuen Defendants wrongly contend that the attachment should be vacated where they are named beneficiary of the EFT and, under NYUCC Article 4A, they could not acquire a property interest in the funds until completion of the EFT and until receipt of the funds into their respective accounts. *Winter Storm*, however, not only determined that EFTs were attachable property under Rule B, but explicitly held that NYUCC Article 4A is preempted to the extent that it conflicts with or prejudices the historical right of maritime attachment under Rule B. *Winter Storm*, 310 F.3d at 278. The Second Circuit stated in *Winter Storm*:

> [T]he broad, inclusive language of Admiralty Rule B(1)(a) and the EFT analysis in Daccarett [*United States v. Daccarett*, 6 F.3d 37 (2d Cir. 1993)], combine to fashion a rule in this Circuit that EFT funds in the hands of an intermediary bank may be attached pursuant to Admiralty Rule B(1)(a). Because that rule is derived from federal law, there is no occasion to look for guidance in state law. However, the district court looked to state law as embodied in U.C.C. § 4-A-503 and held it was fatal to Winter Storm's attachment. Even if contrary to the conclusion we have just expressed, it was appropriate to consider state law, this provision of the U.C.C. cannot abrogate Winter Storm's right to a maritime attachment.

*Id.* Based on the foregoing authorities, Transfield properly attached EFTs moving to or from the Fuchuen Defendants.

**POINT SEVEN**

**EVEN UNDER NEW YORK LAW THE FUCHUEN DEFENDANTS
HAVE ATTACHABLE PROPERTY INTERESTS IN THE EFTs**

Because federal law governs maritime attachments, the Fuchuen Defendants are wrong to

argue that the attachment is invalid under New York state law. The Fuchuen Defendants urge a

black and white application of NYUCC § 4-A-502(4), and comment 4 thereto, for the

proposition that they had no property interest in the attached EFTs. Even assuming the relevance

of state law, precedent interpreting seizures of EFT funds in the hands of intermediary banks

demonstrates that courts must perform a more thoughtful analysis of whether the defendant holds

any property interest in the funds.

> Commentators uniformly recognize that Article 4-A is not a hermetic legal seal over
> funds transfer. See J.J. White & R.S. Summers, Uniform Commercial Code, § 1-2 at p.
> 132 . . . ('With the adoption of Article 4A, electronic funds transactions are governed not
> only by Article 4A, but also common law, contract" [etc.] "[T]he Drafting Committee
> intended that Article 4A would be supplemented, enhanced, and in some places,
> *superceded by other bodies of law*. . . .  the Article is intended to synergize with other
> legal doctrines."

*Sheerbonnet, Ltd. v. American Express Bank, Ltd.*, 951 F. Supp. 403, 408 (S.D.N.Y.

1995)(emphasis added). The drafters of UCC Article 4A perceived that conflicts would arise

between Article 4A and federal law, and in comment 3 to §4A-107 noted that "federal

preemption would make ineffective any Article 4A provision that conflicts with federal law."

Nonetheless, the Fuchuen Defendants focus on the overly-simplistic notion that defining

these property rights is generally a matter of state law. However, the Supreme Court in *Butner*

*v. United States*, 440 U.S. 48, 55 (1979) recognized that property interests are governed by state

law "[u]nless some federal interest requires a different result." *Id.* Here, the federal interest

requiring a different result is Rule B itself.

As the Second Circuit noted most recently in *Aqua Stoli*:

"[M]aritime attachment is a feature of admiralty jurisprudence that antedates both the congressional grant of admiralty jurisdiction to the federal district courts and the promulgation of the first Supreme Court Admiralty Rules in 1844." *Aurora Mar. Co. v. Abdullah Mohamed Fahem & Co.*, 85 F.3d 44, 47 (2d Cir. 1996). In fact, "[t]he use of the process of attachment in civil causes of maritime jurisdiction by courts of admiralty . . . has prevailed during a period extending as far back as the authentic history of those tribunals can be traced." *Atkins v. The Disintegrating Co.*, 85 U.S. (18 Wall.) 272, 303, 21 L. Ed. 841 (1874). The power to grant attachments in admiralty is an inherent component of the admiralty jurisdiction given to the federal courts under Article III of the Constitution. U.S. Const. art. III, § 2. The power's historical purpose has been two-fold: first, to gain jurisdiction over an absent defendant; and second, to assure satisfaction of a judgment. *Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684, 693, 70 S. Ct. 861, 94 L. Ed. 1206 (1950).

*Aqua Stoli*, 2006 U.S. App. LEXIS 19302 *6-*7. Thus, the controlling federal interests promoted by Rule B mandate that federal law, and not state law, govern the property issues.

Even under the state law approach that the Fuchuen Defendants urge, the attachment must stand. This is so because New York law states: "[a]ny debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment." New York Civil Practice Law and Rules § 6202 (McKinney 2001) (hereinafter "CPLR 6202"). Distinguishing generally between "debt" and "property," CPLR 5201(a) and (b) elaborate further, providing:

> (a) Debt against which a money judgment may be enforced. A money judgment may be enforced against any debt, which is past due or which is yet to become due, certainly or upon demand of the judgment debtor, whether it was incurred within or without the state, to or from a resident or nonresident, unless it is exempt from application to the satisfaction of the judgment. A debt may consist of a cause of action which could be assigned or transferred accruing within or without the state.
>
> (b) Property against which a money judgment may be enforced. A money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested, unless it is exempt from application to the satisfaction of the judgment. . . .

N.Y. Civ. Prac. L.& R. § 5201(a), (b) (hereinafter "CPLR 5201").

In *Noble Shipping, Inc. v. Euro-Maritime Chartering, Ltd.*, 2003 U.S. Dist. LEXIS

23008, 2003 WL 23021974 (S.D.N.Y. 2003), a case factually indistinguishable from this case, at

least with regard to the attachment of debts owed to a defendant, the court held:

> Debts owed to a creditor are indisputably property subject to attachment. See, e.g., N.Y.
> C.P.L.R. 5201, 6214 (McKinney 2003). In maritime actions, it is no different. Rule B
> permits "a plaintiff to attach intangible items, such as debts owed to the defendant. Such
> items may be attached even if they have not yet matured or have only partially matured."
> *Winter Storm,* 310 F.3d at 276 *(citing* Robert M. Jarvis, An Introduction to Maritime
> Attachment Practice Under Rule B, 20 *J. Mar. L. & Com.* 521, 530 (Oct. 1989)).

*Noble Shipping,* 2003 U.S. Dist. LEXIS 23008 at *7.

Additionally, New York courts have interpreted CPLR 5201 to apply to a wide variety of

intangible property interests. In the seminal case of *Abkco Ind. v. Apple Films, Inc.*, 39 N.Y.2d

670, 50 N.E.2d 899, 385 N.Y.S.2d 511 (1976), the New York Court of Appeals, in considering

the validity of the attachment of a contractual right to receive funds from a licensing agent,

looked to the economic significance of the interest, reasoning that "[w]hile the fact of value or

lack of it has no legal effect on the validity of the attachment, it obviously will have real

economic value." *Abkco,* 39 N.Y.2d. at 675-76, 50 N.E.2d at 902, 385 N.Y.S.2d at 514. Though

defendant argued that its contractual rights did not constitute an attachable debt under subsection

(a), the court nevertheless held that the contract right constituted intangible property because it

was assignable. *Id. See also In re Bd. of Dir. of Hopewell Int'l. Ins. Ltd.*, 238 B.R 25, 47

(Bankr. S.D.N.Y 1999) *(citing Abkco,* "[u]nder New York law, the bundle of rights created by a

contract or agreement is an intangible personal property interest).

Essentially, "[t]he court said that the right that [defendant] had against [its NY

counterpart] could be treated as *either* a 'debt' under CPLR 5201(a) *or* as 'property' under

5201(b), and held that the levy would be allowed if it passed under either." Siegel, *New York*

*Practice* § 489 at 751 (3d ed. 1999). The *Abkco* court emphasized a pragmatic approach to

defining an attachable property interest. Under Professor Siegel's view, the *Abkco* court wisely

eschewed a purely technical approach by looking at the economic significance of the interest at

stake:

> Avoiding arbitrary distinctions, Abkco takes a pragmatic approach that gives the
> economic potential of the asset the upper hand. If from the judgment creditor's point of
> view the asset is worth pursuing as a matter of economics, Abkco authorizes the pursuit
> notwithstanding the contingent nature of the asset, and even though nothing may come of
> the chase. Abkco does this by giving the judgment creditor the option of treating the
> asset as a 'debt' under subdivision (a) or as 'property' under subdivision (b). Since under
> subdivision (a) the contingent nature of the 'debt' would make it unleviable, the
> judgment creditor need only opt to treat the asset as 'property', which then entitles him to
> pursue it under subdivision (b) regardless of its contingent nature. 'Property' under
> subdivision (b) does not confront the contingency limitations built into subdivision (a).

*Streever v. Mazzone*, 97 Misc.2d 465, 471, 411 N.Y.S.2d 843, 848 (Sup. Ct. Saratoga Co. 1978)

(quoting Professor Siegel).

Professor Siegel concludes that by virtue of the *Abkco* decision, "as long as a New York

situs can be spelled out for the intangible at issue, it can be given 'property' treatment under

CPLR 5201(b) and subjected to levy." Siegel, *New York Practice* § 489 at 794-95 (3d ed. 1999).

In interpreting the expansive scope of the *Abkco* decision, New York courts frequently rely on

Professor Siegel's commentary as reliable and persuasive. *See Digitrex, Inc. v. J. Howard

Johnson*, 491 F. Supp. 66, 68-69 (S.D.N.Y. 1980); *Trojan Hardware Co. v. Bonacquisti Constr.

Corp.*, 141 A.D.2d 278, 282, 534 N.Y.S.2d 789, 791 (3d Dept. 1998); *Niagara Mohawk Power

Corp. v. Young*, 135 A.D.2d 1139, 523 N.Y.S.2d 275, 277 (4th Dept. 1987); *Supreme

Merchandise Co. v. Chemical Bank*, 117 A.D.2d 424, 429-430 503 N.Y.S.2d 9, 12 (1st Dept.

1986); *Kates v. Marine Midland Bank*, N. A., 143 Misc.2d 721, 723, 541 N.Y.S.2d 925, 928

(Sup. Ct. Monroe Co. 1989); and *Streever v. Mazzone*, 97 Misc.2d 465, 471, 411 N.Y.S.2d 843,

848 (Sup. Ct. Saratoga Co. 1978).

Moreover, assuming *arguendo* it is appropriate to look to state law, applying the *Abkco* decision to the facts of this case leads to the conclusion that under New York law the attached funds constitute attachable property interests defined by CPLR 5201. The wire transfers and the proceeds thereof in the garnishees banks' possession were economically significant to Zhejiang Fuchuen at the time of the attachment. *See Abkco*, 39 N.Y.2d. at 675-76, 50 N.E.2d at 902, 385 N.Y.S.2d at 514 (interest is attachable even though real economic significance of interest "may not come into sharp focus until execution on the judgment, if any, in the action for which the attachment provides jurisdiction"). Unlike the preemption issues that arise with regard to the application of NYUCC Article 4A, these aspects of New York law are consistent with the broad scope of attachable property interests under Supplemental Admiralty Rule B.

Other New York precedents in the EFT context support the notion that Fuchuen Defendants have an attachable property interest in the attached funds. In *Bank of New York v. Norilsk Nickel*, 789 N.Y.S.2d 95 (1st Dept. 2004), an EFT payment was made by a Yugoslavian company, Genex, through the Bank of New York in New York City, which acted as the intermediary bank for the EFT. Acting in accordance with federal economic sanctions regulations of the United States Office of Foreign Assets Control ("OFAC"), the Bank of New York accepted the EFTs, but in compliance with the OFAC regulations "maintained the funds in a 'call account' in New York." *Id.* at 98.

In holding that Bank of New York had properly blocked the funds transfer, the court concluded that under the OFAC regulations the blocked EFT constituted "property" or "interests in property" of Genex, as the originator of the EFT, because it "sought to use the funds by transferring them to discharge a debt that Genex owed to Norilsk." *Id.* at 100. In coming to this conclusion, the court reasoned that although the NYUCC determined "title" to the funds at issue,

the OFAC regulations mandated that certain "interests" in property be blocked or frozen without concepts of actual title to property as defined by state law."[3] *Id.*

Having determined that Bank of New York properly complied with the OFAC regulation by blocking the EFT funds because of Genex's "legal interest" in the funds as the originator, the court then proceeded to determine which of the competing parties was entitled to the funds after the OFAC block was lifted. The court concluded that the beneficiary, Norilsk, was entitled to the funds because once the block was lifted, the "UCC then required that the funds be transferred to the rightful owner, Norilsk." *Id.* at 100-01. In this case, it therefore follows that this Court should conclude that all of the attached EFTs constitute the Fuchuen Defendants' intangible property.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, Transfield respectfully requests that this Court deny the Motion to Vacate Attachment by Zhejiang Fuchuen Co. Ltd. and the Motion to Vacate Attachment and Dismiss by Fuchuen Dihai Shipping Co. Ltd.

---

[3] The situation with regard to maritime attachments is no different. *See HBC Hamburg Bulk Carriers, supra,* 2005 U.S. Dist. LEXIS 8009 at *14 ("Rule B is intended to impact any property in which the defendant has a legal interest. Nothing in the language of Rule B requires that the property attached be exclusive property of the defendant, nor that we adjudicate the competing property interests of the sending-payor and the recipient-beneficiary in an EFT at an intermediary bank").

Dated: July 16, 2007
New York, NY

Respectfully submitted,

The Plaintiff,
TRANSFIELD ER CAPE LIMITED

By: _____
Patrick F. Lennon (PL 2162)
Charles E. Murphy (CM 2125)
LENNON, MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 – fax
pfl@lenmur.com
cem@lenmur.com

### AFFIRMATION OF SERVICE

I hereby certify that on July 16, 2007, a copy of the foregoing Memorandum of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: _____

Charles E. Murphy