# EXHIBIT 1

5 Shenton Way #19-01
UIC Building
Singapore 068808
Phone: +65 6225 4020
Fax:  +65 6225 4022
E-mail:  prodgers@rodgersco.com

**Rodgers & Co Solicitors (Asia) Pte Ltd**

# Fax

| To: | Patrick O'Donovan | From: | Paul Rodgers |
| Fax: | +44 20 8977 3052 | Pages: | 5 + 59 |
| | | | |
| Cc: | Skuld (Far East) Ltd | Date: | 10 July 2007 |
| Attn: | Nicola Mason | Our Ref: | PRR/ay/1043 |
| Fax: | +852 (2836) 3219 | | |

**URGENT**
**BY FAX AND EMAIL**

Dear Sir,

<u>Re:  Alina - c/p dd 28th November 2003</u>

We refer to our email of yesterday's date and given the lack of any reply from Skuld, wish to proceed for an urgent application under s30 of the Arbitration Act.  The writer is presently in the UK but due to leave tonight although can defer to later this week for purposes of attending that hearing which is made subject to our previous reservation.  We are sending this email and fax as giving you the option of printing off as you wish.

As you are aware we act for Fuchuen Dihai Shipping Co. Ltd. who were the charterers under the above captioned fixture ("Fuchuen").  We refer to the recent correspondence concerning the reference which Skuld (Far East) Ltd. ("Skuld"), acting on behalf of their member Transfield ER Cape Limited (owner under the above captioned fixture - "Transfield") have purported to commence by appointing you as arbitrator in respect of all disputes arising under or in relation to the charterparty.  We now write to set out our clients' position in relation to two matters - being the constitution of the tribunal and the substantive jurisdiction of the tribunal.

This letter is accompanied by a paginated bundle of copy documents to which reference will be made.

<u>Constitution of the Tribunal</u>

The relevant charterparty (pages 1 to 11) provides as follows (clause 42):-

*"Any dispute arising out of this Charterparty ... shall be referred to arbitration in London in accordance with the arbitration act 1996 ... Upon receipt of the nomination in writing of the claimant's arbitrator, the party receiving the nomination shall appoint its arbitrator within fourteen days, failing which the dispute shall be determined by the single arbitrator"*

Skuld purported to appoint you by e-mail dated 28th May 2007 (page 12).  Our clients did not respond

In association with B.J. Macfarlane & Co, London

Rodgers & Co Solicitors (Asia) Pte Ltd                                    July 10, 2007

within the 14 day period provided for by clause 42 and it follows that "*the disputes shall be determined by the single arbitrator*". We therefore believe that (subject of course to our client's case as to substantive jurisdiction set out below) the tribunal became fully constituted, with you as sole arbitrator, 14 days after 28th May.

If, however, there is any doubt we hereby confirm that our clients are content for you to act as sole arbitrator if and in so far as there has been any valid reference to arbitration.
<u>Substantive Jurisdiction</u>

It is Fuchuen's case that you lack substantive jurisdiction. By this letter Fuchuen applies for the determination of the question of whether you have any substantive jurisdiction. The application is made pursuant to section 30 of the 1996 Act. For the reasons set out below Fuchuen submits that it is necessary and appropriate for you to rule on the application in an award on jurisdiction under s.31(4)(a) and not as part of your award on the merits. Indeed we submit that the application needs to be dealt with as a matter of urgency and hereby request that you fix a short oral hearing to take place as soon as possible (possibly one evening if that would suit your convenience).

We summarised the history of this matter in our letter of 25th June 2007. It may assist if we expand upon that to some extent.

The dispute originates in a charterparty dated 28th November 2003. In March and April 2004 the vessel experienced lengthy delays whilst discharging at Beilun. Transfield alleged that the delays occurred as a result of the breach, by Fuchuen, of the obligation to discharge with customary quick despatch. Transfield first intimated a claim by way of a letter from Winter Scott Solicitors dated 20th May 2004 (pages 13-14). As is clear from the exchange of correspondence between Winter Scott and Fuchuen's then solicitors (Ince & Co.) (pages 15 to 18) it has always been Fuchuen's case that the claim was without any merit whatsoever. The claim was regarded as no more than a "nuisance claim". Transfield nonetheless commenced an arbitration in respect of "*all claims, disputes and counterclaims arising out of or in connection with the charterparty*" (page 19). Fuchuen responded by appointing Mr. Baker-Harber on identical terms (page 20). They went on to invite Transfield to accept that the claim was of no merit and to withdraw the reference to arbitration (pages 21 to 22).

In February 2005 the managers of the parties met and discussed the situation. Terms were agreed by which the dispute would be settled and, in particular, the arbitration would be terminated. These are set out in Transfield's faxes of 23rd February 2005 (pages 23 to 24) and 28th April 2005 (pages 25 to 26). Fuchuen confirmed the agreement that had been reached orally in their fax of 21st July 2005 (pages 27 to 28).

Transfield accepted that the matter had indeed been amicably settled and Winter Scott wrote to the tribunal accordingly on 6 July 2005 (misdated 2006) (page 29). Ince and Co. sent a similar letter on 8th July 2005 (page 30).

In March 2006 they asserted that in fact no agreement had been reached (see the fax at pages 31 to 32). We responded on behalf of Fuchuen (pages 33 to 34).

In all the circumstances we believe that there can be no doubt about the fact that the disputes which arose under the charterparty were settled. Indeed, in their recent complaint in the United States District Court for the Southern District of New York (pages 35 to 40). Transfield positively assert that the parties "*negotiated a compromise settlement*" and accuse Fuchuen of wrongly denying the existence of the settlement (paragraphs 15 and 16). We should point out that although it is correct that the Rule B attachment proceedings commenced in 2004 were dismissed "*without prejudice*" (in circumstances where they had in fact never been served) the same cannot be said of the arbitration. The disputes were settled and the original tribunal was asked to "*close its file*".

It therefore came as something of a surprise to Fuchuen to see from Skuld's most recent message

● Page 2

Rodgers & Co Solicitors (Asia) Pte Ltd                                    July 10, 2007

(page 41) that Transfield appear to be reserving their position as to whether or not there was a settlement (see the words " *... even if there was a settlement ...*" and "*alleged agreement*" in their recent e-mail). If there is really an dispute about this Fuchuen invites the tribunal to conclude that there was indeed a settlement of all disputes arising under the charterparty, as had in fact been common ground until very recently.

Fuchuen's case is simple. Any and all claims and disputes arising out of or in connection with the charterparty were referred to the original tribunal. All such disputes were settled in 2005. There are no outstanding claims or disputes arising under or in relation to the charterparty.

Skuld have suggested in correspondence (page 42) that Fuchuen have "*repudiated*" the settlement. They have provided absolutely no particulars of this allegation but the fact remains that if there is a dispute about performance of the settlement agreement that is a dispute arising out of or in connection with the settlement agreement. It is not, and cannot be, a dispute arising out of or in connection with the original charterparty. Even if Fuchuen have repudiated the settlement agreement, Transfield's remedy is to claim damages for breach (or repudiation) of the settlement agreement. The matter can be tested this way. If the claims which Transfield now purport to advance were claims arising out of or in connection with the original charterparty, then Transfield would be obliged to submit them to the tribunal originally constituted in 2004 (which may be why the Verified Complaint in the Rule B proceedings refers, at paragraph 18 on pages 43 to 49 to "*recommencing the London arbitration*"). But that reference has been brought to an end. The tribunal has been asked to (and presumably has) closed its file. By s.51(2) the original reference has been "*terminated*". The original tribunal is *functus officio*.

Transfield has been noticeably coy about identifying precisely what disputes or claims they intend to refer to the present tribunal. In Skuld's e-mail of 28th May (page 12) it is suggested that the reference is intended to cover "*all disputes arising under or in relation to the charterparty*". Since "*all claims, disputes and counterclaims arising out of or in connection with the charterparty*" have already been referred to arbitration and settled we do not see any legal basis upon which that can be a valid appointment.

In the verified complaint filed with the United States District Court Transfield suggest that Fuchuen has denied the existence of the settlement agreement. Firstly, as set out above, that allegation is factually incorrect. Secondly, even if it were correct that would give rise to a dispute relating to, or a claim arising out of or in connection with, the settlement agreement. Additionally Transfield also allege that Fuchuen have failed to "*pay amounts due and owing under the agreement*" and have "*failed to adhere to the terms of the settlement*". Again, if these allegations (which are wholly un particularised) were true they would give rise to a claim or dispute under the settlement agreement and not one under the charterparty.

Most recently Skuld have suggested in their e-mail of 6th July that the reference covers "*all disputes arising under or in relation to*" the charterparty and that this includes "*settlement discussions relating to the Charterparty*". They go on to state that Transfield contend that Fuchuen has "*repudiated the terms of*" any settlement agreement. Firstly, as set out above, the parties proceeded beyond "*settlement discussions*" and concluded a valid and binding settlement. Presumably Transfield intend to pursue a claim for damages for wrongful repudiation of the settlement agreement. Once again, however, any such claim would be a claim arising out of or related to the settlement agreement and not the original charterparty.

However Transfield's case is viewed it appears that what they are seeking to do is to pursue a claim arising out of the settlement agreement in the guise of a claim under the charterparty. We know of no legal basis upon which it can be said that a claim arising out of (alleged) breach (even alleged repudiatory breach) of a settlement agreement can properly be classified as a claim arising out of or related to the original charterparty. We would remind you that clause 42 of the charterparty provides only that disputes "*arising out of*" the charterparty are to be referred to arbitration. There is simply no basis upon which the present dispute can be described as one "*arising out of*" the charterparty, and we therefore invite you to accept Fuchuen's submission that you have no substantive jurisdiction in relation

● Page 3

Rodgers & Co Solicitors (Asia) Pte Ltd                                    July 10, 2007

to the claims which Transfield seek to advance.

Transfield rightly do not suggest that there is any arbitration agreement contained within the settlement agreement. Fuchuen believe that the only reason that Transfield persists in describing this dispute as one arising under the charterparty is a transparent attempt by them to gain an unjustified tactical advantage. By asserting that the present disputes arise under the charterparty Transfield claim to be entitled to proceed by way of London Arbitration where they would otherwise be obliged to commence legal proceedings in an appropriate forum against Fuchuen. More significantly Transfield have, as you are aware, commenced Rule B Maritime Attachment Proceedings against Fuchuen (and an additional Defendant wrongly said to be Fuchuen's partner, alter ego or alias). Transfield are only able to do so by seeking to characterise their claim as an Admiralty Claim. We understand from Fuchuen client's US Attorneys (although Fuchuen does not waive privilege in the advice received) that whereas a claim under the charterparty would be a maritime or admiralty claim, a claim under a settlement agreement (including a settlement agreement resolving disputes which had arisen under a charterparty) is not an admiralty or maritime claim because a settlement agreement is not a maritime contract.

By order dated 30ᵗʰ May 2007 Transfield obtained an *ex parte* order for process of maritime attachment (pages 50 to 51). That order remains in force and continues to cause prejudice to Fuchuen. As of today that attachment has caught US$3,889,316.39 being the amounted demanded in the second complaint which we understand belongs to Zhejiang Fuchuen Co Ltd ("Zhejiang"), a completely different company. It remains attached by the Respondent and apparently on the basis that Zhejiang is the alter ego and/or joint venture partner, of Fuchuen (although no substantive evidence has been produced to prove that connection which in any event is denied by Fuchuen (and I understand Zhejiang).

In addition our US correspondent learnt yesterday that notwithstanding the attachment had caught the full amount stipulated in Transfield's complaint they have also attached US$51,355.00 which I understand is Fuchuen's money per the attached received from Transfield' s lawyer Mr Patrick Lennon yesterday (I attach an exchange of emails yesterday between Mr Rahul, our US correspondent and Mr Lennon in which Mr Lennon have refused to release that US$51,355 – pages 52 to 59) . My client therefore continue to suffer severe prejudice not only by reason of the money that has been attached (in my view wrongly) but also because any US cash payment would be caught by the Attachment (which is premised on the basis of this arbitration)

If Fuchuen's case as to substantive jurisdiction is correct then the entire basis for the Rule B order falls away. We therefore submit that it is appropriate for the tribunal to determine Fuchuen's.s30 application as soon as possible so that the position can be clarified. In so far as Skuld may suggest that they need more time to respond or to prepare to deal with the application we would make the following points:-

(a)      Transfield have had the benefit of legal advice since May 2004, soon after the disputes under the charterparty first arose. They continued to be represented both before and after the settlement agreement was reached;

(b)      if Skuld feel the need to obtain advice from London solicitors they can presumably obtain it (and do so quickly) from Winter Scott;

(c)      Skuld and Transfield must know what Transfield' claim is because they have commenced this (purported) reference and have commenced Rule B proceedings in the United States District Court;

(d)      there is really only one question for you to determine viz are the claims which Transfield seek to submit to arbitration within the scope of the arbitration clause in the charterparty or not;

(e)      Fuchuen believe that there can be no real dispute between the parties as to the relevant facts. The disputes between the parties which arose in 2004 were referred to arbitration and settled. Any 'live' disputes must relate to performance of the settlement agreement which is an entirely

● Page 4

Rodgers & Co Solicitors (Asia) Pte Ltd                    July 10, 2007

separate contract to the original charterparty claim. Skuld will not have to prepare a case on the evidence;

(f)     so you will need to determine a simple issue of law - are disputes relating to performance of the settlement agreement ones which arise out of the charterparty for the purposes of clause 42? Fuchuen submit that this is an issue which can and should be dealt with within a very short timescale.

We therefore invite you to fix a hearing date for a short oral hearing as soon as possible and ideally this week and before my return to Singapore later this evening. We have retained Mr. Christopher Smith of Essex Court Chambers to represent Fuchuen. He is available to attend a hearing on any day this week. As a further option he could attend an evening hearing on Monday 16th (but not a daytime hearing).

Furthermore I am presently in the UK on vacation from Singapore and although I am due to return to Singapore tonight it would be clearly be advantageous and save costs if the hearing could be fixed this week so that I could stay in the UK in order to avoid the need for a return visit back from Singapore.

As set out in our message of 6th July and yesterday we gave a deadline of close of business today, at the time of sending this message (close of business) we have received no reply although we note from her earlier email today that she is in the office. We are therefore making this application as a matter of urgency

We believe that Skuld should have been able to set out proper details of their case on jurisdiction (it is, after all, their members who seek to argue that the tribunal has jurisdiction and it is for them to establish jurisdiction not for our clients to establish a lack of jurisdiction) without further delay and we can see no reason why a hearing cannot take place this week subject to your availability with a time estimate of 2 hours.

Kind regards

Paul Rodgers
Solicitor

NB As I can read emails on my Blackberry, I would ask if Mr O'Donovan and Skuld, if appropriate, could respond by email during the course of today as my office in Singapore will be closed. And I am due to leave for Singapore this evening. Alternatively my telephone number is +65 91173952.

| 1. Shipbroker | RECOMMENDED |
|---|---|
| **2nd Original** | THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE UNIFORM GENERAL CHARTER (AS REVISED 1922 AND 1976) (To be used for trades for which no specially approved form is in force) CODE NAME: "GENCON"                    Part I |
| | 2. Place and date<br>*28TH NOVEMBER, 2003* |

| 3. Owners/Place of business (Cl. 1)<br><br>*TRANSFIELD ER CAPE LIMITED* | 4. Charterers/Place of business (Cl. 1)<br><br>*FUCHUEN DIHAI SHIPPING CO., LTD., B.V.I.* |
|---|---|
| 5. Vessel's name (Cl. 1)<br>*M.V "ALINA"* | 6. GRT/NRT (Cl. 1)<br>*See Clause 36* |
| 7. Deadweight cargo carrying capacity in tons (abt.) (Cl. 1)<br>*See Clause 36* | 8. Present position (Cl. 1)<br><br>*Trading* |
| 9. Expected ready to load (abt.) (Cl. 1)<br>*20TH JANUARY, 2004* | |
| 10. Loading port or place (Cl. 1)<br>*One safe berth, One safe Port, Ponta Do Ubu, Brazil* | 11. Discharging port or place (Cl. 1)<br>*One or two safe berth(s), One safe port Beilun, P.R. China* |

| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo" (Cl. 1) |
|---|
| *Minimum 170,000 metric tons 10 percent more or less in Owners' option Iron Ore in bulk (one grade only), always excluding DRI/DRIP cargo to be loaded/transported and discharged in accordance with IMO recommendations.* |

| 13. Freight rate (also state if payable on delivered or intaken quantity) (Cl. 1)<br><br>*US$33.50 per metric basis 1/1 on Bills of Lading cargo quantity* | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4)<br><br>*See Clause 20* |
|---|---|

| 15. Loading and discharging costs (state alternative (a) or (b) of Cl. 5; also indicate if vessel is gearless)<br>*F.I.O.S.T.* | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b) if total laytime for load. and disch., fill in c) only) (Cl. 6) |
|---|---|
| 17. Shippers(state name and address) (Cl. 6)<br><br>*to be advised* | (a) Laytime for loading<br>*See Clause 22* |
| | (b) Laytime for discharging<br>*See Clause 23* |
| | (c) Total laytime for loading and discharging<br>*also see Clause 22 and 23* |
| 18. Demurrage rate (loading and discharging) (Cl.7)<br>*See Clauses 22 and 32* | 19. Cancelling date (Cl. 10)<br>*5TH FEBRUARY, 2004* |

| 20. Brokerage commission and to whom payable (Cl. 14) |
|---|
| |

| 21. Additional Clauses covering special provisions, if agreed. |
|---|
| *RIDER CLAUSES NO. 20 TO 51 INCLUSIVE AS ATTACHED TO BE PART OF THIS CHARTER PARTY.* |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners)  *For and on behalf of*<br>**Transfield ER Cape Limited**<br><br>*Authorized Signature(s)* | Signature (Charterers)  *For and on behalf of*<br>Fuchuen Dihai Shipping Co., Ltd.<br>（富春希海船務有限公司）<br><br>*Authorised Signature(s)* |
|---|---|

Printed and sold by Fr. G. Knudtzon Ltd., 55 Toldbodgade, Copenhagen, by authority of The Baltic and International Maritime Conference (BIMCO), Copenhagen

## PART II
### "Gencon" Charter (As Revised 1922 and 1976)
### Including "F.I.O." Alternative, etc.

1. It is agreed between the party mentioned in Box 3 as Owners of the steamer or motor-vessel named in Box 5, of the gross/nett Register tons indicated in Box 6 and carrying about the number of tons of deadweight cargo stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter about the date indicated in Box 9, and the party mentioned as Charterers in Box 4 that:
The said vessel shall proceed to the loading port or place stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at Charterers' risk) as stated in Box 12 (Charterers to provide all mats and/or wood for dunnage and any separations required, the Owners allowing the use of any dunnage wood on board if required) which the Charterers bind themselves to ship, and being so loaded the vessel shall proceed to the discharging port or place stated in Box 11 as ordered on signing Bills of Lading or so near thereto as she may safely get and lie always afloat and there deliver the cargo on being paid freight on delivered or intaken Bills of Lading quantity as in Box 13 at the rate stated in Box 13.

2. **Owners' Responsibility Clause**
Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods (unless stowage performed by shippers/Charterers or their stevedores or servants) or by personal want of due diligence on the part of the Owners or their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager.
And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or crew or some other person employed by the Owners on board or whose for acts they would, but for this clause, be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever. Damage caused by contact with or leakage, smell or evaporation from other goods or by the inflammable or explosive nature or insufficient package of other goods not to be considered as caused by improper or negligent stowage, even if in fact so caused.

3. **Deviation Clause**
The vessel has liberty to call at any port or ports in any order, for any purpose to sail without pilots, to tow and/or assist vessel in all situations, and also to deviate for the purpose of saving life and/or property.

4. **Payment of Freight**
The freight to be paid in the manner prescribed in Box 14 in cash without discount on delivery of the cargo at mean rate of exchange ruling on day or days of payment, the receivers of the cargo being bound to pay freight on account during delivery, if required by Captain or Owners.
Cash for vessel's ordinary disbursements at port of loading to be advanced by Charterers if required at highest current rate of exchange, subject to two per cent, to cover insurance and other expenses.

5. **Loading/Discharging Costs** *(See Clause 22 and 23)*
*(a) Gross Terms*
The cargo to be brought alongside in such a manner as to enable vessel to take the goods with her own tackle. Charterers to procure and pay for necessary men on shore or on board the lighters to do the work there, vessel only heaving the cargo on board.
If the loading takes place by elevator, cargo to be put free in vessel's holds, Owners only paying trimming expenses.
Any pieces and/or packages of cargo over two tons weight, shall be loaded, stowed and discharged by Charterers at their risk and expense.
The cargo to be received by Merchants at their risk and expense alongside the vessel not beyond the reach of her tackle.
*(b) F. I. o. and free stowed/trimmed*
The cargo shall be brought into the holds, loaded, stowed and/or trimmed and taken from the holds and discharged by the Charterers or their Agents, free of any risk, liability and expense whatsoever to the Owners.
The Owners shall provide winches, motive power and windlass free the Crew if requested and permitted; if not, the Charterers shall provide and pay for winchmen from shore and/or crew, if any. (The position shall not apply if vessel is gearless and stated as such in Box 15.
*Indicate alternative (a) or (b), as agreed, in Box 15.*

6. **Laytime** *(See Clause 32, 33 and 34)*
*(a) Separate laytime for loading and discharging*
The cargo shall be loaded within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.
The cargo shall be discharged within the number of running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.
*(b) Total laytime for loading and discharging*
The cargo shall be loaded and discharged within the number of total running hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time actually used shall count.
*(c) Commencement of laytime (loading and discharging)*
Laytime for loading and discharging shall commence at 1 p.m. if notice of readiness is given before noon, and at 6 a.m. next working day if notice given during office hours after noon. Notice at loading port to be given to the Shippers named in Box 17.
Time actually used before commencement of laytime shall count. Time lost in waiting for berth to count as loading or discharging time, as the case may be.

**Demurrage**
Ten running days on demurrage at the rate stated in Box 18 per day or pro rata for any part of a day, payable day by day to be allowed Merchants altogether at ports of loading and discharging.
If the loading/discharging berth is not available and more than ten days, it appears that further

8. **Lien Clause** ... 105, 106
Owners shall have a lien on the cargo for freight, dead-freight, demurrage and damages for detention. Charterers shall remain responsible for dead-freight and demurrage (including damages for detention), incurred at port of loading. Charterers shall also remain responsible for freight and demurrage (including damages for detention) incurred at port of discharge, but only to such extent as the Owners have been unable to obtain payment thereof by exercising the lien on the cargo. ... 107-113

9. **Bills of Lading** ... 114
The Captain or his Agents to sign Bills of Lading at such rate of freight as presented without prejudice to this Charterparty, but should the freight by Bills of Lading amount to less than the total chartered freight the difference to be paid to the Captain in cash on signing Bills of Lading. ... 115-119

10. **Cancelling Clause** ... 120
Should the vessel not be ready to load (whether in berth or not) on or before the date indicated in Box 19, Charterers have the option of cancelling this contract, such option to be declared, if demanded, at least 48 hours before vessel's expected arrival at port of loading. Should the vessel be delayed on account of average or otherwise, Charterers to be informed as soon as possible, and if the vessel is delayed for more than 10 days after the day she is stated to be expected ready to load, Charterers have the option of cancelling this contract, unless a cancelling date has been agreed upon. ... 121-129

11. **General Average** *(See Clause 25)* ... 130
General average to be settled according to York-Antwerp Rules, 1974. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default on the Owners' servants (see clause 2). ... 131-134

12. **Indemnity** ... 135
Indemnity for non-performance of this Charterparty, proved damages, not exceeding estimated amount of freight. ... 136-137

13. **Agency** *(See Clause 26)* ... 138
In every case the Owners shall appoint his own Broker or Agent both at the port of loading and the port of discharge. ... 139-140

14. **Brokerage** ... 141
A brokerage commission at the rate stated in Box 20 on the freight earned is due to the party mentioned in Box 20. In case of non-execution at least 1/3 of the brokerage on the estimated amount of freight and dead-freight to be paid by the Owners to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be mutually agreed. ... 142-147

15. **General Strike Clause** ... 148
Neither Charterers nor Owners shall be responsible for the consequences of any strikes or lock-outs preventing or delaying the fulfilment of any obligations under this contract. ... 149-177

16. **War Risks (Voyage) 1950** *(See Clause 35)* ... 178-251

17. **General Ice Clause** ... 251



# PART II

## "Gencon" Charter (As Revised 1922 and 1976) Including "F.I.O." Alternative, etc.

~~performance of the contract will subject the Vessel, her Master and crew or her cargo, to war risks, the cargo shall be discharged, or if the discharge has been commenced shall be completed, at any safe port in vicinity of the port of discharge as may be ordered by the Charterers. If no such orders shall be received from the Charterers within 48 hours after the Owners have despatched a request by telegram to the Charterers for the nomination of a substitute discharging port, the Owners shall be at liberty to discharge the cargo at any safe port which they may, in their discretion, decide on and such discharge shall be deemed to be due fulfilment of the contract of affreightment. In the event of cargo being discharged at any such other port, the Owners shall be entitled to freight as if the discharge had been effected at the port or ports named in the Bill (s) of Lading or to which the Vessel may have been ordered pursuant thereto.~~

~~(5) (a) The Vessel shall have liberty to comply with any directions or recommendations as to loading, departure, arrival, routes, ports of call, stoppages, destination, zones, waters, discharge, delivery or in any other wise whatsoever (including any direction or recommendation not to go to the port of destination or to delay proceeding thereto or to proceed to some other port) given by any Government or by any belligerent or by any organized body engaged in civil war, hostilities or warlike operations or by any person or body acting or purporting to act as or with the authority of any Government or belligerent or of any such organized body or by any committee or person having under the terms of the war risks insurance in the Vessel, the right to give any such directions or recommendations. If, by reason of or in compliance with any such direction or recommendation, anything is done or is not done, such shall not be deemed a deviation.~~

~~(b) If, by reason of or in compliance with any such directions or recommendations, the Vessel does not proceed to the port or ports named in the Bill (s) of Lading or to which she may have been ordered pursuant thereto, the Vessel may proceed to any port as directed or recommended or to any safe port which the Owners in their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfilment of the contract of affreightment and the Owners shall be entitled to freight as if discharge had been effected at the port or ports named in the Bill (s) of Lading or to which the Vessel may have been ordered pursuant thereto.~~

~~(6) All extra expenses (including insurance costs) involved in discharging cargo at the loading port or in reaching or discharging the cargo at any port as provided in Clauses 4 and 5 (b) hereof shall be paid by the Charterers and/or cargo owners, and the Owners shall have a lien on the cargo for all moneys due under these Clauses.~~

port of loading

(a) In the event of the loading port being inaccessible by reason of ice when vessel is ready to proceed from her last port or at any time during the voyage or on vessel's arrival or in case frost sets in after vessel's arrival, the Captain for fear of being frozen in is at liberty to leave without cargo, and this charter shall be null and void.

(b) If during loading the Captain, for fear of vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter to be forwarded to destination at vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Receivers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per Charter.

(c) In case of more than one loading port, and of one or more of the ports are closed by ice, the Captain or Owners to be at liberty either to load part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the charter null and void unless Charterers agree to load full cargo at the open port.

(d) This Ice Clause not to apply in the Spring.

port of discharge

(a) Should ice (except in the Spring) prevent vessel from reaching port of discharge Receivers shall have the option of keeping vessel waiting until the re-opening of navigation and paying demurrage, or of ordering the vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers of the impossibility of reaching port of destination.

(b) If during discharging the Captain for fear of vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.

(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

Transfield ER Cape Limited



RIDER CLAUSE TO M/V "ALINA"
CHARTER PARTY DATED 28TH NOVEMBER, 2003

## Clause 20

Ninety-five percent (95%) percent freight to be paid within 7 banking days, after completion of loading, sailing loading port, signing/releasing Bills of Lading marked "Freight Payable As Per Charter Party".

Balance 5% freight payable together with demurrage/despatch, if any within 30 days of completion of discharge.

Owners have lien on cargo for freight/dead-freight.

Freight deemed earned as cargo loaded on board whether cargo and or vessel lost or not lost.

## Clause 21

The vessel to be in every way fully suitable to load, carry and discharge this cargo. No cargo to be loaded in the vessel's deeptanks, bunker or other places inaccessible to grabs by Charterers' stevedores.

The vessel to be guaranteed suitable for grab discharge.
Owners guarantee vessel is ITF/AHL fitted and to satisfy themselves regarding any restriction/limitation at loading port and discharging port.

## Clause 22 – Loading Rate

See Scale Loading Terms

a) Charterers shall load Pellets on board vessels nominated by Owners in accordance with Article 7 hereof, spout trimmed, vessel being always safely afloat, free of all risk, expense and damage to Owners and/or vessel. However, Charterers shall not be responsible for damages and injuries not attributable to Charterers. Charterers shall accommodate at Ponta Do Ubu, Brazil, vessel with the following maximum dimensions:

| Length (L.O.A) | : 315 meters |
| Beam | : 50 meters |
| Arrival Draught(1) | : 22.70 meters(1) High tide 1.8 meters |
| Sailing Draught | : 18.1 meters dayshift maneuvering |
| | 17.1 meters nightshift maneuvering |

b) Charterers shall load Pellets on board vessels at the following loading rate per weather working day of twenty-four (24) consecutive hours, or pro rata fractions thereof, Sundays and holidays included.

| Cargo Size | Loading Rate |
| Upto 100,000 WMT | 40,000 tons/day |
| Above 100,000 WMT | 50,000 tons/day |

Demurrage shall be paid by Charterers to Owners for all time in excess of allowed laytime according to the foregoing loading rates, and dispatch at half the demurrage rate shall be paid by Owners to Charterers for all laytime saved in loading, in United States Dollars, by telegraphic transfer within 30 days, at the following rates per day, pro rata for parts of a day.

| Vessel's DWT | Demurrage (US$) | Despatch (US$) |
|---|---|---|
| 50,000 to 99,999 | 8,000 | 4,000 |
| 100,000 to 149,999 | 13,000 | 6,5000 |
| Over 150,000 | 14,000 | 7,000 |



RIDER CLAUSE TO M/V "ALINA"
CHARTER PARTY DATED 28TH NOVEMBER, 2003

### Clause 23 - Discharging Rate
C.Q.D. terms to apply

### Clause 24
Laytime for loading shall commence 12 hours after acceptance of Notice of Readiness, whether in berth or not, unless loading is sooner commenced, and waiting time, if any, for a berth and shifting time shall count as laytime. Notice of Readiness may be presented, provided that vessel is in free pratique, gas free, cleared by Port Authorities and ready to be loaded/discharge respectively at any time in or out of office hours, whether in berth or not. Laytime shall terminate upon completion of loading.

### Clause 25 - Agents
Loading port shall be nominated by Charterers, discharging port shall be nominated by Owners and both are for Owners' account.

### Clause 26
Cargo to be loaded at *one safe berth, one safe port, Ponta Do Ubu, Brazil,* and to discharged at *one or two safe berth(s), one safe port, Beilun, P.R. China.* Owners to verify themselves about any prevailing restriction at all ports, berths and approaches under this Contract at both loading and discharging ports.
Vessel employed under this Contract at all times to comply with all current Brazilian port regulations.

### Clause 27
Vessel to work overtime if requested to do so, and all extra expenses incurred thereby to be paid by party ordering same, except for crew/officers overtime, which always to be for Owners' account, if overtime ordered by port authorities, same to be shared equally between Owners and Charterers.

### Clause 28
Shifting alongside loading and discharging berth if required to facility loading/discharging and trimming to be effected by Owners shifting time to count, shifting expenses to be for Owners' account. Shifting from waiting berth to loading respectively discharging berth to be done by Owners at their time, risk and expense.

### Clause 29
Before loading of the cargo commenced, cleaning of the vessel to be carried out by Owners for Owners' account, if vessel has been washed, humidity is allowed, but no water to be left when loading commences. The vessel to have clean and dry hold and to be in every way suitable for loading this cargo to Shippers' inspector's satisfaction.

Before tendering Notice of Readiness and before commencement of loading, vessel's holds, hatches, beams and bottom sides of hatch cover to be free of all containing substances and loose rust.

### Clause 30
Deleted.

### Clause 31
General Average, if any, to be settled according to York-Antwerp Rules 1974, amended 1990 and any amendment thereto at London and English law to apply.

RIDER CLAUSE TO M/V "ALINA"
CHARTER PARTY DATED 28TH NOVEMBER, 2003

*6*

Clause 32 – Demurrage/Despatch Money
Demurrage/despatch as per Scale at loading port only.

Clause 33
New Jason Clause, New Both-to-Blame Collision clause, P & I Bunkering Clause and Clause Paramount incorporated Hague Rules Legislation are deemed to be incorporated in this Contract.

Clause 34
In the absence of Bill(s) of Lading at discharging port, Owners/Master to allow cargo discharge against Charterers' Letter of Indemnity only in Owners standard P and I wording without bank endorsement or guarantee.

Clause 35
Master/Owners or their Agents have to give Charterers and Suppliers with 15/10/7/5/3 days/forty-eight (48) hours notice of ETA and thereafter 24 hours definitely notice before vessel arrival at loading port.

Upon sailing from loading port, Master to advise Charterers and Agents at discharging port by telex or cable of time of sailing, Bill(s) of Lading quantity, holdwise loaded, sailing draft, ETA discharging port and estimated arrival draft.

Thereafter Master/owners have to advise the same parties 10/7/5/3/2 days and 24 hours prior to ETA discharging port.

Loadable quantity to be advised by Owners or Master approximate 5 days prior to vessel's ETA loading port which is for Charterers' reference. Exact loadable quantity to e declared in writing by Master upon tendering Notice of Readiness.
The vessel shall be seaworthy.

Clause 36 –Performing Vessel
Performing vessel:
M.V. "ALINA"
Panama Flag, Built 1986
179,802mt DWT on 18.125 metre
LOA / Beam 290 / 46 metre
Grain Capacity 6,932,128 cubic feet
All details about

Owners to nominate a named vessel or substitute upon fixing. Owners to nominate final performing vessel latest 15 days prior to vessel's ETA loading port.

Clause 37
Owners to ensure that vessel's crew to open and close hatches (provided same is allowed by shore regulation) whenever required at vessel's time and expense and vessel provides light as on board for night work free of expense to the Charterers. The vessel is to permit the use of it's winches and other appropriate gear and is to provide sufficient power for same without cost to Charterers.

Clause 38
Deleted.



D 2

RIDER CLAUSE TO M/V "ALINA"
CHARTER PARTY DATED 28TH NOVEMBER, 2003

## Clause 39
When so required by stevedores (Charterers), Receivers, vessel to close hatch covers during non-weather permitting periods, in both loading and discharging ports.

## Clause 40
Deleted.

## Clause 41
Any taxes and/or dues and/or wharfage on cargo to be for Charterers' account at both ends.  Any taxes and/or dues and/or wharfage on vessel and/or freight to be for Owners' account at both ends.

## Clause 42 - Arbitration Clause
Any dispute arising out of this Charter Party or any Bill of Lading issued hereunder shall be referred to arbitration in London in accordance with the arbitration act 1996 and any statutory modification or re-enactment in force.  Upon receipt of the nomination in writing of the claimant's arbitrator, the party receiving the nomination shall appoint its arbitrator within fourteen days, failing which the dispute shall be determined by the single arbitrator.  If both parties each appoint an arbitrator and those arbitrators do not agree, they shall appoint an umpire whose decision shall be final and binding.  If the amount in dispute is less than US$50,000 the matter shall be referred to the small claim tribunal in London in accordance with the L.M.A.A. procedure 1989.  The arbitrators, umpire and mediator shall be commercial persons normally engaged in the shipping industry.

## Clause 43
All stevedore damages to be settled directly between Owners and stevedores, Charterers will assist Owners to recover eventual stevedores damages, only when notified in writing by the Master at the time of occurrence of damage or latest within 24 hours thereafter.  Master to co-operate with Charterers and Agents on giving prompt notice of claim in writing to party causing same latest before sailing.  The Master to use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage be made good in the meantime by stevedores otherwise Charterers will not assist.

## Clause 44
There is no guarantee on port disbursement except for discharging port. (Also see Rider Clause 51)

## Clause 45
Owners fax the ISM/DOC Certificates to Charterers for nomination.

## Clause 46 - ISM Clause
Owners guarantee that from the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during currency of the Contract, the vessel and the 'Company' (as defined by the ISM Code) shall comply with all requirement of the ISM Code and hold a valid Safety Management Certificate (SMC) an Document of Compliance (DOC) upon request the Owners shall provide a copy of relevant and DOC to Charterers.  Notwithstanding anything to the 'Company' in this Contract, Owners shall be liable for agree to indemnify Charterers against all losses including but not limited to loss of profit), damages (direct and indirect), expense

8

and/or delay (including but not limited to any time lost whether the vessel is on demurrage or otherwise) arising from or in any connected with the failure by the vessel, its Owners and/or the 'Company' to comply with the requirement of the ISM Code and/or any regulations promulgated in relation thereto.

Further, Owners shall be liable for and agree to indemnify Charterers against any claims against Charterers arising from or in any way connected with the failure by the vessel, its Owners and/or the 'Company' to comply with requirement of the ISM Code and/or any law or regulation promulgated in relation thereto.

### Clause 47
Fixture to be kept top private and confidential and not to report on market.

### Clause 48 – War Cancelling Clause
In the event of war or warlike operation involving either Japan, R.O.C. (Taiwan), United States of America, Great Britain, CIS, People's Republic of China, Brazil, Germany, France, Norway of the nation under the flag of which any vessel performing under this Contract is registered, and this, seriously affects Charterers' or Owners' ability to perform or cost of performing their obligations under this Contract, Charterers or Owners may cancel this Charter Party.

### Clause 49
Charterers and Owners agree to sign the Charter Party within two months after fully fixed.

### Clause 50 - BIMCO Standard War Risks Clause for Voyage Chartering, 1993 Code Name: "Voywar 1993"

(1) For the purpose of this clause, the words:

   (a) "Owners" shall include the Shipowners, Bareboat Charterers, Disponent Owners, managers or other operators who are charged with the management of the vessel, and the Master; and

   (b) "War risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise how-soever), by any person, body; terrorist or political group, or the government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

(2) If at any time before the vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performances of the Contract of carriage, or any part of it, may expose, or is likely to expose, the vessel, her cargo, crew or other persons on board the vessel to war risks, the Owners may give notice to the Charterers canceling this Contract of carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the vessel, her cargo, crew or other persons on board the vessel to war risks; provided always that if this Contract or carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the



9

RIDER CLAUSE TO M/V "ALINA"
CHARTER PARTY DATED 28TH NOVEMBER, 2003

Charterers the vessel, her cargo, crew, or other persons onboard the vessel may be exposed, or may be likely to be exposed, to war risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.

(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bill(s) of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the vessel, her cargo (or any part thereof), crew or other persons on board the vessel (or any one or more of them) may be, or are likely to be, exposed to war risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loaidng0 in complete fulfillment of the contract of carriage.  The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight Contract for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.

(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the vessel, her cargo, crew or other persons on board the vessel may be, or are likely to be, exposed to war risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken.  In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.

(5) The vessel shall have liberty:
   (a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;

   (b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;



D.6

RIDER CLAUSE TO M/V "ALINA"
CHARTER PARTY DATED 28TH NOVEMBER, 2003

(c) to comply with the terms of any resolution of the security council of the united nations, any directives of the European community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;

(e) to call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;

(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfillment of the contract of carriage.

Clause 51
Deleted.



## RIDER CLAUSE TO M/V "ALINA"
### CHARTER PARTY DATED 28TH NOVEMBER, 2003

### NEW BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than or in addition to, the colliding ships or objects are at fault in respect to a collision or contract."

And the Charterers shall procure that the Bills of Lading issued under this Charter Party shall contain the same Clause.

### P & I BUNKER DEVIATION CLAUSE 1948

The vessel in additional to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this charter and there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks, deep tanks, and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

### THE NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees, or Owners of the goods shall contribute with the carrier in General Average to the payment of any sacrifices, losses, or expenses of a General Average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salvage ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his Agents may deem sufficient to cover the estimated contribution of the goods and any salvage or special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery."

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

### CLAUSE PARAMOUNT

The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment shall apply to this contract.

When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply, but in respect of shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply.



D R

12

-----Original Message-----
**From:** BM HKG Claims [mailto:hkg@skuld.com]
**Sent:** Monday, May 28, 2007 2:28 PM
**To:** shipping@fuchuen.com
**Cc:** BM HKG Claims
**Subject:** MV "Alina" - c/p dd 28.11.2003

Oref: 40018159/03/NMA

To: Fuchuen Dihai Shipping Co. Ltd

Dear Sirs ,

Re. ALINA - c/p dd 28.11.2003

We should be grateful if you would note that we hold the entry for Transfield ER Cape Limited, Disponent Owners of the above vessel under the above charter.

Please note that we have appointed Mr Patrick O'Donovan as Disponent Owners' arbitrator in respect of all disputes arising under or in relation to the charterparty dated 28th November 2003, pursuant to clause 42 of the same. Mr O'Donovan's contact details are as follows:

Patrick O'Donovan
Churcham House
1 Bridgeman Road
Teddington
Middx
TW11 9AJ

Tel: +44 (0)20 8977 3666
Fax: +44 (0)20 8977 3052

We hereby call upon you to appoint a second arbitrator in accordance with clause 42.

Kind Regards
Nicola Mason
Vice President
Skuld (Far East) Ltd

6/1/2007

13

20-MAY-2004  12:17  FROM  WINTER SCOTT

# ■ Winter Scott
Solicitors

19-21 Great Tower Street
London EC3R 5AR
Telephone: + 44 (0)20 7648 2460
Fax: + 44 (0)20 7626 5591
DX: 518 London/City
E-mail: firstinitialsurname@winterscott.co.uk

## FAX TRANSMISSION

DATE:           20th May 2004
TO:             00 852 3405 1777
                Fuchuen Dihai Shipping Co. Ltd. Hong Kong
                Lawrence Yeung Esq., Manager of Trading

3405 1775
M: 9851 2136

FROM:           G  D Winter
OUR REF:        GDW/In/new
NUMBER OF PAGES: 2

CONFIDENTIALITY NOTICE: This facsimile is intended only for the addressee.  It may contain privileged and/or confidential information.
If you are not the intended recipient please inform us on the above telephone number immediately and do not disclose the contents or
take copies.

### Re: "ALINA" -- C/P dd 28th November 2003

We should be grateful if you would note that we have been instructed on behalf of
Transfield ER Cape Limited, Owners under the above Charterparty.

Our Clients have a claim against you in respect of damages for the vessel's detention
at Beilun.

We understand that you are refusing to accept responsibility for the vessel's delay at
Beilun. With respect, that refusal is wholly unjustifiable for the following reasons:-

1.    The Charterparty expressly provides that the cargo was to be *"discharged by
      the Charterers or their Agents, free of any risk, liability and expense
      whatsoever to the Owners"* (as per clause 5(b)) and that C.Q.D (Customary
      Quick Despatch) terms were to apply on discharge (as per clause 23);

2.    The effect of these provisions is that you were obliged to ensure that the cargo
      was discharged as fast as was possible in the circumstances prevailing at the
      discharge port; In this regard, we would refer you, for example, to London
      Arbitration 2/01 (which was, in fact, the writer's case).  For these purposes,
      we would emphasise that Charterers will be held responsible insofar as any
      delay could have been avoided by any measures reasonably available to
      themselves, their Receivers or their respective Agents. Further, where one

Partners: Glenn Winter Ken Scott Michael Ellis Damian Wilkes Tim Houghton
Associates: Richard Verney (not admitted) Rachel Belsham-Revell
Consultant: Heidi Shamsuddin
Regulated by the Law Society

VAT No-GB 819 4174 16

20-MAY-2004  12:17    FROM  WINTER SCOTT

method of discharge is unavailable, but other methods are available, Charterers will be liable unless they obtain and utilise one of the alternative methods; see, for example, *Rodenacker v. May & Hassell Ltd.* (1901) 6CC 37 in which it was held that, where it was not possible to use railway trucks to discharge logs (the usual method at the port), Charterers were under an obligation to arrange and discharge into lighters. Similarly, Charterers will be liable for delays which do not relate to the physical discharge of the cargo but which are connected with the warehousing, disposal or onward transportation of the cargo.

3.      It is clear from the documents that the vessel was, in fact, detained at Beilun because the Receivers did not have sufficient storage space available and because they failed to arrange adequate transportation to remove cargo from the port, so as to enable the cargo on board our Clients' vessel to be discharged. These are clearly matters for which Charterers are responsible.

4.      We also understand that part of the delay may have been attributable to a failure to provide import/export documentation or a failure to pay import tax: these matters are your responsibility; see, for example, clauses 5(b) and 41 of the Charterparty and *The Aello* [1961] A.C. 135.

In the circumstances, we see no realistic basis on which you can refuse to pay damages for detention.

We would therefore ask you to confirm, within 7 days, that you accept responsibility for the delay at Beilun. Failing such confirmation, we expect to be instructed to commence proceedings against you without further notice or delay. In that event, you will also be held liable for compound interest and costs (which will quickly become substantial).

We trust, however, that it will not be necessary for us to take such action and that you will confirm, within our deadline, that you will honour your obligations to pay damages for detention forthwith.

Yours faithfully,

Winter Scott

TOTAL P.02

# Fax



SJ Latham
AWY Chan
RSY Lau
PJ Murray*
ES Woodruff*
DJ Beaves**
KCK Lee

PRC LAWYER
Z Chen

*Non resident partners
**Notary Public

Please contact ext 110 immediately if any part of this transmission is incorrectly received.

INTERNATIONAL LAW FIRM

Room 3801-6, 38th Floor
Asia Pacific Finance Tower
Citibank Plaza
3 Garden Road
Hong Kong

Tel +852 2877 3221
Fax +852 2877 2633
Email firstname.lastname@incelaw.com
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Simon Latham / Rory Macfarlane | SJL/RMcF/Alina | 21 May 2004 |

| To | Attention | Your Ref |
|---|---|---|
| Winter Scott | G D Winter | GDW/In/new |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| 2 | London | + 44 207 626 5591 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|

Matter

## *ALINA – C/P dated 28 November 2003*

We have been instructed by the Charterers of the above captioned vessel, Fuchuen Dihai Shipping Co. Ltd., in relation to your fax to them of 20 May 2004.

We have considered the contents of your fax but fail to see how your clients are able to justify their purported claim. It is accepted that the Charterparty dated 28 November 2003 ("the Charterparty") provides that C.Q.D. terms will apply to the discharge rate. You state that, as a result, our clients were obliged to ensure that the cargo was discharged from the vessel as fast as possible, and imply that they were under a duty to discharge by any method that was available. With respect, that overstates the legal effect of the clause.

It is well established that the phrase C.Q.D. imposes a requirement on Charterers that is qualified by the concept of reasonable diligence. Charterers will therefore be excused from liability for any delays provided that they have acted reasonably under the conditions prevailing at the time. Our client's maintain that they acted at all times with reasonable diligence and your letter provides no evidence to the contrary.

In paragraph (4) of your letter you state that you '*understand*' that there '*may*' have been a delay due to a failure to provide some unspecified import/export documentation or some un-particularised tax. We are instructed that there was no such failure and your understanding is incorrect.



21 May 2004

Our client's were not in any way responsible for the delays at Beijun, nor were they in breach of any term in the Charterparty. There is, therefore, no basis for your client's purported claim. The admission of liability you seek will not be forthcoming and we trust that this matter is now at an end.

Yours faithfully,

**Ince & Co**

28-MAY-2004  16:14    FROM  WINTER SCOTT          TO  0085225772533          P.01/22



# Winter Scott
## Solicitors

<div align="right">

19-21 Great Tower Street
London EC3R 5AR
Telephone: + 44 (0)20 7648 2460
Fax + 44 (0)20 7626 5591
DX: 518 London/City
E-mail: firstinitialsurname@winterscott.co.uk

</div>

### FAX TRANSMISSION

DATE:          28th May 2004
TO:            00 852 2877 2633
               Ince & Co.
               Simon Latham Esq. / Rory MacFarlane Esq. – Ref: SJL/RMcF/Alina

FROM:          G D Winter
OUR REF:       GDW/in/82/52
NUMBER OF PAGES:   2

CONFIDENTIALITY NOTICE: This facsimile is intended only for the addressee. It may contain privileged and/or confidential information. If you are not the intended recipient please inform us on the above telephone number immediately and do not disclose the contents or take copies.

Re: "ALINA" – C/P dd 28th November 2003

We refer to your fax of 21st May.

We do not believe that any of the points you have raised will assist your Clients.

As we made clear in our fax of 20th May, Charterers will be held responsible for any delay which could have been avoided by any measures reasonably available to themselves, their Receivers or their respective agents and for any delay which was caused, not by any problems in the physical discharge of the cargo, but by problems connected with the warehousing, disposal or onward transportation of the cargo. In these circumstances, even if Charterers themselves acted with reasonable diligence (which is certainly not admitted), they will still be held liable as the vessel was detained because their Receivers did not have sufficient storage space available and because of problems in removing cargo from the port after discharge; these were not matters for which our Clients accepted responsibility or for which your Clients can avoid liability by reference to COD terms applying to a discharge rate.

The position with regard to the import/export documentation/import tax will no doubt become clear in due course.

Partners: Glenn Winter Ken Scott Michael Ellis Denise Wilkes Tim Hooghton
Associates: Richard Viney (not admitted) Rachel Ditchum Rend
Consultant: Nick Shannandoa
Regulated by the Law Society

VAT No GB 613 4274 18

In the circumstances, we are disappointed that your Clients are not prepared to admit liability. That, no doubt, may result in them being held liable for substantial costs in due course.

Yours faithfully,

Winter Scott

TOTAL P.02

03-AUG-2004  18:49  FROM WINTER SCOTT          TO 0085228772633          P.01/01

# ■ Winter Scott
### Solicitors

# COPY

19-21 Great Tower Street
London EC3R 5AR
Telephone: + 44 (0)20 7648 2450
Fax + 44 (0)20 7626 5591
DX: 518 London/City
E-mail: firstinitialsurname@winterscott.co.uk

## FAX TRANSMISSION

DATE:              3 August 2004

TO:                00 852 2877 2633
                   Ince & Co.
                   Simon Latham Esq. / Rory MacFarlane Esq. – Ref: SJL/RMcF/Alina

COPY TO:           01980 630467
                   BDI McKenzie, Esq

FROM:              Glenn Winter / Tim Houghton
OUR REF:           GDW/ln/82/52
NUMBER OF PAGES:   1

CONFIDENTIALITY NOTICE: This facsimile is intended only for the addressee. It may contain privileged and/or confidential information. If you are not the intended recipient please inform us on the above telephone number immediately and do not disclose the contents or take copies.

### Re: "ALINA" – C/P dd 28th November 2003

We refer to our previous correspondence.

Please note that we have today appointed BDI McKenzie as Disponent Owners' arbitrator in respect of all claims, disputes and counterclaims arising out of or in connection with the charterparty dated 28th November 2003 pursuant to clause 42 of the same. Mr McKenzie's contact details are as follows:

B.D.I. McKenzie
The Old Vicarage, Upavon, Wiltshire SN9 6AA
Telephone: 01980 630757 Fax: 01980 630467

We hereby call upon you to appoint a second arbitrator in accordance with clause 42.

Yours faithfully
WINTER SCOTT

Partners: Glenn Winter Ken Scott Michael Ellis Damian Wilkes Tim Houghton
Associates: Richard Verney (not admitted) Rachel Baksham-Revell
Consultant: Heidi Shamsuddin
Regulated by the Law Society

VAT No GB 519 4174 16

TOTAL P.01

TOTAL P.03

# Fax



**DRAFT**



INTERNATIONAL LAW FIRM

SJ Latham
AWY Chan
RSY Lau
PJ Murray*
ES Woodruff*
DJ Beaves**
KCK Lee

PRC LAWYER
Z Chen

*Non resident partners
**Notary Public

Please contact ext 110 immediately if any part of this transmission is incorrectly received.

Room 3801-6, 38th Floor
Asia Pacific Finance Tower
Citibank Plaza
3 Garden Road
Hong Kong

Tel +852 2877 3221
Fax +852 2877 2633
Email firstname.lastname@incelaw.com
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Simon Latham / Rory Macfarlane | SJL/RMcF/fy (04.0391) | 11 August 2004 |

| To | Attention | Your Ref |
|---|---|---|
| Winter Scott | Glenn Winter/Tim Houghton | GDW/In/82/52 |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| 1 | London | + 44 207 626 5591 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|

Matter

### *ALINA – C/P dated 28 November 2003*
### Appointment of Arbitrator

We refer to our previous correspondence and write to confirm that Charterers have today appointed Mr M J Baker-Harber as their arbitrator in respect of all claims, disputes and counter-claims arising out of, or in connection with, the Charterparty dated 28 November 2003. The appointment of Mr Baker-Harber is made under clause 42 of the said Charter.

Mr Baker-Harber's contact details are as follows:-

M. J. Baker-Harber
25 Ives Street, London SW3 2ND
Tel : +44 207 589 9996 or +44 207 584 1444
Fax : +44 207 584 1588

Mr Baker-Harber is a member of the LMAA and his details can be found on their website if he is not already known to you.

Regards,

Simon Latham/Rory Macfarlane
Ince & Co
E:\04.0391\RMcF-fix\Winter Scott004

---

HAMBURG     HONG KONG     LE HAVRE     LONDON     PARIS     PIRAEUS     SHANGHAI     SINGAPORE

# Fax



**INCE & CO**

INTERNATIONAL LAW FIRM

SJ Latham
AWY Chan
RSY Lau
PJ Murray*
ES Woodruff*
DJ Beaves**
KCK Lea

PRC LAWYER
Z Chan

```
FAX OUT

1 9 AUG 2004
```

Room 3801-6, 38th Floor
Asia Pacific Finance Tower
Citibank Plaza
3 Garden Road
Hong Kong

*Non resident partners
**Notary Public

Please contact ext 110 immediately if any part of this transmission is incorrectly received.

Tel +852 2877 3221
Fax +852 2877 2633
Email firstname.lastname@incelaw.com
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Simon Latham / Rory Macfarlane | SJL/RMcF/fy (04.0391) | 19 August 2004 |

| To | Attention | Your Ref |
|---|---|---|
| Winter Scott | Glenn Winter/Tim Houghton | GDW/In/82/52 |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| 2 | London | + 44 207 626 5591 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|
| | | |

Matter

## Fuchen Dihai Shipping Co Ltd v Transfield ER Cape Limited
### *ALINA – C/P dated 28 November 2003*

We write further to our fax of 12 August 2004, pursuant to which Mr Michael Baker-Harber was appointed as Charterers' arbitrator in respect of the above captioned matter.

We write to express our surprise, and disappointment, that your clients have elected to commence arbitration. Prior to the commencement of arbitration, you sent just two faxes to our clients/ourselves dated 20 May 2004 and 28 May 2004. In neither of these faxes did you particularise your clients' claim to any significant degree. Instead, you simply asked our clients to *"accept responsibility"* for your clients' damages in detention, without giving any indication of the quantum of your clients' claim.

It would have greatly assisted us, and our clients, to evaluate the issues in dispute if you had provided the particulars of your clients' claim before proceeding to arbitration. Instead, no proper particulars, nor even a figure for the quantum of your clients' claim, have yet been provided. In proceeding in this manner, your clients have ignored the principles that are now embodied in the Overriding Objective and Pre-action Protocols of the Civil Procedure Rules. Although the CPR is not directly applicable to an arbitration, the Overriding Objective and Pre-action Protocols nonetheless reflect what is considered to be the good practice and the proper conduct that parties should adopt in relation to a dispute that is proceeding by arbitration. We also note that notwithstanding the commencement of the arbitration, no claim submissions have been served. We therefore find ourselves in a position having



19 August 2004

to advise our clients *"in the dark"*, based only on our best estimate of what your clients eventual claim might be.

Our clients are an entirely reputable business and will respond to a proper claim and discharge their legal obligations as may be established. In the circumstances, we now call upon you to serve fully particularised claim submissions, duly supported with all the requisite documentation, or to withdraw the reference to arbitration.

Best regards,

Simon Latham/Rory Macfarlane
**Ince & Co**
R:\04.0391\RMcF-6x\Winter Scott005

"Transfield proposed to terminate the arbitration proceeding and wished to have the confirmation from Fuchuen. "

On company notepaper of Transfield ER Cape Ltd
To: Fuchuen Company Limited AND Fuchuen Dihai Shipping Co Ltd
Re: M.V. ALINA C/P (28 Nov. 2003) Detention

Further to our company managers' friendly discussion, we both reached the same agreement as follows:

1. Transfield ER would terminate the arbitration procedure immediately and withdraw our arbitration application submitted to London in all sincerity.

2. Fuchuen agree to continue to maintain and strengthen the business cooperation with Transfield ER as usual ; observe the principle of equality and Priority, offer the right of First Refusal to Transfield for chartering vessels in the future marine transport contracts negotiations

3. Transfield ER will offer various feasible solutions for long term cooperation between both party & contribute more endeavors to achieve win win developing situation.

Please reply to confirm.
Thank you.

Transfield ER Cape Ltd

23 Feb 2005

**This translation accurately reflects the meaning of the attached original.**

Chief Translator :    Nora Ali               ID No:   S8242722H
**Chambers Consultants Pte Ltd*** Reg. No. 1990061586G * www.chambersinternational.net
1 Sophia Road, #03-09, Peace Centre, Singapore 228149 Tel: (65) 6334 6013, 6339 1886 Fax: 6339 6168

8. APR. 2005  10:50   ZHEJIANG TRANSFIELD ER CAPE  1777        ...
23. FEB. 2005  15:56



Transfield ER
昌遅萊管

'Transfield ER Cape Ltd
c/o Room 3303, 33/F, Sun Hung Kai Centre,
30 Harbour Road, Wanchai, Hong Kong.
Tel: (852) 8227-6220  Fax (852) 2827-9651

**致: 富春有限公司 并富春帝梅船务有限公司**

有关 'ALINA' 轮 2003年11月23日在北仑 卸煤索栈所发生
"DETENTION" 一案, 经贵我司 郁总、朱总 和 岑总 的友好协商, 取得一致
意见, 双方同意如下:

1. 为显示诚意, 昌遅东富总司立即终止针对我国际, 收回向伦敦仲裁庭
的仲裁申请。

2. 富春帝梅公司 同意一如既往, 继续保持双方的业务来往, 按照同等
优先原则, 在以后的租船及长期期 运合同洽谈中, 给予昌遅东富
很好照录后及优先取会权。

3. 昌遅东富将提供双方长期合作的各种可行性方案, 为创造双赢的发
展局面作出更多努力。

以上意见敬请回复确认。

谢谢!

昌遅东富
2005年2月23日

2

$2\zeta$

"Transfield proposed that for the future business cooperation, they now have terminated the arbitration proceeding and withdrawn the arbitration application."

On company notepaper of Transfield ER Cape Ltd
To: Fuchuen Company Limited AND Fuchuen Dihai Shipping Co Ltd
Re: M.V. ALINA C/P (28 Nov. 2003) Detention

Further to our company managers' friendly discussion, we both reached the same agreement as follows:

Transfield ER would terminate the arbitration procedure immediately and withdraw our arbitration application submitted to London in view of seeking common ground and resolving differences for the long term cooperation.

Fuchuen will continue to maintain and strengthen the business cooperation with Transfield ER as usual; observe the principle of equality and Priority, give priority to consider Transfield ER's rates for chartering vessels and give the last opportunity in future marine transport contracts negotiations.

Transfield ER and Fuchuen would continue to seek all possibilities of long term cooperation & endeavor to achieve win win developing situation.


Best regards

Transfield ER Cape Limited *(company seal)*
28 April 2005

**This translation accurately reflects the meaning of the attached original.**

Chief Translator : ___Nora Ali___        ID No: ___S8242722H___
Chambers Consultants Pte Ltd* Reg. No. 1990061586G * www.chambersinternational.net
1 Sophia Road, #03-09, Peace Centre, Singapore 228149 Tel: (65) 6334 6013, 6339 1886 Fax: 6339 6168

26

28. APR. 2005 12:20                                        NO. 297   P. 1


**Transfield ER**
昌運東富

**Transfield ER Cape Ltd**
c/o Room 2506, 25/F, Sun Hung Kai Centre,
30 Harbour Road, Wanchai, Hong Kong.
Tel: (852) 2827-8869  Fax: (852) 2827-8821

致: 富春有限公司 并富春帝海船务有限公司


有关 'ALINA' 轮 2003年11月28日租约在 北仑 卸港索偿所发
生 "DETENTION" 一案, 经贵我司 磋商, 徐总 和 冯总 的友好协商, 双
方取得一致意见, 同意如下:


昌运东富公司本着求同存异, 长远合作的原则, 现行终止仲裁
程序, 收回向伦敦仲裁庭递缴的仲裁申请。


富春帝海公司将一如既往, 和昌运东富继续保持和加强双方的
业务来往; 按照同等优先原则, 在以后的即期及长期海 运合同招标中,
优先取合昌运东富的租船报价并给予最后机会。


昌运东富和富春帝海将继续寻求双方长期合作的各种可行性方
案, 为创造双蠃的发展局面作出更多努力。


此致!


昌运东富
2005年4月28日



4

27

"The confirmation from Fuchuen that they agree the proposal from Transfield that the arbitration proceeding has been terminated immediately, even if substantial legal costs has been incurred."

On company notepaper of Fuchuen Dihai Shipping Co Ltd
To: Transfield ER Cape Limited

Re: M.V.ALINA-C/P 28 November 2003-Termination of London Arbitration

We have received your letter of 28 April 2005 confirming the termination of the abovementioned arbitration proceedings. Although we have already incurred substantial legal costs for this claim, in view of our friendly cooperation between both parties, we agree with you, as you suggested, the immediate termination of application for the arbitration procedure.
Fuchuen will, as usual, maintain and strengthen the business cooperation with Transfield.

Fuchen Dihai Shipping Co Ltd Hong Kong *(company seal)*
21 July 2005



**This translation accurately reflects the meaning of the attached original.**

Chief Translator :    Nora Ali                ID No:   S8242722H
**Chambers Consultants Pte Ltd\* Reg. No. 1990061586G \* www.chambersinternational.net**
1 Sophia Road, #03-09, Peace Centre, Singapore 228149 Tel: (65) 6334 6013, 6339 1886 Fax: 6339 6168

 富春帝海船务有限公司
FUCHUEN DIHAI SHIPPING CO., LTD.

致: 昌运东富

关于 "ALINA" 轮 2003 年 11 月 28 日租约终止伦敦仲载的事宜

贵司 2005 年 4 月 28 日发给我司的有关终止 "ALINA" 轮上述仲载程序的确认
已收悉。尽管我司已为此案支付了昂贵的法律费用, 但为了双方的友好合作, 我
司同意贵司提出的立即终止仲载程序的申请。

富春帝海公司将一如既往, 和昌运东富继续保持和加强双方的业务未往。



富春帝海船务有限公司
2005 年 7 月 21 日

香港金钟道95号统一中心35字楼
35F., UNITED CENTRE, 95 QUEENSWAY, HONG KONG

TEL: 852-3405 1868    FAX:852-3405 1777
E-MAIL: SHIPPING@FUCHUEN.COM

6

# Winter Scott
## Solicitors

19-21 Great Tower Street
London EC3R 5AR
Telephone: + 44 (0)20 7648 2460
Fax: + 44 (0)20 7626 5591
DX: 518 London/City
E-mail: firstinitialsurname@winterscott.co.uk

## FAX TRANSMISSION

DATE:          6th July 2006
TO:            01980 630467
               B.D.I McKenzie, Esq

COPY TO:       020 7351 1623
               Michael Baker-Harber Esq.

               000 852 2877 2633
               Ince & Co.
               Simon Latham Esq. / Roy MacFarlane Esq.

FROM:          G D Winter
OUR REF:       GDW/in/82/52
NUMBER OF PAGES:   1

CONFIDENTIALITY NOTICE: This facsimile is intended only for the addressee. It may contain privileged and/or confidential information. If you are not the intended recipient please inform us on the above telephone number immediately and do not disclose the contents or take copies.

### Re: "ALINA" – C/P dd 28th November 2003

Further to our previous correspondence, we wish to confirm that this matter has now been amicably settled and we should therefore be grateful if the Tribunal would close its file.

We would like to thank yourself and Mr. Baker-Harber for the Tribunal's kind assistance in this case.

Yours faithfully,

WINTER SCOTT

Partners: Glenn Winter Ken Scott Michael Ellis Damian Wilkes Tim Houghton
Associates: Richard Verney (not admitted) Rachel Belsham-Revell James King
Non-Practising Consultant: Heidi Shamsuddin
Regulated by the Law Society

VAT No GB 819 4174 16

TOTAL P.01

30

# Fax



SJ Latham
AWY Chan
RSY Lau
PJ Murray*
DJ Beaves**
KCK Lee

PRC LAWYER
Z Chen

*Non resident partners
**Notary Public

Please contact ext 110 immediately if any part of this transmission is incorrectly received.

INTERNATIONAL LAW FIRM

Room 3801-6, 38th Floor
ICBC Tower
Citibank Plaza
3 Garden Road
Hong Kong

Tel +852 2877 3221
Fax +852 2877 2633
Email firstname.lastname@incelaw.com
www.incelaw.com

| From | Our Ref | Date |
|---|---|---|
| Simon Latham / Rory Macfarlane | SJL/RMcF/fy (04.0391) | 8 July 2005 |

| To | Attention | Your Ref |
|---|---|---|
| Mr M J Baker-Harber | | |

| Total number of pages | Town/Country | Fax Number |
|---|---|---|
| 1 | London | +44 207 584 1588 |

| Copies to | Attention/Ref | Town/Country/Fax Number |
|---|---|---|

**Matter**

**Fuchen Dihai Shipping Co Ltd v Transfield Er Cape Limited**
*ALINA – C/P dated 28 November 2003*

We write further to Winter Scott's fax of 6 July 2005 in which they notified the Tribunal that this claim has been settled. As a result, we write simply to enquire whether you have any further fees which must be settled.

We should be grateful if you would kindly clarify the position at your earliest convenience and we would also like to take this opportunity to thank you for accepting the appointment in this matter.

Best regards,

Simon Latham/Rory Macfarlane
Ince & Co
N:\04.0391\RMcF fy\Baker-Harber.002

"the message from Transfield that they will start arbitration again"

To: Hong Kong Fuchuen Company Limited AND
    Fuchen Dihai Shipping Co Ltd

Further to our letter of 28 April 2005 and your fax of 21 July 2005, we believe that both parties have not reached any agreement or common view regarding to the arbitration dispute of M.V. ALINA.

Although we continuously believe that the suggestions we stated in our letter of 28 April 2005 were practicable, reasonable and constructive for both parties' points of view, unfortunately you did not fully accept our suggestions in your fax of 21 July 2005 apart from the acceptance of terminating the arbitration process. You did not mention the result of acceptance of other additional conditions. Therefore, we believe that you did not agree to all the conditions laid down in our letter of 28 April 2005.

We feel deeply regrettable that you continuously ignored us despite that we attempted to communicate with various relevant persons in your company last year and this year and stated our positions/view on a number of occasions. Therefore, we have decided that we would re-open the arbitration procedure as regarding M.V.ALINA with effect from today.

We hereby serve you this notice.

Transfield ER Cape Limited *(company seal)*

7 March 2006

 **This translation accurately reflects the meaning of the attached original.**

Chief Translator :___Nora Ali___          ID No:__S8242722H___
**Chambers Consultants Pte Ltd\*** Reg. No. 199006158 G \* www.chambersinternational.net
1 Sophia Road, #03-09, Peace Centre, Singapore 228149 Tel: (65) 6334 6013, 6339 1886 Fax: 6339 6168

32

致： 香港富睿有限公司并富春帝海船务有限公司

接我司 2005 年 4 月 28 日所发函及贵司同年 7 月 21 日所复传真，我司认为双方一直未能就 "ALINA" 轮有关件载争议达成任何协议及共识。

虽然我司一直认为我司 05 年 4 月 28 日函中所提建议对双方都是可行、合理及极具建设性的，惜你司在 05 年 7 月 21 日所覆函中并未对我司提议全面接受，只提到可以接受终止件载，并未提及其它附带条件的接受结果，因此我司认为你方并不赞同我司 05 年 4 月 28 日函中的所有条件。

尽管我司在去年及今年随后时间中与你司有关人员多方联系，并多次阐明了我司立场，惜你方一直置之不理，我司对此深表遗憾，因此我司决定由即日开始重新启动与贵司的"ALINA"轮的件载程序。

特此知会。

昌瑞泉宝

2006 年 3 月 7 日

TO = FUCHUEN

ATTN: 继红

33



RHB Building Cecil Street #16-02A
Singapore 069531
Phone: +65 6225 4020
Fax: +65 6225 4022
E-mail: prodgers@rodgersco.com

## Rodgers & Co Solicitors (Asia) Pte Ltd

# Fax

 URGENT

| To: | Transfield ER Cape Ltd | From: | Paul Rodgers |
|---|---|---|---|
| Attn: | Claims Department | Pages: | 2 |
| Fax: | 852 2587 9551 | Date: | 17 March 2006 |
| Yr Ref: | | Our Ref: PR/KVay | |

RE:    CHARTER PARTY DATED 26 NOVEMBER 2003 – BREACH OF SETTLEMENT
AGREEMENT

We have been instructed by FUCHUEN DIHAI SHIPPING CO LIMITED in relation to your recent exchange with them and in particular your fax of 7 March 2006. We note that you allege, for the first time, that no settlement agreement was reached regarding your various claims under the above charter party.

However having carefully considered the documents and relevant materials, it is indisputable that a binding settlement agreement was reached with yourselves as long ago as April 2005. Indeed your own fax to our clients dated 28 April 2005 states inter alia "Further to our company's manager's friendly discussion, we both reached the same agreement as follows" (our emphasis). We will not recite the entire fax, suffice to say that it was agreed between the company managers that Transfield ER would terminate the arbitration procedure immediately and withdraw your arbitration application (our emphasis).

There can be no dispute whatsoever therefore that the settlement agreement was reached between the parties and was recorded in the fax dated 28 April 2005. This matter is put beyond doubt by our client's fax of 21 July 2005 in which our clients agreed to waive their legal costs incurred todate.

Regrettably you have breached that agreement by failing to immediately withdraw your arbitration proceedings notwithstanding the said agreement. You now, some eight months after our client's fax and almost a year after the settlement agreement, suggest that our clients are somehow in breach.

There is clearly no foundation whatsoever in your allegation but even if it was true (which we deny) we would not be surprised if our clients did not wish to maintain ongoing business relations with you, given the said breach of the settlement agreement.

Unless you unequivocally, and unconditionally notify the Tribunal by close of business Tuesday 21 March 2006 (London time) with copy to ourselves that you have irrevocably discontinued the arbitration, we will recommend to our clients that they take all appropriate measures to enforce that agreement and seek full damages arising out of your breach. At that time we will take all necessary legitimate action to bring your unlawful conduct to the attention of the shipping market and take all appropriate measures to obtain security for our client's damages arising out of the said breach.

March 17, 2006

We are unsure whether you have appointed any lawyers but would strongly recommend that you discuss this letter and the relevant correspondence, with your legal advisers before you respond to this message.

We look forward to hearing from you by close of business Tuesday 21 March 2006.

Regards

Paul Rodgers
Solicitor



17/03 2006 18:41 FAX  +85 62256022          RODGERS N CO SOLICITORS                    ☎001

```
***************************
***     TX REPORT     ***
***************************

TRANSMISSION OK

TX/RX NO                 0825
DESTINATION TEL #        15165322875551
DESTINATION ID
ST. TIME                 17/03 18:41
TIME USE                 00'45
PAGES                    2
RESULT                   OK
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

TRANSFIELD ER CAPE LIMITED ,                    :

                            Plaintiff,          :        04 Civ. _____ (      )

            - against -                         :

FUCHUEN DIHAI SHIPPING CO.,                     :
LTD., HONG KONG,                                :

                            Defendant.          :
------------------------------------------------------X

**Judge Pauley**

04 CV 0~~

RECEIVED
JUN 10 2004
U.S.D.C. S.D. N.Y.
CASHIERS

### VERIFIED COMPLAINT

Plaintiff, TRANSFIELD ER CAPE LIMITED (hereafter referred to as "Plaintiff" or

"Transfield"), by and through its attorneys, Tisdale & Lennon, LLC, as and for its Verified

Complaint against the Defendant, FUCHUEN DIHAI SHIPPING CO., LTD., HONG KONG

(hereafter referred to as "Defendant" or "Fuchuen"), alleges, upon information and belief, as

follows:

      1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.

      2.     At all times material to this action, Plaintiff was, and still is, an entity duly

incorporated under the laws of British Virgin Islands with a principal place of business at 30

Harbour Road, Wanchai, Hong Kong.

      3.     Plaintiff is an operator of sea going vessels and is involved in the carriage and

delivery of bulk cargoes by sea.

4.    Upon information and belief, Defendant was, and still is, a corporation, or other business entity, organized under, and existing by virtue of, the laws of Hong Kong, with a principal place of business in Hong Kong.

5.    On or about November 28, 2003, Plaintiff and Defendant entered into a charter party whereby Plaintiff agreed to supply a sea going vessel to Defendant to carry a total volume of 170,000 metric tons of iron ore from one safe berth, one safe port at Ponta Do Ubu, Brazil to a final discharge at one or two safe berths, one safe port at Beilun, Peoples Republic of China. A copy of the charter party is attached hereto as Exhibit 1.

6.    Defendant was required to pay Plaintiff $33.50 per metric ton of cargo carried on the performing vessel. Defendant was further required, as per contract, to pay additional monies for use, or detention, of the Plaintiff's vessel in excess of the time permitted under the contract of charter. Detention of the vessel required that Defendant pay Plaintiff $80,000 per day.

7.    Plaintiff nominated the M/V "Alina" to perform the carriage of cargo contemplated by the charter party.

8.    Pursuant to the aforesaid agreement the Plaintiff employed the M/V "Alina" to perform the carriage of Defendant's cargo and this vessel arrived at the discharge port of Beilun, China on March 14, 2004. However, due to a shortage of storage capacity and barge availability the Defendant's cargo was not fully discharged from the M/V "Alina" until April 9, 2004.

9.    Based upon the foregoing, upon information and belief, and as best as may be presently estimated, the Plaintiff alleges that Defendant owes Plaintiff $1,980,000 in detention damages due to the 24.75 days of vessel detention which occurred at Beilun, China.

2

10.    As a result of the Defendant's breach of the aforesaid maritime contract of charter, Plaintiff has suffered damages and loss in the total principal sum of $1,980,000.00 as best as may be presently estimated.  Damages are exclusive of interest thereupon, costs, reasonable attorney's fees and other damages which may be sustained as a result of the Defendant's breach.

11.    The charter party provides in Clause 42 that any disputes arising thereunder are to be arbitrated in London, England.

12.    Plaintiff will shortly nominate its arbitrator.

13.    Interest, costs and attorney's fees are routinely awarded to the prevailing party in London arbitration proceedings.  As best as may now be estimated, Plaintiff expects to recover from the Defendant the following amounts in the arbitration:

| | | |
|---|---|---|
| A. | Principal claim: | $1,980,000; |
| B. | 2 years interest at 8% per annum: | $316,800 |
| C. | Costs (arbitrators fees, etc…) | $25,000; and |
| D. | Attorney's fees: | $60,000. |

14.    The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of Citibank, N.A., garnishee, which is believed to be due and owing to the Defendant.

3

15.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching any assets of the Defendant held by the aforesaid garnishees for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Complaint;

B.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all of the Defendant's tangible or intangible property held by any garnishee, including Citibank, N.A., which are due and owing to the Defendant, up to the amount of $2,381,800 to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That this Court retain jurisdiction over this matter through the entry of a judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof; and

D.    That the Plaintiff have such other, further and different relief as the Court may deem just and proper.

4

39

Dated:        New York, New York
              June 10, 2004


                              The Plaintiff,
                              TRANSFIELD ER CAPE LIMITED


                      By: _____
                              CHARLES E. MURPHY (CM 2125)
                              KEVIN J. LENNON (KL 5072)

                              TISDALE & LENNON, LLC
                              11 West 42nd Street
                              Suite 900
                              New York, NY 10036
                              (212) 354-0025 – phone
                              (212) 869-0067 – fax

5

**ATTORNEY'S VERIFICATION**

State of Connecticut )
                 )   ss.:    Town of Southport
County of Fairfield )

    1.     My name is Charles E. Murphy.

    2.     I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

    3.     I am an associate with the firm of Tisdale & Lennon, LLC, attorneys for the Plaintiff.

    4.     I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

    5.     The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a corporation with no officers or directors now within this District.

    6.     The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

    7.     I am authorized to make this Verification on behalf of the Plaintiff.

Dated:        Southport, Connecticut
            June 10, 2004

                                       CHARLES E. MURPHY

6

## Paul Rodgers

**From:** BM HKG Claims [hkg@skuld.com]

**Sent:** Friday, July 06, 2007 12:17 PM

**To:** Paul Rodgers; patrickodonovan@hotmail.com

**Subject:** MV ALINA C/P DD 28 November 2003

Oref:   40018159/03/NMA
Attn:   Paul Rogers
Yref:   PRR/ay/1043

Attn:   Patrick O'Donovan

**Re: Alina – C/P DD 28/11/2003**

We confirm that we have appointed Patrick O'Donovan as Transfield's Arbitrator in respect of all disputes arising under or in relation to the above Charterparty (including settlement discussions relating to the Charterparty).

It is Transfield's position that they are entitled to pursue arbitration under the Charterparty on the basis that, even if there was a settlement agreement between the parties, Charterers repudiated the terms of any such settlement agreement.

If you do not accept that this was the case and you wish to proceed with an application to the Tribunal, we would suggest that you constitute the Tribunal and make a formal application with full supporting documents and particulars (including details of any alleged agreement on which you rely).

Regards,

Nicola Mason
Vice President
Skuld (Far East) Ltd.
Direct Line: +852 2836 4715
Mobile: +852 9028 4217
www.skuld.com

42

## Paul Rodgers

| | |
|---|---|
| **From:** | Nicola Mason [nicola.mason@skuld.com] |
| **Sent:** | Friday, June 29, 2007 4:19 PM |
| **To:** | Paul Rodgers |
| **Cc:** | Amelia Cheung |
| **Subject:** | FW: RE:- ALINA C/P DD 28 NOVEMBER 2003 |

Dear Paul

Sorry there was some typos not least being your name. I pressed sent too quickly. Below is the corrected version.
Best regards
Nicola

**From:** Nicola Mason
**Sent:** 29. Fri, Jun 2007 16:09
**To:** 'prodgers@rodgersco.com'
**Cc:** Amelia Cheung
**Subject:** RE:- ALINA C/P DD 28 NOVEMBER 2003

Without Prejudice

Dear Paul

I am glad to see you are on this one officially. I will formally respond to you and Patrick O Donovan with regard to your fax of 25 June 2007.

As you know the alleged agreement was certainly not a straight forward agreement or in fact in any way substantive. in so far as it was , your clients clearly repudiated the agreement which would leave our members perfectly free to arbitrate the matter which they have done.

No doubt you are aware that a Rule B attachment has caught significant sums. The purpose of this email was simply to see whether your clients are minded to resolve this matter amicably. I do not have any instructions to approach you on this but as we have in the past been able to resolve cases in a sensible manner I thought it might be worth sounding you out.

Best regards.
Nicola Mason

43

Ex. A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

TRANSFIELD ER CAPE LIMITED,

              Plaintiff,

   - against -

FUCHUEN DIHAI SHIPPING CO. LTD. and ZHEJIANG
FUCHUEN CO. LTD.,

              Defendants.

------------------------------------------------------------X

07 CIV 4528

ECF CASE



RECEIVED
MAY 3 0 2007
U.S.D.C. S.D. N.Y.
CASHIERS

### VERIFIED COMPLAINT

    Plaintiff, TRANSFIELD ER CAPE LIMITED (hereafter referred to as "Plaintiff"), by

and through its attorneys, Lennon, Murphy, and Lennon, LLC, as and for its Verified Complaint

against the Defendants, FUCHUEN DIHAI SHIPPING CO. LTD. ("FUCHUEN DIHAI") and

ZHEJIANG FUCHUEN CO. LTD. ("ZHEJIANG FUCHUEN") (collectively referred to as

"Defendants"), alleges, upon information and belief, as follows:

    1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.

    2.     At all times material to this action, Plaintiff was, and still is, a foreign company

duly organized and operating under foreign law.

    3.     Plaintiff is an operator of sea going vessels and is involved in the carriage and

delivery of bulk cargoes by sea.

    4.     Upon information and belief, Defendant Fuchuen Dihai, was, and still is, a foreign

corporation, or other business entity, organized under, and existing by virtue of foreign law.

5.    Upon information and belief, Defendant Zhejiang Fuchuen, was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was, and still is, at all material times the alter-ego, alias and/or paying agent of Fuchuen Dihai.

6.    On or about November 28, 2003, Plaintiff and Defendant Fuchuen Dihai entered into a charter party whereby Plaintiff agreed to supply a sea going vessel to Defendant Fuchuen Dihai to carry a total volume of 170,000 metric tons of iron ore from one safe berth, one safe port at Ponta Do Ubu, Brazil to a final discharge at one or two safe berths, one safe port at Beilun, Peoples Republic of China.

7.    Defendant Fuchuen Dihai was required to pay Plaintiff $33.50 per metric ton of cargo carried on the performing vessel. Defendant Fuchuen Dihai was further required to pay demurrage, or additional hire for use of the Plaintiff's vessel in excess of the time permitted under the contract of charter, at a rate set forth in the contract depending on the gross tonnage of the performing vessel. Detention of the vessel required that Defendant Fuchuen Dihai pay Plaintiff $100,000 per day.

8.    Plaintiff nominated the M/V "Alina" to perform the carriage of the cargo contemplated by the charter party.

9.    Pursuant to the aforesaid agreement the Plaintiff employed the M/V "Alina" to perform the carriage of Defendant Fuchuen Dihai's cargo and thus vessel arrived at the discharge port of Beilun, China on March 14, 2004.

10.    Due to a shortage of storage capacity and barge availability the Defendant Fuchuen Dihai's cargo was not fully discharged from the M/V "Alina" until April 8, 2004 in breach of the agreement.

2

11.     Disputes arose among the parties regarding Defendant Fuchuen Dihai's failure to pay detention due and owing to Plaintiff under the agreement.

12.     As a result of Defendant Fuchuen Dihai's breach of the agreement, as best as may be reasonably approximated, Plaintiff sustained damages in the total principal amount of $2,475,000.00, exclusive of interest, arbitration costs and attorney's fees.

13.     Pursuant to the agreement, all disputes arising thereunder are to be submitted to arbitration in London with English Law to apply.

14.     Plaintiff commenced a prior action in this court under docket # 04 Civ. 4395 (WHP) and obtained an Ex-Parte Order of Maritime Attachment and Garnishment attachment against Defendant Fuchuen Dihai pursuant to Rule B of the Supplemental Admiralty Rules on June 17, 2004.

15.     Subsequently, the parties negotiated a compromise settlement and the action was voluntarily dismissed *without prejudice.*

16.     However, Defendant Fuchen Dihai has now denied the existence of the settlement and refused to pay the sum owed to Plaintiff under the agreement. The settlement agreement did not contain a jurisdiction clause.

17.     Despite due demand Defendant Fuchuen Dihai has failed to pay the amounts due and owing under the agreement and has failed to adhere to the terms of the settlement.

18.     In consequence of Defendant's denial of the settlement agreement, Plaintiff is in the process of recommencing the London arbitration under the November 28, 2003 charter party, pursuant to which all disputes between the parties are to be submitted to arbitration in London with English Law to apply.

3

19.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party in arbitration pursuant to English Law. As best as can now be estimated, Plaintiff intends to claim the following amounts:

| | | |
|---|---|---|
| A. | Principal claim: | $2,475,000.00 |
| B. | Estimated interest on claims:<br>5 years (2004-2009) at 8%, compounded quarterly | $1,204,316.39 |
| C. | Estimated attorneys' fees: | $150,000.00 |
| D. | Estimated arbitration costs/expenses: | $60,000.00 |
| **Total** | | **$3,889,316.39** |

20.    Zhejiang Fucheun is the alter-ego of Fuchuen Dihai because it dominates and disregards Fuchuen Dihai's corporate form to the extent that Zhejiang Fucheun is actually carrying on Fuchuen Dihai's business and operations as if the same were its own, or vice versa.

21.    Upon information and belief, Fuchuen Dihai has no separate identity from Zhejiang Fuchuen.

22.    Defendants have the exact same address: United Centre 35th Floor, Room B, 95 Queensway Admiral, Hong Kong.

23.    Upon information and belief, Fuchuen Dihai uses Zhejiang Fuchuen as a "paying agent" or "pass through" entity such that it can insulate itself from creditors relating to its contracts.

24.    It is not general practice in the maritime community, nor any where else, for independent companies to make large payments on behalf of other independent companies.

25.    Payments sent or received on behalf of another independent company are suggestive of a relationship that is not "arms length."

4

26. Upon information and belief, Zhejiang Fuchuen makes payments on Fuchuen Dihai's behalf where Zhejiang Fuchuen has absolutely no contractual obligation to Fuchuen Dihai's creditors.

27. Upon information and belief, Zhejiang Fuchuen made a payment on Fuchuen Dihai's behalf with regards to the above agreement on May 18, 2004 in the amount of $284,192.56.

28. In the further alternative, Defendants are partners and/or joint venturers.

29. In the further alternative, Defendants are affiliated companies such that Zhejiang Fuchuen is now, or will soon be, holding assets belonging to Fuchuen Dihai, or vice versa.

30. In the alternative, "FUCHUEN DIHAI" is an alias of "ZHEJIANG FUCHUEN."

31. The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendants.

32. The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendants held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendants, and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Complaint;

B.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$3,889,316.39** belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That the court enter a judgment against the Defendant(s) on the parties' settlement agreement;

D.    That in the alternative and in the event that the court determines there is no settlement agreement between the parties that the Court recognize and confirm any arbitration award or judgment rendered on the claims had herein as a Judgment of this Court;

E.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

4 9

F.    That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

G.    That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated: Southport, CT
       May 30, 2007

The Plaintiff,
TRANSFIELD ER CAPE LIMITED


By: _____
    Patrick F. Lennon (PL 2162)
    Nancy R. Peterson (NP 2871)
    LENNON, MURPHY & LENNON, LLC
    The Gray Bar Building
    420 Lexington Ave., Suite 300
    New York, NY 10170
    Phone (212) 490-6050
    Fax (212) 490-6070
    pfl@lenmur.com
    nrp@lenmur.com

7

PAULEY S.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

TRANSFIELD ER CAPE LIMITED,

               Plaintiff,

   - against --

FUCHUEN DIHAI SHIPPING CO. LTD. and ZHEJIANG
FUCHUEN CO. LTD.,

               Defendants.

------------------------------------------------------------X

**07 CIV 4528**

07 CV _____

ECF CASE

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/31/07

### EX PARTE ORDER FOR PROCESS OF MARITIME ATTACHMENT

**WHEREAS**, on May 30, 2007 Plaintiff, TRANSFIELD ER CAPE LIMITED, filed a

Verified Complaint, herein for damages amounting to **$3,889,316.39** inclusive of interest, costs

and reasonable attorney's fee, and praying for the issuance of Process of Maritime Attachment

and Garnishment pursuant to Rule B of the Supplemental Admiralty Rules for Certain Admiralty

and Maritime Claims of the Federal Rules and Civil Procedure; and

**WHEREAS**, the Process of Maritime Attachment and Garnishment would command that

the United States Marshal or other designated process server attach any and all of the

Defendants' property within the District of this Court; and

**WHEREAS**, the Court has reviewed the Verified Complaint and the Supporting

Affidavit, and the conditions of Supplemental Admiralty Rule B appearing to exist:

**NOW**, upon motion of the Plaintiff, it is hereby:

**ORDERED**, that pursuant to Rule B of the Supplemental Rules for Certain Admiralty

and Maritime Claims, the Clerk of the Court shall issue Process of Maritime Attachment and

Garnishment against all tangible or intangible property, credits, letters of credit, bills of lading,

effects, debts and monies, electronic funds transfers, freights, sub-freights, charter hire, sub-charter hire or any other funds or property up to the amount of **$3,889,316.39** belonging to, due or being transferred to, from or for the benefit of the Defendant(s), including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named on whom a copy of the Process of Maritime Attachment and Garnishment may be served; and it is further

 **ORDERED** that supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further order of the Court; and it is further

 **ORDERED** that following initial service by the United States Marshal or other designated process server upon each garnishee, that supplemental service of the Process of Maritime Attachment and Garnishment, as well as this Order, may be made by way of facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee; and it is further

 **ORDERED** that service on any garnishee as described above is deemed effective continuous service throughout the day from the time of such service through the opening of the garnishee's business the next business day; and it is further

 **ORDERERD** that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) each garnishee may consent, in writing, to accept service by any other means.

**SO ORDERED:**

WILLIAM H. PAULEY III U.S.D.J.

5/30/07

2

**Paul Rodgers**

| | |
|---|---|
| **From:** | Rahul Wanchoo [rwanchoo@ecaseinc.com] |
| **Sent:** | 10 July 2007 06:40 |
| **To:** | 'Patrick F. Lennon' |
| **Cc:** | 'Owen Duffy'; 'Nancy R. Peterson' |
| **Subject:** | RE: Transfield v. Fuchuen Dihai et al - 1056 |
| **Importance:** | High |

Pat,

The flip side of that argument is that if you maintain that Zhejiang Fuchuen is the alter ego of Fuchuen Dihai (FD), then Transfield does not have the right to continue to serve the banks and attach additional funds of FD when it is already secured for the full amount of its claim. It seems to me that Transfield wants to have its cake and eat it too. While I cannot speak of ZF's property, I request that Transfield immediately vacate the $51,355 restrained by Standard Chartered. Please confirm if Transfield will agree to voluntarily vacate the excess attachment, failing which I will have to write to Judge Cederbaum requesting an immediate hearing in this matter.

Best regards,

Rahul Wanchoo
Law Offices of Rahul Wanchoo
Phone:(201) 882-0303
Fax:   (201) 301-3576
Mobile:(201) 694-5235
E-mail: rwanchoo@wanchoolaw.com
Web site: www.wanchoolaw.com

CONFIDENTIALITY NOTICE

THE INFORMATION AND MATERIAL CONTAINED IN THIS E-MAIL MESSAGE ARE INTENDED ONLY FOR THE USE OF THE ADDRESSEE AND MAY BE PRIVILEGED AND CONFIDENTIAL ATTORNEY COMMUNICATION. PERSONS RESPONSIBLE FOR DELIVERING THIS COMMUNICATION TO THE INTENDED RECIPIENT ARE INSTRUCTED NOT TO DISCLOSE, COPY OR DISTRIBUTE THIS COMMUNICATION AND ARE NOT AUTHORIZED TO TAKE ANY ACTION WITH RESPECT TO IT OTHER THAN TO ASSURE ITS PROPER DELIVERY TO THE PERSON TO WHOM IT IS ADDRESSED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE TO ARRANGE FOR ITS PROPER RETURN DESTRUCTION.

**From:** Patrick F. Lennon [mailto:pfl@lenmur.com]
**Sent:** Monday, July 09, 2007 2:33 PM
**To:** Rahul Wanchoo
**Cc:** Owen Duffy; Nancy R. Peterson
**Subject:** RE: Transfield v. Fuchuen Dihai et al - 1056

Rahul,

It is simply my position that if you are denying the alter ego, and also denying that the funds already attached belong to Fuchuen Dihai, then Transfield has the right to seek to attach property over which there is no question as to who owns it. At most, I am willing to release an equivalent amount of Zhejiang Fuchuen's property (once my client authorizes me to do so), but Transfield will not consent to release funds that undoubtedly belong to your client.

I would appreciate you and Owen (RIC) letting me know if the foregoing compromise position is acceptable.

Thanks and regards,

Patrick F. Lennon
*Lennon, Murphy & Lennon, LLC*

10/07/2007

The GrayBar Building
420 Lexington Ave, Suite 300
New York, NY 10170
(212) 490-6050
(212) 490-6070 fax

Tide Mill Landing
2425 Post Road
Southport, CT 06890
(203) 256-8600
(203) 256-8615 fax

www.lenmur.com

****NOTICE****
This message is being sent by a lawyer and may contain confidential information, attorney-client privileged
information or attorney work-production information.  If you have received this message in error, please notify
the sender and delete the message.  Thank you.

---

**From:** Rahul Wanchoo [mailto:rwanchoo@ecaseinc.com]
**Sent:** Monday, July 09, 2007 2:32 PM
**To:** Patrick F. Lennon
**Cc:** 'Owen Duffy'; Nancy R. Peterson
**Subject:** RE: Transfield v. Fuchuen Dihai et al - 1056

Dear Pat,

As I understand it Transfield doesn't have an independent claim against ZF. The predicate of attaching ZF's
funds is that it is allegedly an alter ego of FD, against whom you have brought the Rule B attachment. Do
you have any authority that you are entitled to security from each defendant? The ex parte order authorizes
Transfield to attach defendants' property **"up to the amount of $3,889,316.39"**.  For your information, in
another Rule B case I have with Kevin where I represent the plaintiff, I got my wrists slapped by Judge
Haight for attaching funds in excess of the amount authorized by the Order where we were seeking an
amendment of the claim.

I look forward to hearing from you.

Best regards,

Rahul Wanchoo
Law Offices of Rahul Wanchoo
Phone:(201) 882-0303
Fax:    (201) 301-3576
Mobile:(201) 694-5235
E-mail: rwanchoo@wanchoolaw.com
Web site: www.wanchoolaw.com

---

**From:** Patrick F. Lennon [mailto:pfl@lenmur.com]
**Sent:** Monday, July 09, 2007 12:44 PM
**To:** Rahul Wanchoo
**Cc:** Owen Duffy; Nancy R. Peterson
**Subject:** RE: Transfield v. Fuchuen Dihai et al - 1056

Dear Rahul,

10/07/2007

The amended answer from SCB was also the first notification that we received from it that funds of Fuchuen Dihai were restrained. Transfield will not consent to release the attachment of your client's funds because (a) your client and Zhejiang Fuchuen have denied they are alter egos (which Transfield obviously refutes); (b) and the attachment of Zhejiang Fuchuen's funds under the current circumstances of the case does not provide security for Transfield's claims against your client.

Please advise if you need to discuss this further.

Kind regards,

Patrick F. Lennon
*Lennon, Murphy & Lennon, LLC*

The GrayBar Building
420 Lexington Ave, Suite 300
New York, NY 10170
(212) 490-6050
(212) 490-6070 fax

Tide Mill Landing
2425 Post Road
Southport, CT 06890
(203) 256-8600
(203) 256-8615 fax

www.lenmur.com

****NOTICE****
This message is being sent by a lawyer and may contain confidential information, attorney-client privileged information or attorney work-production information. If you have received this message in error, please notify the sender and delete the message. Thank you.

---

**From:** Rahul Wanchoo [mailto:rwanchoo@ecaseinc.com]
**Sent:** Monday, July 09, 2007 12:25 PM
**To:** Patrick F. Lennon
**Cc:** 'Owen Duffy'
**Subject:** Transfield v. Fuchuen Dihai et al
**Importance:** High

Dear Pat,

I note from the amended answer of garnishee Standard Chartered Bank that the bank restrained a wire transfer of $51,335.00 on July 5, 2007, which shows Fuchuen Dihai as the beneficiary of the EFT. This is the first notification I have received about Fuchuen Dihai's assets haven been restrained by the bank pursuant your client's Rule B attachment. I was previously advised by Owen Duffy that Transfield is fully secured to the amount of its claim of $3,889,316.39. If this is correct, please confirm that you have instructed the bank to immediately release the excess funds of $51,355 to Fuchuen Dihai.

Best regards,

Rahul Wanchoo
Law Offices of Rahul Wanchoo
Phone:(201) 882-0303
Fax:    (201) 301-3576
Mobile:(201) 694-5235
E-mail: rwanchoo@wanchoolaw.com
Web site: www.wanchoolaw.com

10/07/2007

CONFIDENTIALITY NOTICE

THE INFORMATION AND MATERIAL CONTAINED IN THIS E-MAIL MESSAGE ARE INTENDED ONLY FOR THE USE OF THE
ADDRESSEE AND MAY BE PRIVILEGED AND CONFIDENTIAL ATTORNEY COMMUNICATION. PERSONS RESPONSIBLE FOR
DELIVERING THIS COMMUNICATION TO THE INTENDED RECIPIENT ARE INSTRUCTED NOT TO DISCLOSE, COPY OR DISTRIBUTE
THIS COMMUNICATION AND ARE NOT AUTHORIZED TO TAKE ANY ACTION WITH RESPECT TO IT OTHER THAN TO ASSURE ITS
PROPER DELIVERY TO THE PERSON TO WHOM IT IS ADDRESSED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR,
PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE TO ARRANGE FOR ITS PROPER RETURN DESTRUCTION.

10/07/2007

Joseph A. Vogel (JV-5533)
KRAVET & VOGEL, LLP
1040 Avenue of the Americas, Suite 1101
New York, New York 10018-3703
212-997-7634

*Attorneys for Garnishee Standard Chartered Bank*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

TRANSFIELD ER CAPE LIMITED,

|                                   |                        |
|-----------------------------------|------------------------|
| Plaintiff,                        | 07 CIV 4528 (WHP)      |
| -against-                         | AMENDED ANSWER OF GARNISHEE |
| FUCHUEN DIHAI SHIPPING CO. LTD. and | STANDARD CHARTERED BANK IN |
| ZHEJIANG FUCHUEN CO. LTD.,        | RESPONSE TO MARITIME |
|                                   | ATTACHMENT AND GARNISHMENT |
| Defendants.                       |                        |

------------------------------------------------------------x

TO THE MARSHALL OF THE SOUTHERN DISTRICT OF NEW YORK:

In compliance with Rule B(3)(a) of the Supplemental Rules for Certain Admiralty and

Maritime Claims of the Federal Rules of Civil Procedure, and in reference to that certain Process of

Maritime Attachment and Garnishment, dated June 1, 2007, as initially served upon garnishee

STANDARD CHARTERED BANK, One Madison Avenue, New York, New York 10010 and again

thereafter; garnishee STANDARD CHARTERED BANK, by its attorneys Kravet & Vogel, LLP, as

its verified answer does hereby state that on the date of service upon garnishee of another copy of the

aforementioned Process of Maritime Attachment and Garnishment, and as of the date of this

response, STANDARD CHARTERED BANK, New York Branch, had no property or assets in its

possession or custody owing or belonging to the defendants, except for the following three (3) wire

#1099A                                  1

transfers which have been restrained pending further court order pursuant to the aforesaid Process of

Maritime Attachment and Garnishment:

Wire No. 1:

| | |
|---|---|
| Transaction Reference: | 20070608-00029277 |
| Sender Reference Number: | P0706080160OP01 |
| Wire Transfer Request Received (NY): | June 8, 2007 |
| Value Date: | June 8, 2007 |
| Amount of Wire: | US$3,050,000.00 |
| Amount Restrained: | US$3,050,000.00 |
| Originator: | **Zhejiang Fuchuen Co Ltd** |
| | 35.F, Flat B, United Centre |
| | 95 Queensway |
| | Hong Kong |
| Originator's Bank: | Fortis Bank HK |
| | Attn Zonnie Leung Rm Inst Bkg Fds |
| | 27.F Fortis Bk Twr 77-79 Gloucester |
| | Wanchai Hong Kong |
| Beneficiary: | Zhejiang Fuchuen Co Ltd. |
| Beneficiary Bank: | Standard Chartered Bank HK Ltd. |
| | 4-4A Des Voeux Road Central |
| | Hong Kong |

Wire No. 2:

| | |
|---|---|
| Transaction Reference: | 20070611-00019012 |
| Sender Reference Number: | 070611MS99241100 |
| Wire Transfer Request Received (NY): | June 11, 2007 |
| Value Date: | June 11, 2007 |
| Amount of Wire: | US$193,640.65 |
| Amount Restrained: | US$193,640.65 |
| Originator: | **Zhejiang Fuchuen Co Ltd** |
| | Office B 35/F United Ctr |
| | 95 Queensway |
| | HK |
| Originator's Bank: | Bank of China (Hong Kong) Ltd. |
| | Settlement Division |
| | 24/F Bank of China Center |
| | Olympian City 1, 11 Hoi Fai Road |
| Beneficiary: | Sang Thai Shipping Agency(s) Pte Ltd |
| Beneficiary Bank: | Standard Chartered Bank |
| | Maxwell Road |
| | Singapore 9038 |

#1099A                                    2

Wire No. 3:

| | |
|---|---|
| Transaction Reference: | 20070705-00016515 |
| Sender Reference Number: | 2020T07070402192 |
| Wire Transfer Request Received (NY): | July 5, 2007 |
| Value Date: | July 5, 2007 |
| Amount of Wire: | US$51,335.00 |
| Amount Restrained: | US$51,335.00 |
| Originator: | Bright Seaway S. Co. Ltd.<br>Rm 601<br>No. 2 Nong 121 Qin He Road<br>Jiang Bei |
| Originator's Bank: | Standard Chartered Bank HK Ltd<br>4-4A Des Voeux Road Central<br>Hong Kong |
| Beneficiary: | Fuchuen Dihai Shipping Co. Ltd.<br>35 Fl United Centre 95 Queensway<br>Hong Kong |
| Beneficiary Bank: | Bank of China Hong Kong Ltd.<br>14/F, Bank of China Tower<br>1 Garden Road<br>Hong Kong |

Dated:     New York, New York
           July 6, 2007

KRAVET & VOGEL, LLP

By: _____
      Joseph A. Vogel (JV 5533)

1040 Avenue of the Americas, Suite 1101
New York, New York 10018-3703
212-997-7634
*Attorneys for Garnishee Standard Chartered Bank*

TO:   Lennon, Murphy & Lennon, LLC
      420 Lexington Avenue, Suite 300
      New York, New York 10170
      (212) 490-6050

      *Attorneys for Plaintiff*

#1099A                        3

## VERIFICATION

STATE OF NEW YORK        )
                                    )ss.:

COUNTY OF NEW YORK     )

    JAYSON JARUSHEWSKY, being duly sworn, deposes and states as follows:  I am an Executive Vice President and Head of Legal –The Americas, for Standard Chartered Bank, and have reviewed the contents of the forgoing Amended Answer of Garnishee Standard Chartered Bank in Response to Maritime Attachment and Garnishment and know the contents thereof and that the same are true as to my own personal knowledge, except as to those matters stated to be upon information and belief, and as to those matters I believe them to be true.  I base my information upon personal knowledge and a review of the Bank's files relating to this matter.

JAYSON JARUSHEWSKY

Sworn to before me this
6th  day of July 2007

Notary Public

CHARLENE SUMPTER
Notary Public, State of New York
No. 01SU5042463
Qualified in New York County
Commission Expires April 24, 2011

#1099A                         4