# EXHIBIT 2

5 Shenton Way #19-01
UIC Building
Singapore 068808
Phone: +65 6225 4020
Fax:    +65 6225 4022
E-mail: prodgers@rodgersco.com

**Rodgers & Co Solicitors (Asia) Pte Ltd**



| | | | | |
|---|---|---|---|---|
| **To:** | Patrick O'Donovan | | **From:** | Paul Rodgers |
| **Fax:** | +44 20 8977 3052 | | **Pages:** | 2 + 18 |

| | |
|---|---|
| **Cc:** | Winter Scott |
| **Attn:** | Graeme Lloyd |
| **Yr Ref:** | GDW/GL/kr/82/143 |
| **Fax:** | +44 20 7726 2371 |

| | |
|---|---|
| **Date:** | 17 July 2007 |
| **Our Ref:** | PRR/ay/1043 |

| | |
|---|---|
| **Cc:** | B J Macfarlane & Co |
| **Attn:** | Ben Macfarlane/Reema Shour |
| **Fax:** | +44 20 7190 2989 |

**URGENT
BY FAX AND EMAIL**

Dear Sir,

### Re: Alina - c/p dd 28th November 2003

Further to our email earlier today, we enclose our client's submissions in response. These had been settled by Counsel after sight of your fax of 16.23 but without the benefit of having read your e-mail of 18.25 or your email this morning

We remain of the view that it would, as originally envisaged, still be possible for an oral hearing to receive oral submissions to take place this week if that would assist you in dealing with the legal issues that arise. We suggest that if a hearing is to take place for this purpose it should be fixed for tomorrow. With respect to Winter Scott, they cannot be heard to say that an oral hearing for that limited purpose cannot take place. After your order of last week it was always envisaged that there may be a short oral hearing for submissions to be made, and the only issue which has changed since then is that Winter Scott served their submissions not on Friday as ordered, not over the weekend as promised but after Singapore office hours yesterday and the best part of two hours after they were apparently approved by their clients. If we could have been ready for an oral hearing today (which we could) then Winter Scott can clearly be ready for a hearing tomorrow.

The suggestion of a hearing to take oral evidence is, clearly, an entirely different matter. For the reasons set out in our submissions we invite you to reject that application. In particular we would point out that throughout last week Winter Scott were maintaining that no oral hearing at all was required - let alone one to take oral evidence. The first notice that either we or you had that their position had changed was upon receipt of their submissions. The tactics employed by Transfield amount to a very obvious attempt to delay the resolution of our application. Not only have they completely changed their position in

In association with B.J. Macfarlane & Co, London

Rodgers & Co Solicitors (Asia) Pte Ltd                                    July 17, 2007

relation to an oral hearing, you will note that they remain prepared to say one thing in this jurisdiction at one time and another (wholly contrary thing) at a different time. Further they remain happy to advance a pleaded verified and sworn case in the US proceedings that cannot be reconciled with the new case they now seek to advance here. Of particular note is, as pointed out in the submissions, that Winter Scott confirmed in open correspondence in 2005 (without any conditionality) that the charterparty disputes had been settled. As recently as last week Mr Winter admitted in open correspondence that his instructions had indeed been that the charterparty disputes had been settled (again with no suggestion of any conditionality). Now Transfield seek to perform a complete U turn. And by doing so at the very last minute (and outside our office hours on the day our response was due) they seek to engineer for themselves the tactical advantage of having determination of our application deferred.

In the circumstances we would invite you to fix an oral hearing for tomorrow morning if, having read our written submissions, you consider that there are any legal issues arising which can usefully be dealt with orally. Our clients have gone to the expense of instructing London solicitors and Counsel to represent them at any hearing that may be necessary. We remain ready to attend a hearing if that would assist you. Otherwise we urge you to dispose of the application on paper as Winter Scott themselves originally urged.

One final but important point we should make is that a hearing is scheduled to take place in New York on Wednesday evening (our time) to vacate the Rule B attachment and it would considerably assist the US court if they had some indication of the present status of the English Arbitration proceedings purportedly commenced by Transfield.

Perhaps you would revert to the parties once you have had the chance to consider this letter and our client's submissions.

Kind regards

Paul Rodgers
Solicitor

● Page 2

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND IN THE MATTER OF AN ALLEGED ARBITRATION

B E T W E E N :-

### TRANSFIELD ER CAPE LIMITED

**Owners/Claimants**

- and -

### FUCHUEN DIHAI SHIPPING CO. LTD.

**Charterers/Respondents**

### REPLY SUBMISSIONS

*on behalf of*

### FUCHUEN DIHAI SHIPPING CO. LTD.

1.     These submissions are served on behalf of Fuchuen Dihai Shipping Co. Ltd.
       ("Fuchuen") in response to the submissions of Transfield ER Cape Limited
       ("Transfield"). They are, like the submissions set out in Rodgers & Co.'s letter of 10th
       July, served strictly subject to the reservations set out in the earlier correspondence.
       The tribunal has no jurisdiction save for that conferred on it by s.30.

2.    References to pages are, except where otherwise stated, to the pages of the bundle served with Rodgers & Co.'s fax of 10th July. References to paragraphs are, except where otherwise stated, to the paragraphs of Winter Scott's submissions.

3.    Fuchuen notes that Winter Scott have confirmed that an award under s.31 is required. Fuchuen assumes that it is common ground that the tribunal should deal with the question of jurisdiction now and not as part of its award on the merits - that is to say that an award is required under s.31(4)(a).

4.    Fuchuen notes with interest that Transfield's case (paragraph 3) is that the (only) question for the tribunal to determine is whether the disputes arising under the charterpartry have been settled. As set out in Rodgers & Co.'s letter of 10th July, Fuchuen did not understand, until very recently, that there was any dispute as to whether the disputes had been settled.

5.    Fuchuen notes, and relies upon, the fact that Transfield does not put forward any submissions in response to the other matters raised in Rodgers & Co.'s letter of 10th July 2007. It must follow that Transfield has accepted that, if it is wrong, and the disputes arising under the charterparty were settled, the application must succeed. As set out in Rodgers & Co.'s letter of 10th July, Fuchuen knows of no legal basis upon which Transfield would be entitled to pursue this arbitration (and no legal basis upon which the tribunal could have substantive jurisdiction) if the disputes under the charterparty have been settled. This now appears to be common ground.

6.    In these submissions Fuchuen will, therefore, deal only with the only question covered in Winter Scott's submissions - that of whether the disputes arising under the charterparty have been settled and the related question of what the proper consequences would be if the tribunal was minded to conclude that there had been no settlement agreement. If the tribunal accepts Fuchuen's case that the disputes have been settled it must inevitably follow that the application under s.30 succeeds.

### THE ALLEGED NEED FOR ORAL EVIDENCE

7.    As set out in Fuchuen's earlier submissions, it may well be that the tribunal would benefit from a short oral hearing at which the parties could expand upon their written submissions and deal with any issues arising (such as the authority of Winter Scott to have sent their letter of 6th July 2005 confirming the settlement if there is to be any dispute about that issue). What the tribunal clearly does not require is oral evidence.

8.    For the reasons set out below Fuchuen submits that it is quite clear from the documentary evidence that the parties did indeed settle the disputes which had arisen under the charterparty. That settlement was subsequently evidenced in writing (on more than one occasion) even though it was never recorded in writing as such. It was confirmed, in open correspondence, and without any suggestion of conditionality, by both parties' solicitors.

9.    Irrespective of what Mr. Kong Sau and Mr. Newmen Lock may say (or more correctly may say that they will say - because to date neither has signed a statement) the best

evidence of what the parties agreed is what they wrote down and what they and their solicitors did in 2005. Self serving statements prepared for the purposes of this arbitration (and in fact for the underlying purpose of enabling Transfield to maintain its rule B attachments) would be of little, if any evidential value, to the tribunal.

10. Fuchuen believes and submits that the suggestion that oral evidence may be required is no more than another transparent attempt by Transfield to put off the day on which the present application is resolved in Fuchuen's favour. The tribunal should, it is submitted, be astute to avoid this happening given that Transfield have in excess of US$4,000,000 attached in the US in proceedings that will (it appears to be common ground) fall away if this application succeeds.

11. The tribunal is invited to conclude that there was a settlement and that oral evidence is not necessary for the determination of this issue. As recently as 10th July Winter Scott's position was that there was no need even for an oral hearing, let alone for oral evidence. If, however, the tribunal has any doubt as to whether an agreement was reached the correct course would not be to put off the determination of this application to take oral evidence on the issue. This is because, for the reasons set out in paragraphs 33 to 37, below, even if (contrary to Fuchuen's case) there was no settlement agreement the present tribunal still lacks substantive jurisdiction. So it would be wholly wrong (and futile) for this tribunal to hear oral evidence on the subject.

**THE SETTLEMENT AGREEMENT**

12.    It is common ground that a meeting took place in February 2005. It was attended by
       Mr. Miao, Mr. Xu and Mr. Sau as set out in Transfield's fax of 23rd February (page 1
       of the Transfield bundle).

13.    The best evidence of the fact that a settlement was concluded at that meeting is
       Transfield's own fax (and the tribunal is invited to note that on this issue Fuchuen is
       not relying on any document produced by its side but on Transfield's own document).

14.    That fax recorded that both parties had "***reached the same agreement as follows***". It
       is therefore clear that an agreement had been reached. Contrary to what Transfield
       now say (when it suits them to deny the existence of an agreement) the 23rd February
       fax did not contain a proposal. It evidenced an agreement that had (already) been
       reached.

15.    The fact that an agreement had already been reached is confirmed by the first
       numbered paragraph of the fax - Transfield had already agreed to terminate the
       arbitration "***immediately***". Further, Fuchuen was asked to reply "***to confirm***". That
       language is wholly inconsistent with the suggestion now made that Transfield was
       making an offer for Fuchuen to accept or reject. Transfield merely sought
       confirmation from Fuchuen that the fax reflected the agreement which had been
       reached.

16. The fact that Transfield was not asking for acceptance is confirmed by the fact that it sent a second fax on 28th April (page 3 of Transfield's bundle). That fax was in materially identical terms in so far as it recorded that an agreement had been reached. But significantly the words *"Please reply to confirm"* were omitted. If (by its February fax) Transfield had been putting forward a proposal it would, in the absence of a response from Fuchuen, have concluded (by April) that the proposal was not accepted. Instead it wrote confirming that an agreement had (on its own words) been *"reached"*.

17. It must follow that in February and April 2005 Transfield's belief was that a settlement had been reached. The fact that Transfield's witnesses may now be prepared to say that no settlement was reached is none to the point - the documents are quite clear.

18. Lest there was any doubt, Transfield subsequently instructed Winter Scott that a settlement had been reached. The only explanation for Winter Scott writing to the tribunal on 6th July 2005 (page 29) and stating that *"the matter has now been amicably settled"* is that they were so instructed by their client. Helpfully Mr. Winter has very recently confirmed (page 11 of Transfield's bundle) that his recollection is that he was given instructions that all disputes had been fully and finally settled.

19. Unless Transfield is going to argue that Winter Scott was not acting in accordance with instructions in July 2005 (and that Mr. Winter's recollection in July 2007 was wrong) it is simply not open to them to deny the existence of a settlement. Fuchuen

notes and relies upon the fact that Transfield has not suggested, even in its most recent submissions, that Winter Scott's letter of 6th July did not accurately reflect instructions given by Transfield at the time. Inviting a tribunal to close its file is self evidently not a step Winter Scott would have taken without proper (and clear) instructions and authority. If the settlement had been in any way conditional then Winter Scott would not have written in the terms that they did, the effect of which was to mean (pursuant to s.51) that the arbitration was terminated. Certainly Fuchuen and its lawyers were entitled to proceed upon the basis that Winter Scott had instructions and authority to write in the terms that they did and Fuchuen notes and relies on the fact that it is not in fact suggested that they did not.

20. For Transfield's case to carry any credibility they would have to offer a full and proper explanation (supported by documents including, if necessary, documents which would otherwise be privileged) for why Winter Scott confirmed that the disputes had been settled if they had not. Even if they were able to put forward an explanation for this they would still face the insurmountable hurdle that Winter Scott clearly had authority (usual or ostensible even if not actual) to settle the disputes and bring the original arbitration (and the claims advanced in it) to an end.

21. In its letter of March 2006 (page 32) Transfield argued that Fuchuen's letter of 21st July was equivocal in that it did not *"fully accept"* the *"suggestions"* set out in the earlier correspondence. That argument is repeated in paragraphs 12 and 13. It was and remains a thoroughly bad point because Transfield was already aware of the fact that a settlement had been reached. No confirmation or acceptance was required not least

because Fuchuen's letter of July 2005 post dated the correspondence from both parties' solicitors to the original tribunal confirming that the disputes had been settled and terminating the reference. Further, in so far as the 21st July fax may be relevant it accurately records that Fuchuen had agreed to bear its own costs of the original arbitration if Transfield terminated it immediately. That indeed is the agreement which the parties implemented. It is curious indeed that Transfield deny the existence of a settlement agreement which they (and Fuchuen will say Fuchuen) have performed!

## FUCHUEN'S CONSISTENCY

22.    Since 2005 Fuchuen's position has consistently been that the charterparty disputes were settled. In particular:-

    (a)    Ince & Co. (Fuchuen's then solicitors) confirmed the settlement in their fax of 8th July 2005 (page 30);

    (b)    Fuchuen confirmed the settlement in its fax of 21st July 2005 (page 27);

    (c)    Rodgers & Co. confirmed the settlement in their fax of 17th March 2006 (page 33);

    (d)    since the present dispute arose (when Skuld purported to appoint Mr. O' Donovan) Fuchuen's position has always been that the charterparty disputes

were settled in 2005 (see for example the letter at page 9 of Transfield's bundle).

23.   Transfield suggests that Fuchuen has had difficulty in identifying the terms of the settlement agreement (paragraphs 17 - 21 of Winter Scott's submissions). This submission is both legally irrelevant and factually untrue.

24.   Firstly, whatever Rodgers & Co. may or may not have said (in 2007) in correspondence in relation to this application is irrelevant to the question of whether an agreement was concluded. The tribunal is concerned with the correspondence and conduct of the parties (and their authorised agents including Winter Scott) at the time.

25.   Secondly, Rodgers & Co. have never suggested that they have any difficulty in identifying the terms of the settlement agreement (and there has been no inconsistency in what Rodgers & Co. have said on the subject). They have simply argued (correctly it is submitted) that the terms of the settlement agreement are irrelevant. The tribunal is invited to note that, at the time of the relevant correspondence, Fuchuen's position was that there was a settlement agreement and Transfield's position appeared (from paragraphs 15, 16 and 17 of the Verified Complaint in the U.S. proceedings - page 45) to be the same. So it is easy to see why Rodgers & Co. concluded (at the time) that the terms of the settlement agreement were irrelevant (and why they declined to clog up the correspondence with reference to them) even if the tribunal concluded (now) that (Transfield having altered its position and sought to argue that there is no settlement agreement) it might be relevant to consider the terms.

26.    Thirdly, in so far as there is a dispute as to whether or not the parties settled the charterparty disputes, Fuchuen is entitled to rely upon what Winter Scott said, with ostensible or usual authority even if, for reasons which Transfield does not deign to explain, they may not have had actual authority. And Winter Scott have confirmed (in open correspondence) that the disputes have been settled.

27.    Fourthly, in so far as it may (given that Transfield now wish to go back on the position taken by their English solicitors in 2005 and by their US Attorneys as recently as May 2007) be appropriate for Fuchuen to provide particulars of the settlement agreement the relevant particulars are as follows:-

    (a)    the settlement was concluded orally at a meeting at the Shangri-la Hotel in Hong Kong in February 2005;

    (b)    the meeting was attended by, amongst others, Mr. Miao, Mr. Xu and Mr. Sau;

    (c)    so far as the present dispute is concerned, the relevant terms of the settlement are that Transfield would immediately terminate the arbitration (i.e. termination was not, contrary to paragraph 12 of Transfield's submissions, conditional upon Fuchuen performing any of the other terms) and Fuchuen would not seek to recover its costs of the arbitration.

28.  Since Transfield has now confirmed that it denies the existence of the settlement agreement (and no longer, therefore, seeks damages for breach of it or alleges repudiation of it) the operative terms of the settlement agreement are (even if the terms set out above are not) wholly irrelevant to the present application. The fact that some of the terms had (on Transfield's case at paragraph 8) yet to be finally concluded is also irrelevant. The terms that mattered had been agreed as is evidenced by the fact that they were subsequently implemented.

## TRANSFIELD'S INCONSISTENCY

29.  In stark contrast to Fuchuen's position, Transfield's position in relation to the question of settlement has been entirely lacking in consistency:-

(a)  in July 2005 Transfield clearly considered that a settlement had been reached because they so instructed Winter Scott (page 29). Although Winter Scott say that Mr. Sau Kong discussed the fact that Fuchuen's fax of 21st July was not acceptable (paragraph 13) he had that discussion with Mr. Alfred Ming Zhang who is described (at paragraph 6) as a representative of Transfield - not Fuchuen. It is significant that even now Transfield do not suggest that they passed on that conclusion to Fuchuen. They did not respond to the 21st July letter;

(b)  by March 2006 Transfield was seeking to argue that no settlement had been reached (page 31);

(c)     between March 2006 and May 2007 Transfield did, so far as Fuchuen is
        aware, nothing. Presumably it accepted, as set out in Rodgers & Co.'s fax of
        17th March 2006 (page 33) that the disputes had been settled;

(d)     in May 2007 Transfield purported to appoint Mr. O'Donovan in respect of "*all
        disputes arising under or in relation to the charterparty*" (see the original
        appointment attached to these submissions). They subsequently amended (or
        purported to amend) that appointment by widening it to include "*settlement
        discussions relating to the Charterparty*" (page 41). If Transfield had
        believed (at this time) that there was no settlement (and that Winter Scott's fax
        of 6th July 2005 was "*incorrect*") they would have reverted to the original
        tribunal, corrected the error and pleaded their case - they would not have
        sought to appoint a fresh tribunal;

(e)     at precisely the same time Transfield instructed its US lawyers (assuming that
        the Verified Complaint is true and accurate - and Transfield have not
        suggested that it was not or provided any explanation for how, if it was not, it
        came to be filed) that "*the parties negotiated a compromise settlement*"
        (paragraph 15 at page 45) and that Fuchuen had "*denied the existence of the
        settlement agreement*". Fuchuen invites the tribunal to consider the following
        rhetorical question - how could it (Fuchuen) deny the existence of a settlement
        agreement if one did not exist? Similarly how could Transfield's US lawyers
        state (on instructions) that the settlement agreement did not contain a
        jurisdiction clause if there was no settlement agreement? And how could

Transfield allege that Fuchuen had "*failed to adhere to the terms of the settlement*" (paragraph 17) if there was no settlement;

(f)    as recently as 10th July Mr. Winter confirmed (page 11 of Transfield's bundle) that his recollection was that he was instructed that the charterparty disputes had been fully and finally settled. It was only thereafter (presumably having considered the inevitable consequences that would follow from the fact that the disputes had been settled - that this application would succeed and the rule B attachment would have to be vacated) that Transfield sought to muddy the waters;

(g)    at first Transfield adopted a neutral position - it did not assert a positive case either way as to whether there was a settlement agreement (see the e-mail at page 15 of Transfield's bundle) although it did feel able to maintain that if there was a settlement agreement Fuchuen had repudiated it - so it presumably knew the terms which it says were breached for otherwise it could not have given any proper instructions to its US lawyers (who made a positive allegation of breach in the Verified Complaint) or Winter Scott (who made a positive allegation of breach of condition in the correspondence at, for example page 15 of Transfield's bundle);

(h)    in the submissions finally served on 16th July Transfield for the first time set out a positive case that there was no settlement agreement (a case wholly inconsistent with its previous argument that Fuchuen had repudiated the

settlement agreement). This was over 2 years after the settlement was concluded and after both parties confirmed the settlement to the original tribunal in open correspondence.

## CONCLUSION ON THE SETTLEMENT AGREEMENT ISSUE

30.    Fuchuen submits that there can be no doubt about the fact that the disputes which arose under the charterparty were settled. The contemporaneous documents support that conclusion. The contemporaneous conduct of the parties supports that conclusion. The subsequent conduct of the parties supports that conclusion. In particular Transfield's own solicitors have confirmed, in open correspondence, that the disputes have been settled (page 29).

31.    Although Winter Scott say (rather lamely) that *"unfortunately the contents of"* their letter of 6th July 2006 were *"incorrect"* (paragraph 11) they offer no proper explanation (and conveniently overlook the fact that Ince & Co., also acting on instructions, also confirmed the settlement). The correspondence (from both solicitors) in July 2005 is irreconcilable with the case which Transfield now seek to run (and Fuchuen notes that Transfield makes no attempt to reconcile that correspondence with its present case).

32.    Transfield fails to deal with the following important question viz why (or more precisely in what respect) was the letter incorrect and how did this come about? Were Winter Scott given wrong instructions, or did they receive correct instructions which

they wrongly implemented? Were they or were they not instructed by Transfield that the disputes had been settled? If they were not so instructed how did they come to write their fax of 6th July? If they were so instructed how did this occur if those they take instructions form now want to argue that there was no settlement? The fact that Transfield does not even begin to deal with this issue (and the equally important issue of how it is that their US attorneys were, it can be assumed, instructed as recently as May this year that a settlement was reached) is fatal to the case it now seeks to advance. Winter Scott undoubtedly had authority to confirm the settlement and bring the original reference to an end (and if there is any doubt about this we would welcome the opportunity to take the tribunal to the relevant authorities). This is what they did. That is an end of the matter.

## CONSEQUENCES IF TRANSFIELD IS CORRECT

33.    If, contrary to the foregoing, the parties did not reach a settlement the consequence of that would not, as Transfield appear to assume, be that this tribunal had substantive jurisdiction. If there was no settlement then Transfield's present claim (and the only one it can pursue) is for breach of the charterparty. No questions arise in relation to damages for breach of the settlement agreement or repudiation of it. So the disputes which Transfield now wishes to have determined are precisely those which were originally referred to the original tribunal.

34.    Fuchuen submits that the inevitable consequence would be that the original tribunal, and not the present tribunal, had substantive jurisdiction. Transfiled would have to

apply to that tribunal to re-commence that reference. This tribunal lacks jurisdiction even if there was no settlement agreement.

35.    In 2004 both Mr. Mckenzie and Mr. Baker-Harber accepted their appointments on LMAA terms. Clause 10 of the then current (2002) terms provides that *"the jurisdiction of the tribunal shall extend to determining all disputes arising under or in connection with the transaction the subject of the reference, and each party shall have the right before the tribunal has given notice of its intention to proceed to its award to refer to the tribunal for determination any further dispute(s) arising subsequent to the commencement of the arbitral proceedings"*.

36.    Fuchuen's primary case is and remains that the original tribunal is *functus officio* because of the settlement agreement. But if Transfield wishes to argue that there was no settlement then that is clearly a dispute for the original tribunal to determine (under s.30 because if there was a settlement agreement then the original tribunal also lacks jurisdiction). If Transfield is correct then the original tribunal will so rule and the original reference will (subject to any arguments about waiver and estoppel) proceed. If, however, Fuchuen is correct the original tribunal has jurisdiction (under s.30) to so declare.

37.    In the circumstances Fuchuen submits that if this tribunal has any doubts at all about whether a settlement was reached the appropriate course is not to adjourn this application to permit Transfield to call oral evidence. Nor is it to make a declaratory award in favour of Transfield. The appropriate course is to make a declaratory award

that this tribunal lacks substantive jurisdiction irrespective of whether a settlement agreement was entered into and to leave the underlying question to be determined by the original tribunal, if Transfield can persuade them that the disputes were not settled.

## SUMMARY AND CONCLUSION

38.    The tribunal is invited to conclude that there was a settlement of the charterparty disputes and to rule that (as appears to be common ground) the consequence of this is that the tribunal has no substantive jurisdiction to hear any claims against Fuchuen.

39.    Alternatively the tribunal is invited to conclude that even if there was no settlement agreement it would still lack jurisdiction because the original disputes, which have already been referred to arbitration, would (by definition) still be live. It would not, therefore, be appropriate for this tribunal to rule that there was no settlement agreement. It would be for Transfield to apply to the original tribunal to re-commence the original reference and that tribunal would then have to determine (under s.30) whether there had been a settlement (such as to deprive it of further jurisdiction) or whether there had not (in which case, subject to any arguments as to estoppel, waiver and the like, the charterparty claims would be determined by the original tribunal to which they have already been referred). In short if Transfield is correct it cannot escape the fact that the disputes it now seeks to arbitrate have already been referred to a validly constituted LMAA tribunal. Either (if Transfield is right) that tribunal retains substantive jurisdiction (to the exclusion of this tribunal) or (which appears to be

common ground) both tribunals lack substantive jurisdiction if Fuchuen is right and there has been a settlement.

40.    Fuchuen will be happy to expand upon or clarify any of the above submissions by way of a short oral hearing if that would assist the tribunal. Subject to that possibility the tribunal is invited to proceed to an immediate award on the s.30 application and to award Fuchuen its costs of the application and, indeed of the entire reference (to be assessed by the tribunal or the High Court if not agreed).

41.    Fuchuen requests that the tribunal provide (hopefully relatively brief) reasons for its award.

Essex Court Chambers,                                   Christopher Smith
24, Lincoln's Inn Fields.