CHALOS, O'CONNOR & DUFFY, LLP
Attorneys for Defendant
ZHEJIANG FUCHUEN CO. LTD.
366 Main Street
Port Washington, New York 110050
Telephone:    516-767-3600
Telefax:    516-767-3605
Owen F. Duffy (OD-3144)


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
TRANSFIELD ER CAPE LIMITED                                  :
                                                            :
            Plaintiff,                                      :        07 CV 04528 (MGC)
                                                            :
      - against -                                           :        ECF Case
                                                            :
FUCHUEN DIHAI SHIPPING CO. LTD., and                        :
ZHEJIANG FUCHUEN CO. LTD.                                   :
                                                            :
            Defendants,                                     :
                                                            :
------------------------------------------------------------x




### DEFENDANT ZHEJIANG FUCHUEN CO. LTD.'s
### MEMORANDUM OF LAW IN REPLY TO PLAINTIFF'S MEMORANDUM OF
### LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO VACATE
### MARITIME ATTACHMENT

## TABLE OF CONTENTS

TABLE OF CONTENTS ……………………………………...………......…ii

TABLE OF AUTHORITIES……………………………………………….iii

PRELIMINARY STATEMENT...…………………...……………………...…………1

THE FACTS………………………………………….......................……3

LEGAL ARGUMENT…………………………………….......................…4

    I.    PLAINTIFF UNDERSTATES THE BURDEN REQUIRED TO MAINTAIN A MARITIME ATTACHMENT………………………….4

    II.    THE PLAINTIFF DOES NOT ASSERT A VALID *PRIMA FACIE* MARITIME CLAIM AND THERE IS NO FOUNDATION FOR A RULE B MARITIME ATTACHMENT………………………………….9

    III.    THE ALTER EGO CLAIM IS FACTUALLY WRONG AND WOEFULLY INSUFFICIENT TO MAINTAIN AN ATTACHMENT OF ZHEJIANG'S PROPERTY……………………………………….15

    IV.    THE ATTACHMENT SHOULD BE VACATED BECAUSE ZHEJIANG FUCHUEN IS ENTITLED TO SOVEREIGN IMMUNITY……………………………………………….......22

    V.    THE COURT SHOULD VACATE THE ATTACHMENT PURSUANT TO THE DISCRETIONARY GROUNDS APPROVED BY THE COURT OF APPEALS IN AQUA STOLI……………….....32

CONCLUSION …………………………...................................................36

## <u>TABLE OF AUTHORITIES</u>

**PAGE**

**CASES**

<u>Aifos Trade SA v. Midgulf Int'l Ltd.</u>,
   06-203 (S.D.N.Y. May 1, 2006)................................................35

<u>Aqua Stoli Shipping Ltd. v. Gardiner Smith Pty Ltd.</u>,
   460 F.3d 434 (2d Cir. 2006)................................................4, 5, 7, 32, 33, 34, 35, 36

<u>Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.</u>,
   968 F.2d 196 (2d Cir. 1992)................................................11

<u>Brown v. M/V Global Link</u>,
   2003 U.S. Dist. LEXIS 14723 (S.D.N.Y. Aug. 21, 2003)................12, 13

<u>Capatorto v. Compania Sud Americana de Vapores</u>,
   541 F.2d 985 (2d Cir. 1976)................................................12

<u>Cimino v. Raymark Indus.</u>,
   751 F. Supp. 649 (E.D. Tex. 1990), *aff'd in part, vacated in part on other
   grounds*, 151 F.3d 297 (5th Cir. 1998), *reh'g denied* (Sept. 21, 1998)..............30

<u>Compania Sudamricana de Vapores S.A. v. Sinochem Tianjin Co.</u>,
   06 Civ. 13765 (S.D.N.Y. Apr. 4, 2007)................................................8

<u>Commissioner v. Shamberg's Estate</u>,
   144 F.2d 998 (2d Cir. 1994)................................................28

<u>Commissioner v. White's Estate</u>,
   144 F.2d 1019 (2d Cir. 1944)................................................29

<u>Dolco Invs., Ltd. v. Moonriver Dev., Ltd.</u>,
   2007 U.S. Dist. LEXIS 31101 (S.D.N.Y. Apr. 26, 2007)................................6, 7

<u>Dole Food Co. v. Patrickson</u>,
   538 U.S. 468 (2003)................................................22, 23, 24, 25, 30

<u>Exxon Corp. v. Central Gulf Lines</u>,
   500 U.S. 603 (1991)................................................10, 12

<u>Garcia v. Warner, Quinlan Co.</u>,
   9 F. Supp. 1010 (S.D.N.Y. 1934)................................................14

<u>Garret v. Moore-McCormack Co., Inc.</u>,
   317 U.S. 239 (1942)................................................13

Gates v. Victor Fine Foods,
    54 F.3d 1457 (9th Cir. 1995).................................................................30

Maersk, Inc. v. Neewra, Inc.,
    443 F. Supp. 2d 519 (S.D.N.Y. 2006)..............................................5, 8

Meridian Bulk Carriers, Ltd. v. Lamed Investment & Trade Co. Ltd. and ICS (121) Ltd.,
    07 Civ. 987 (S.D.N.Y. July 6, 2007)...................................................8

Miniturn v. Maynard,
    58 U.S. 477, 17 How. 477, 15 L. Ed. 235 (1855)...................................10

OGI Oceangate Transportation Co., Ltd. v. RP Logistics Pvt. Ltd., et al.,
    2007 U.S. Dist LEXIS 46841 (June 21, 2007).....................7, 8, 32, 33, 34, 35

Pitstick v. Potash Corp. of Saskatchewan Sales, Ltd.,
    698 F. Supp. 131 (S.D. Ohio 1988)....................................................30

Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc.,
    466 F.3d 88 (2d Cir. 2006)...............................................................33

Rutkowski v. Occidental Chemical Corp.,
    1988 U.S. Dist. LEXIS 11414 (N.D. Ill. Oct. 5, 1988)..............................30

Sagastume v. Lampsis Nav. Ltd., Drosa,
    579 F.2d 222 (2d Cir. 1978)..............................................................12

Sea Transport Contractors, Ltd. v. Industries Chemiques du Senegal,
    411 F. Supp. 386 (S.D.N.Y. 2006).......................................................10

Stolt-Nielsen SA v. Celanese AG,
    430 F.3d 567 (2d Cir. 2005)...............................................................10

The Schooner Freeman v. Buckingham,
    59 U.S. (18 How.) 182 (1856).............................................................14

The YANKEE v. Brewer Dry Dock Co.,
    37 F. Supp. 512 (E.D.N.Y. 1941).........................................................14

Thyssen Steel Corp. v. Fed. Commerce & Navigation Co.,
    274 F. Supp. 18 (S.D.N.Y. 1967).........................................................10

Tide Line, Inc. v. Eastrade Commodities, Inc.,
    2006 U.S. Dist. LEXIS 958970 (S.D.N.Y. Aug. 15, 2006)......................6, 20

iv

Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transport N.V.,
    2007 U.S. Dist. LEXIS 50260 (S.D.N.Y. July 6, 2007)...........................6, 8, 9

United Philippine Lines v. Metalsrussia Corp.,
    1997 U.S. Dist. LEXIS 5616 (S.D.N.Y. Apr. 24, 1997)............................13

Vandewater v. Mills,
    60 U.S. (19 How.) 82 (1857)..................................................................14

Wajilam Exps. (Singapore) Pte, Ltd. v. ATL Shipping Ltd.,
    475 F. Supp. 2d 275 (S.D.N.Y. 2006)...................................................8

Westvaco Worldwide Corp. v. M/V Niger Basin,
    1989 U.S. Dist. LEXIS 5323 (E.D. Pa. May 10, 1989)...................12, 13

Winter Storm Shipping, Ltd. v. TPI,
    310 F.3d 263 (2d Cir. N.Y. 2002) *cert. denied* 539 U.S. 927 (2003)...............34


**STATUTES and RULES**

28 United States Code § 1333(1)..................................................................10

28 United States Code § 1332.....................................................................27

28 United States Code §§ 1602-1611, The Foreign Sovereign
Immunities Act ................................................................1, 2, 22, 23, 29, 31

28 United States Code § 1603.....................................................................30

28 United States Code § 1603(b)..........................................................28, 30, 31

28 United States Code § 1603(b)(1)..............................................................28

28 United States Code § 1603(b)(2)..........................................................28, 30

28 United States Code § 1603(b)(3)..............................................................28

28 United States Code § 1610...................................................................28, 31

30 Opp. Atty. Gen. 252 (U.S. 1914)..............................................................28

*Fed. R. Civ. P.*, Supplemental Rules for Certain Admiralty and Maritime Claims,
Rule B..........................................2, 5, 6, 7, 9, 10, 12, 27, 33, 34, 35, 36

*Fed. R. Civ. P.*, Supplemental Rules for Certain Admiralty and Maritime Claims, Rule C.........................................................................................................12

*Fed. R. Civ. P.*, Supplemental Rules for Certain Admiralty and Maritime Claims, Rule E........................................................................................................ 5

*Fed. R. Civ. P.*, Supplemental Rules for Certain Admiralty and Maritime Claims, Rule E(4)(f)...............................................................................................6, 7

## OTHER AUTHORITIES

BALLENTINE'S LAW DICTIONARY (Third Edition (1969)................................28

Black's Law Dictionary Dictionary,
    Sixth Edition (1992)..............................................................................28

COMMENT: No Calm After the Storm: The Rise of the Rule B Attachment Cottage Industry, 31 Tul. Mar. L. J. 95 (2006)..................................................34

Dillon Municipal Corporations,
    5th Ed., Sec. 34..................................................................................28

https://www.cia.gov/library/publications/the-world-factbook/geos/ch.html,
    (as of July 20, 2007)...........................................................................29

## PRELIMINARY STATEMENT

This Memorandum of Law is submitted on behalf of the Defendant, Zhejiang Fuchuen Co. Ltd., (hereinafter "Zhejiang") in Reply to the Opposition to Zhejiang's Motion to Vacate the Process of Maritime Attachment presented by Plaintiff, Transfield ER Cape Limited (hereinafter "Transfield") on July 16, 2007.

As is clear, from its Motion to Vacate, Zhejiang presents substantial challenges to the Transfield attachment of Zhejiang's property in the not insignificant amount of $3,889,316.30. With its Opposition to the Motion to Vacate, Plaintiff Transfield takes issue on each and every one of Zhejiang's challenges and, with this reply, it is submitted that the motion presents several arguments that will be best addressed in logical order based on a flow chart type of analysis.

Zhejiang preliminarily submits that the Court is called upon to make the following determinations:

*1)     Does the Plaintiff have a maritime claim against Fuchuen Dihai to support Admiralty jurisdiction and, consequently, a maritime attachment?*

*If not, the attachment must be vacated as to all defendants.*
*If so, the analysis continues.*

*2)     If the Plaintiff does have a maritime claim against Fuchuen Dihai, is the claim properly asserted against Zhejiang as an alter ego of Fuchuen Dihai?*

*If not, then the maritime attachment as to Zhejiang must be vacated.*
*If so, the analysis continues.*

*3)     If Plaintiff has a maritime claim against Fuchuen Dihai and a valid alter ego claim is asserted against Zhejiang, then the Court must consider if there is a statutory bar to the attachment Zhejiang's property pursuant to the Foreign Sovereign Immunities Act.*

*If attachment of Zhejiang's property is precluded by the FSIA, then the attachment must be vacated as to Zhejiang.*

*If Zhejiang is not entitled to the protection of the FSIA, then the analysis continues.*

*4)     If Plaintiff has a maritime claim against Fuchuen Dihai, a valid alter ego claim is asserted against Zhejiang and Zhejiang is not entitled to sovereign immunity, then is vacatur warranted under the discretionary ground set forth Aqua Stoli, which in this case is because both Transflield and Zhejiang are parties are present in the same foreign jurisdiction, i.e. Hong Kong, foreign law no doubt applies to the claims and the case has no otherwise tangible connection to the United States?*

*If so, and notwithstanding anything else, the attachment should be vacated on this ground alone.*
*If not, then the Court must consider two final questions, namely,*

*5)     Are EFT payments properly attachable pursuant to Supplemental Rule B[1]?*

*and,*

*6)     Is good cause shown for reduction of the Attachment?*

In proceeding through the review of Plaintiff Transfield's claim, it must be recognized that the claim against Zhejiang warrants reminder of the fact that the Rule B procedure presents a real risk of abuse which this Court is obligated to guard against. As more fully developed below, Transfield's attachment of the property of Zhejiang is an abuse of Supplemental Rule B because it begins with a faulty foundation, i.e. no admiralty jurisdiction, and Transfield compounds the abuse with understatement of its burden and presentation of inaccurate and insufficient allegations of alter ego, inaccurate and irrelevant assumptions against the fact that Zhejiang is a state owned enterprise, a distortion of the holding of <u>Aqua Stoli</u> and, on top of all that, completely unsupported damages. In sum, the attachment against Zhejiang must be vacated because Transfield

---

[1] Defendant Zhejiang stands on the argument made in its Memorandum of Law in Support of Motion to Vacate the Maritime Attachment, dated June 28, 2007, that EFTs do not constitute attachable property and, therefore, will not reply to the arguments in opposition on that point made by Plaintiff Transfield.

cannot show that it is able to meet its several burdens to justify the attachment of

Zhejiang's property.

## THE FACTS

The facts pertaining to the instant Motion to Vacate the Process of Maritime are

more fully set forth in the accompanying:

- Attorney's Affidavit of Owen F. Duffy, dated June 27, 2007, and the exhibits thereto;
- Declaration of Weng Changrong, dated June 25, 2007, and the exhibits thereto;
- Attorney's Affidavit of Rahul Wanchoo, dated June 27, 2007, and exhibits thereto;
- Declaration of attorney Paul R. Rodgers, dated June 27, 2007, and exhibits thereto;
- Declaration of attorney Charles E. Murphy, dated July 16, 2007, and exhibits thereto;
- Declaration of attorney Chris Howse, dated July 16, 2007, and exhibits thereto;
- Declaration of attorney Song Dihuang, dated July 15, 1007, and exhibits thereto;
- Declaration of Lawrence Yeung, dated July 23, 2007, and exhibits thereto; and,
- Attorney's Affidavit of attorney Owen F. Duffy, dated July 23, 2007, and exhibits thereto.

Rather than restate the facts fully herein, this Reply Memorandum of Law will make

reference to the facts set forth the various affidavits and declarations submitted for the

Court's consideration.

## LEGAL ARGUMENT

## POINT I

## PLAINTIFF UNDERSTATES THE BURDEN
## REQUIRED TO MAINTAIN A MARITIME ATTACHMENT

With due regard for the fact that Plaintiff has the burden of proof to show why the attachment should not be vacated and the determinations that have to be made, as listed in the Preliminary Statement herein, it needs to be recognized that the Plaintiff advances a general theme with its Opposition to the Motion to Vacate. The theme is driven by the rubric for a *"prima facie"* standard of review. Whereas the Plaintiff argues that it need only demonstrate that the attachment was properly issued, Transfield actually advocates for no review and insists the Court must simply gloss over, or even ignore the facts relevant to: the Plaintiff's allegations for admiralty jurisdiction; the Plaintiff's claim for alter ego liability against Zhejiang; the Plaintiff's objections to the claim for sovereign immunity; the Plaintiff's off-hand dismissal of the point that there is a valid basis for vacatur pursuant to the rules established by the Court of Appeals in <u>Aqua Stoli</u>: and, the claim for damages in the amount of $3,889,316.30. Simply put, Transfield does not want the Court to look at any of the facts and seeks to shield its claim from any judicial scrutiny.

Indeed, if the Court is willing to accept the Plaintiff's theme as guidance, then the validity of the underlying facts do not matter because the Court's role would be limited to performing a perfunctory review of the Complaint to ensure that the magic words "maritime claim" and "alter ego" are in Complaint somewhere. As a matter of plain

4

common sense that cannot be right, and there is a growing number of Judges in the

Southern District of New York who will not accept that.

With the Court of Appeal's decision in <u>Aqua Stoli</u>, it has been generally accepted

that the Court of Appeals attempted to articulate some clear rules for the District Courts

when they were required to consider the validity of a Maritime Attachment. In that

regard, the Court of Appeals specifically held:

> "We therefore hold that, in addition to having to meet the filing and
> service requirements of Rules B and E, an attachment should issue if the
> plaintiff shows that 1) it has a valid prima facie admiralty claim against
> the defendant; 2) the defendant cannot be found within the district; 3) the
> defendant's property may be found within the district; and 4) there is no
> statutory or maritime law bar to the attachment. Conversely, a district
> court must vacate an attachment if the plaintiff fails to sustain his burden
> of showing that he has satisfied the requirements of Rules B and E. We
> also believe vacatur is appropriate in other limited circumstances. While,
> as we have noted, the exact scope of a district court's vacatur power is not
> before us, we believe that a district court may vacate the attachment if the
> defendant shows at the Rule E hearing that 1) the defendant is subject to
> suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in
> personam jurisdiction over the defendant in the district where the plaintiff
> is located; or 3) the plaintiff has already obtained sufficient security for the
> potential judgment, by attachment or otherwise."
> 460 F.3d at 445.

As things came to pass post-*Aqua Stoli*, disputes arose as to the actual burden of

proof a claimant carried in order to justify an attachment and what could be considered to

weigh the burden when considering such issues as whether the plaintiff really had a

maritime claim or whether an alter-ego claim was properly presented. *Compare*, Maersk,

Inc. v. Neewra, Inc., 443 F. Supp.2d 519, 527 (S.D.N.Y. 2006)(Judge Casey noted that a

*prima facie* standard created a real risk of abuse, and the Court held "The plaintiff must

demonstrate that 'reasonable grounds' exist for the attachment, and that all technical

requirements for effective attachment have been met."), *with a decision rendered two weeks later*, Tide Line, Inc. v. Eastrade Commodities, Inc., 2006 U.S. Dist. LEXIS 958970 * 15-16 (S.D.N.Y. Aug. 15, 2006)(Judge Wood noted that the rationale of Aqua Stoli cautioned against a fact intensive inquiry, and Judge Wood held that "a proper verified complaint is all that is required to satisfy Rule B and prevail against a Rule (E)(4)(f) motion to vacate.).

In the case at hand, the Plaintiff goes to great lengths to advocate that this Court must blindly adhere to Tide Line and those cases that have followed Tide Line in limiting judicial review to the four corners of the complaint when presented with a motion to vacate Process of Maritime Attachment. *See*, PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE MARITIME ATTACHMENT, dated July 16, 2007 at Preliminary Statement, page 2. In support of its position in this regard, the Plaintiff has specifically made reference to the recent decision in Transportes Navieros y Terrestes, S.A. de D.V. v. Fairmount Heavy Transport N.V., 2007 U.S. Dist. LEXIS 50260 (S.D.N.Y. July 6, 2007), for the proposition that a plaintiff need not prove its case or present evidence at the Supplemental Admiralty Rule E(4)(f) hearing because a proper Verified Complaint is all that is required to satisfy Rule B and to withstand a motion to vacate. *See*, PLAINTIFF'S MEMORANDUM OF LAW at page 3.

The Plaintiff, however, understates the burden, misreads Transportes Navieros and purposefully fails to recognize that there is contrary authority. As just one example of contrary authority not addressed by Transfield, in Dolco Investments, Ltd., Cypress v. Moonriver Development, Ltd., 2007 U.S. Dist. LEXIS 31101 * 10 (S.D.N.Y. April 26, 2007), Judge Sweet accepted that the majority of courts in this district to have considered

6

the issue have interpreted <u>Aqua Stoli</u> to require the application of the *prima facie* standard when considering the adequacy of the claim in a maritime vacatur motion and he agreed with concept. Nevertheless, on a motion to vacate a maritime attachment of Moonriver's property, Judge Sweet still went on to examine the facts underlying the plaintiff's claims for breach of an agreement to supply operational items to the plaintiff, Owner of the M/V MOONRIVER, for lost profits and indemnification. *Id.* at * 11-12. He found that Dolco had established an admiralty claim with respect to the first claim, but not the others. Id. at *13-14. He, likewise, carefully examined Dolco's alter ego allegations against co-defendant GML, Ltd. and concluded that Dolco failed to meet its burden because it had not included any *factual* allegations that GML exercised complete domination over Moonriver. *Id.* at *28. Accordingly, while the standard was *prima facie*, Judge Sweet did limit his review to the four corners of the complaint, he did not blindly ignore the facts presented by the defendant and he rejected the notion that that a proper verified complaint is all that is required to satisfy Rule B and prevail against a Rule (E)(4)(f) motion to vacate.

Likewise, in another recent case, Judge Sweet once again applied the *prima facie* standard, but went on to consider the underlying facts of the plaintiff's claims for breach of charter party and wrongful arrest. <u>OGI Oceangate Transportation Co., Ltd. v. RP Logistics Pvt. Ltd. and R. Piyarelall International Pvt. Ltd.</u>, 2007 U.S. Dist. LEXIS 46841 (S.D.N.Y. June 21, 2007). In that case, and with specific reference to the fact that the plaintiff has the burden of affirmatively showing it has a maritime claim, he found that the plaintiff had failed to meet this burden for either of the claims pled in the complaint

and, consequently, the attachment was vacated even though the plaintiff made claims for breach of charter party and wrongful arrest of a vessel. *Id.* at \*12 & 15.

For that matter, on the very same day that Transportes Navieros was decided, Judge Jones stated, in no uncertain terms, that the proper standard to evaluate a plaintiff's maritime claim on a motion to vacate an attachment was not a *prima facie* standard, but reasonable grounds. In Meridian Bulk Carriers, Ltd. v. Lamed Investment & Trade Co. Ltd. and I.C.S. (121) Ltd., 07 Civ. 987 (S.D.N.Y. July 6, 2007), Judge Jones vacated the maritime attachment of Lamed's property, holding:

> In assessing whether a plaintiff has a valid admiralty claim, courts apply the 'reasonable grounds' test." Compania Sudamricana de Vapores S.A. v. Sinochem Tianjin Co., No. 06 Civ. 13765 (S.D.N.Y. Apr. 4, 2007). Contrary to Plaintiff's assertion such an inquiry is not limited to the four corners of the complaint (Hr'g Tr. at 5.) Rather, the Court "may consider any allegations or evidence offered in the parties' papers or at the post-attachment hearing." Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Limited, 475 F. Supp.2d 275, 279 (S.D.N.Y. 2006) (quoting Maersk, Inc. v. Neewra Inc., 443 F. Supp.2d 519, 527 (S.D.N.Y. 2006)). "Courts have compared the showing required in a 'reasonable grounds' analysis to the more familiar probable cause." Id. at 279. The probable cause standard requires "less than a preponderance of the evidence," id., but "nevertheless calls for a 'fair probability' that the asserted facts are true, "Compania Sudamericana, 2007 WL 1002265 at \*2 (citing Wajilam Exports, 475 F. Supp. 2d at 279).

S.D.N.Y. 07 Civ. 987 at D.E. # 23.

Even in the case relied upon by Transfield for minimal scrutiny of the grounds for the attachment, i.e. Transportes Navieros, Judge Preska realized that the plaintiff's allegations were not to be blindly accepted. In that regard, while Judge Preska did not vacate the attachment in that case, Judge Preska did state that undisputed facts presented on a motion to vacate needed to be examined by the Court in order to test the validity of the claim. 2007 U.S. Dist. LEXIS 50260 \* 19. Judge Preska went on to examine the

8

plaintiff's attachment of $3,604,999.50 and, ultimately, reduced the attachment to only $15,000 to secure an amount that might be attributable to legal fees incurred by Transportes Navieros to lift an alleged wrongful arrest of its vessel M/V CABELLO AZTECA. 2007 U.S. Dist. LEXIS 50260 * 20. Accordingly, even the cases relied upon by Transfield do not support the minimal review that Transfield advocates in order to protect its attachment from judicial scrutiny.

In sum, Transfield understates the burden that it carries in order to survive the challenge to its attachment of $3,889,316.30 belonging to Zhejiang. This Court should recognize the injustice that would result from the limited, or nonexistent, inquiry advocated by Plaintiff Transfield. Whether the standard is a *"prima facie"* standard or a "reasonable grounds" standard, the Court is obligated to consider the evidence and facts presented by Zhejiang in its motion to vacate and, when that evidence and those facts are fairly considered, the Court will conclude that the Motion to Vacate the Attachment presented by Zhejiang must be granted.

## POINT II

### THE PLAINTIFF DOES NOT ASSERT A VALID PRIMA FACIE MARITIME CLAIM AND THERE IS NO FOUNDATION FOR A RULE B MARITIME ATTACHMENT

Attachment in admiralty, i.e. Rule B, is an extraordinary and unique remedy by which a claimant can obtain *quasi in rem* jurisdiction over a defendant's property – before any judgment is rendered - for purposes of jurisdiction and security. It is an exception to the general rule that a plaintiff may not have security for a claim until the

9

claim is established and reduced to judgment. Thyssen Steel Corp. v . Fed. Commerce & Navigation Co., 274 F. Supp. 18, 21 (S.D.N.Y. 1967). With reference to the historical purposes of maritime attachment, the most basic prerequisite of a Rule Attachment is for the plaintiff to present a *prima facie* case, or reasonable grounds, that it has a maritime claim against the defendant. Lack of a maritime claim translates to lack of maritime jurisdiction which renders a Rule B maritime attachment void. Sea Transport Contactors, Ltd. v. Industries Chemiques du Senegal, 411 F. Supp. 2d 386, 392 (S.D.N.Y. 2006).

Admiralty jurisdiction is afforded this Court under 28 U.S.C. § 1333(1), which provides for original jurisdiction in "any civil case of admiralty or maritime jurisdiction." The traditional rule in this Circuit is that a maritime contract is one that "relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment." Stolt-Nielsen SA v. Celanese AG, 430 F.3d 567, 572 (2d Cir. 2005) (alterations and quotation marks omitted). In Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 111 S. Ct. 2071, 114 L. Ed. 2d 649 (1991), the Supreme Court gave the modern rule for determining admiralty jurisdiction in a contracts case. Overruling Minturn v. Maynard, 58 U.S. 477, 17 How. 477, 15 L. Ed. 235 (1855), and dispensing with the *per se* rule excluding agency contracts from admiralty, the Court held that the "true criterion" and "crucial consideration" for determining admiralty jurisdiction is the "nature and subject matter of the contract at issue." Exxon, 500 U.S. at 610-11. The Court also reiterated that the "fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce." *Id.* at 608 (internal quotation marks omitted). Accordingly, when determining whether a contract is maritime sufficient to support admiralty jurisdiction, "a federal court must initially determine whether the

10

subject matter of the dispute is so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction." Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd., 968 F.2d 196, 200 (2d Cir. 1992).

With this general background, the initial question for this Court to determine is what the nature of the claim presented by Plaintiff Transfield actually is. In its Opposition to the Motion to Vacate, Transfield attempts to hedge its bets by claiming that it is has either a claim for breach of charter party or, alternatively, for breach of a settlement agreement. *See*, PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE MARITIME ATTACHMENT, dated July 16, 2007 at Preliminary Statement, page 1. Transfield's failure to commit is, however, disingenuous because the Plaintiff's Verified Complaint makes it abundantly clear that the charter party claim was settled and dismissed, and the only cause of action presented is for breach of the settlement agreement. For the avoidance of doubt, the Court simply needs to refer to the Verified Complaint, which unambiguously alleges: "Despite due demand Defendant Fuchuen Dihai has failed to pay amounts due and owing under the agreement and has failed to adhere to the terms of the settlement." *See*, Duffy Affidavit, dated June 27, 2007 at Ex. 9, Verified Complaint at ¶s 15 & 17. Moreover, Fuchuen Dihai concedes that the underlying claim for breach of charter party was settled. *See*, Affidavit of Rahul Wanchoo, dated June 27, 2007 at ¶9; *and*, Declaration of Paul R. Rodgers, dated June 27., 2007 at ¶s 3(b) and 4(b). Accordingly, it is beyond any credible argument that issue is joined solely on the question of whether there was a breach of the settlement agreement and the Rule B attachment procedure has been utilized to secure a claim for breach of settlement agreement and not a claim for breach of charter party.

11

From there, the question becomes whether the claim for breach of settlement agreement is a maritime claim in accordance with the principles enunciated in Exxon Corp. v. Central Gulf Lines, Inc. and, thereby, sufficient to support a Rule B maritime attachment. In its Opposition to the Motion to Vacate, Transfield relies first on Judge Chin's decision in Brown v. M/V GLOBAL LINK, 2003 U.S. Dist. LEXIS 14723 (S.D.N.Y. Aug. 21, 2003) for the overly broad proposition that courts in this district are bound by precedent to exercise jurisdiction over settlement disputes in maritime cases. See, Plaintiff's Memorandum of Law in Opposition to Motion to Vacate at page 12. Secondarily, Transfield attempts to distinguish the instant case from Westvaco Worldwide Corp. v. M/V NIGER BASIN, 1989 U.S. Dist. LEXIS 5323 (E.D. Pa. May 10, 1989), which held that a claim for breach of a settlement agreement to settle liability for cargo losses was not a maritime contract and could not support a Rule C arrest of a vessel. Neither of Transfield's arguments is valid.

First of all, Transfield overstates the holding of Brown v. M/V GLOBAL LINK. While Judge Chin did state that "courts in the Second Circuit have exercised jurisdiction over settlement disputes in maritime cases", the Judge was citing to the Second Circuit's holdings in Capatorto v. Compania Sud Americana de Vapores, 541 F.2d 985 (2nd Cir. 1976) and Sagastume v. Lampsis Nav. Ltd., Drosa, 579 F.2d 222 (2nd Cir. 1978). 2003 U.S. Dist. LEXIS 14723 * 5. What Transfield fails to mention is that M/V GLOBAL LINK, and the cases cited by Judge Chin, have all involved releases signed by a longshoreman and seamen and what was at issue was whether the settlement had been paid, 2003 U.S. Dist. LEXIS 14723 * 2, or the validity of the releases, 541 F.2d 985, 986 and 579 F.2d 222, 224. Accordingly, the underlying rational and exception to the general

12

rule against continuing jurisdiction over a settlement agreement that Judge Chin based his ruling on was the traditional rule of American law that a seaman's release is "subject to careful scrutiny" and the party relying on the release has the burden of proving that the "release was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights. ..." Garret v. Moore-McCormack Co., Inc., 317 U.S. 239 (1942).

The underlying concerns with the protection of seamen's rights in Brown v. M/V GLOBAL LINK have no impact on the case at hand. Neither party disputes the existence of the settlement agreement, and the settlement between Fuchuen Dihai and Transfield was freely entered into by sophisticated commercial parties who met in person and agreed to "drop hands" over a charter party dispute in order to preserve commercial relations. Accordingly, M/V GLOBAL LINK in no way requires this Court to exercise jurisdiction in order to resolve disputes over a settlement agreement between Transfield and Fuchuen Dihai and this is, especially so, where Judge Pauley already declined the case. See, Duffy Affidavit of June 27, 2007 at ¶ 33.

Secondly, Transfield's attempt to move away from the precedent established by the Westvaco court and the United Philippine Lines court fails. Transfield argues that the instant case is different from both Westvaco and United Philippine Lines because the settlement between Fuchuen Dihai and Transfield contemplated ongoing maritime transactions. See, PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE MARITIME ATTACHMENT at page 13. What Transfield failed to consider in making that argument, however, is that even if Transfield is correct on that point, the fact remains that this would amount to nothing more than an executory contract

to perform maritime services. An executory contract that calls for the future employment of a vessel or future contracts of affreightment are not maritime contracts and do not support admiralty jurisdiction. The Schooner Freeman v. Buckingham, 59 U.S. (18 How.) 182,188 (1896); Vandewater v. Mills, 60 U.S. (19 How.) 82, 90; and see, The YANKEE v. Brewer Dry Dock Co., 37 F. Supp. 512, 514 (E.D.N.Y. 1941)(A contract related to repairs to be made to a vessel was regarded as an executory contract to render a maritime service and "In the absence of even part performance, the admiralty jurisdiction cannot be invoked even in personam.") Consequently, and even assuming Transfield's argument is valid, the best that Transfield has with Fuchuen Dihai is an executory contract that calls for possible future employment of non-specified vessels and that does not support admiralty jurisdiction. See, Garcia v. Warner, Quilan Co., 9 F. Supp. 1010, 1011 (S.D.N.Y. 1934)(The court determined that it could not exercise admiralty jurisdiction in a claim for breach of a contract to sell a steamship company all its fuel requirements for one year reasoning that the contract was "not a maritime contract as to any part that remains executory.").

To sum up on this point, Plaintiff Transfield does not have a claim for breach of charter party. At best, Plaintiff Transfield has a claim for breach of a settlement agreement. Any way the claim for a breach of a settlement agreement is looked at, i.e. as a straight settlement agreement or a contract that contemplated future, but unspecified, business, it is not a claim that supports admiralty jurisdiction and, therefore, Transfield does not have a valid prima facie maritime claim. Thus, the maritime attachment must be vacated.

14

**POINT III**

**THE ALTER EGO CLAIM
IS FACTUALLY WRONG AND WOEFULLY INSUFFICIENT
TO MAINTAIN AN ATTACHMENT OF ZHEJIANG'S PROPERTY**

Even if Plaintiff Transfield is found to be presenting a claim for breach of charter party against Fuchuen Dihai or the claim for breach of the settlement agreement is determined to be a maritime claim, the Court needs to consider carefully the grounds on which Transfield seeks to bootstrap its claim against Fuchuen Dihai up another level into a claim against Zhejiang. The attachment of Zhejiang's property is predicated solely on the allegation that Zhejiang is the alter ego, i.e. dominates, the defendant Fuchuen Dihai who had a charter party relationship with Transfield in 2003. Zhejiang was never a party to the charter party dated March 28, 2003 nor was Zhejiang a guarantor of the charter party dated March 28, 2003.

As previously argued in Zhejiang's Motion to Vacate, the Plaintiff Transfield has failed to present sufficient factual allegations to support a Rule B pre-judgment attachment of Zhejiang's property. With its Opposition, Transfield seeks to overcome that deficiency primarily with reliance on its limited inquiry of the facts defense. Secondarily, Transfield seeks to cure the deficiencies of its alter ego claim by referring the Court to the so-called "extrinsic" evidence provided by attorney Chris Howse in order to persuade the Court that its alter ego allegations are factually supported. Transfield's limited inquiry of the facts defense of the attachment has already been addressed above at Point I and, without belaboring the point, Zhejiang reiterates that Transfield understates the burden. Separate and apart from that, Transfield's "extrinsic" evidence is of no

consequence and, in fact, the extrinsic evidence is easily discounted by undisputed factual points.

Initially, it must be noted that Mr. Chris Howse is attempting to mix apples and oranges. The information he offers is, at best, misleading and, therefore, unreliable. On the one hand, attorney Howse goes to great lengths to demonstrate that there must be a connection between Zhejiang and Fuchuen Dihai Shipping Company Ltd. of Hong Kong because Zhejiang owns 65% of the shares of Fuchuen Dihai and they share an address. *See*, Declaration of Chris Howse, dated July 16, 2007 at ¶s 3, 5, 6 & 7. At the same time, however, attorney Howse utterly fails to address the more salient point which is whether Zhejiang is the alter ego of, i.e. dominates, Fuchuen Dihai Shipping Co. Ltd. of the British Virgin Islands, which was Transfield's contractual partner.

The fact of the matter is that there are two separate companies, namely: Fuchuen Dihai Shipping Co., Ltd. which was incorporated in the British Virgin Islands (hereinafter "FD BVI") on March 25, 2003, *see*, Duffy Affidavit of June 27, 2007 at ¶ 8, Ex. 1, and the Fuchuen Dihai Shipping Company Limited, which was incorporated in Hong Kong (hereinafter "FD HK") on August 27, 2004, *see*, Wanchoo Affidavit of June 27, 2007 at Ex. H. As the Court will recall, Transfield's contractual relationship with Fuchuen Dihai arises out of a charter party dated November 28, 2003. *See*, Duffy Affidavit of June 27, 2007 at ¶ 17. Since FD HK did not even exist in November of 2003, it follows that any claim that has been presented for breach of charter party is against FD BVI and could not be against FD HK. *See also*, Declaration of Lawrence Yeung, dated July 23, 2007 at ¶ 10, Ex. 2B ("Furthermore, Transfield issued their freight invoice to

FD BVI, and the freight was paid from our Hong Kong bank account as indeed are all our freights. Transfield must know this.").

FD BVI and FD HK are two separate companies that perform different functions. *See*, Declaration of Lawrence Yeung, dated July 23, 2007 at ¶ 8. FD BVI was in the chartering business, *see*, Declaration of Lawrence Yeung, dated July 23, 2007 at ¶ 8, and Mr. Yeung, who was the Deputy General Manager of FD BVI, did not even know why FD HK had been created, but, most certainly, FD BVI was not involved with that FD HK. *See*, Declaration of Lawrence Yeung, dated July 23, 2007 at ¶ 15. The important point here is that it was FD BVI, and not FD HK, that was the contractual partner of Plaintiff Transfield with respect to the charter party dated March 28, 2003. *See*, Declaration of Lawrence Yeung, dated July 23, 2007 at ¶ 8. Accordingly, the fact that Zhejiang may own 65% of the shares of FD HK is of no consequence because Transfield does not have any claim against FD HK and the only issue before the court is whether Zhejiang could be considered to be the alter ego of FD BVI.

With respect to FD BVI, and as previously noted in Zhejiang's motion to vacate, the only factual allegations are that defendants have the same address and that Zhejiang made a payment on behalf of Fuchuen Dihai's behalf in connection with the charter party on May 18, 2004. *See*, Verified Complaint at ¶s 23 & 27. With its Opposition, Transfield is unable to present any new factual allegations in support of its alter ego claim and simply seeks to bolster the two lone factual statements in the complaint with numerous statements from attorney Chris Howse to the effect that he made an investigation of the two companies and was able to determine that FD BVI operates from space within the offices of Zhejiang, the companies share the same telephone number, Zhejiang made a

17

payment of freight to Transfield in connection with the March 28, 2003 charter and, therefore, Zhejiang must dominate FD BVI. *See*, Declaration of Chris Howse, dated July 16, 2007 at ¶s 2, 5, 6 & 10.

The points made by attorney Chris Howse are all easily refuted or explained by Mr. Lawrence Yeung. Mr. Yeung was, as he explains in his declaration, working for FD BVI in 2003 and was personally involved with the charter of the M/V ALINA. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶s 6 & 12. Mr. Howse, by contrast, does not appear to have had any personal involvement with the charter of the M/V ALINA in 2003. *See*, Declaration of Chris Howe, dated July 16, 2007.

As an initial point, Mr. Yeung readily concedes that, since 2003, the offices of FD BVI have been physically located within the offices of Zhejiang. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶s 4 & 5. However, and contrary to the assumptions of Mr. Howse, Mr. Yeung affirmatively declares that FD BVI was independent from Zhejiang, the two companies did not share email addresses and telephone numbers, the two companies have separate managers, directors and staff, the two companies do not share a computer network and the two companies have separate bank accounts. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶s 5 & 6. Consequently, the fact that FD BVI was sharing space with Zhejiang, standing alone, is completely insufficient to establish a valid *prima facie* alter ego claim

The additional suggestions of alter ego made by attorney Chris Howse are completely rebutted with reference to the details of the charter of the M/V ALINA. As explained by Mr. Yeung, Zhejiang does not dominate FD BVI. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶ 6. On the contrary, Zhejiang is a client of FD

BVI whereby FD BVI charters vessels for the transportation of Zhejiang's cargoes, *see*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶ 6, and Zhejiang and FD BVI act at arms length when negotiating such transactions. For example, as set forth in the Declaration of Lawrence Yeung, the majority of its customers, such as Zhejiang, purchase cargoes on an F.O.B. basis, and then sell the cargo to importers in China on a C&F basis. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶ 12. Zhejiang was doing just that when it approached FD BVI in 2003 to find a vessel to carry Zhejiang's cargo from Brazil to China. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶ 13. FD BVI finds a vessel for its customer, which it charters at the best possible rate, and then nominates the vessel to carry the customer's cargo at a rate higher than FD BVI is paying to the actual vessel Owner, which in this case was Transfield. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶ 12. FD BVI nominated the M/V ALINA to carry Zhejiang's cargo and, and after FD BVI had chartered the M/V ALINA from Transfield, FD BVI turned around and sub-chartered the vessel to Zhejiang. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶s 13 to 26. A separate contract was entered into between FD BVI and Zhejiang to evidence the rights and responsibilities between FD BVI and Zhejiang. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶ 12, Ex. 3A (Fixture confirmed between Zhejiang Fuchuen Co., Ltd., as charterers, and Fuchuen Dihai Shipping Co., Ltd., as owners.).

For the charter of the M/V ALINA, the fact that FD BVI dealt with Zhejiang at arms length is positively evidenced by the fact that the agreed freight rate paid by Zhejiang to FD BVI was higher than the freight FD BVI was paying to Transfield. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶s 6 & 12. In other words, and as

specifically noted by Mr. Yeung, FD BVI was making a profit from Zhejiang of about US$ 2.50 per metric ton of cargo carried on the M/V ALINA on the back of Zhejiang and were, therefore, dealing with Zhejiang in the same way as they would any other customer. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶s 6 & 12. Any suggestion that Zhejiang was dominating FD BVI is completely undermined by the fact that FD BVI made a profit from Zhejiang because it defies common sense to believe that a dominating company would let a subservient company make a profit at its own expense.

Similarly, Transfield's only other factual allegation in support of its alter ego claim, i.e. a payment of freight in the amount of US$ 284,192.56 for the M/V ALINA, is taken completely out of context by Transfield and it cannot be used as support for an alter ego claim. As explained by Mr. Lawrence Yeung, FD BVI paid 95% of the freight owed to Transfield pursuant to the charter party dated March 28, 2003 for the charter of the M/V ALINA and the payment came from an account belonging to FD BVI. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶ 24, Ex. 7. However, because of cash flow problems, Transfield was seeking payment of the 5% balance prior to the scheduled date of May 8, 2004. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶ 25. As an accommodation to Transfield, FD BVI arranged to have Zhejiang pay a portion of the freight (US$ 284,192.56) that it owed to FD BVI directly to Transfield. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶ 25. Consequently, and completely different from the situation in <u>Tide Line</u>, where it was established that Transclear *occasionally* paid Eastrade's debts with no explanation, the facts of this case are that Zhejiang did not *occasionally* pay FD BVI's debts, but paid freight that it owed

20

to FD BVI directly to Transclear on only one occasion and that was to accommodate Transclear. *See*, Declaration of Lawrence Yeung dated July 23, 2007 at ¶ 25. In this case, therefore, Transclear makes an inaccurate and insufficient allegation to establish an alter ego relationship.

A final point raised by Transfield in its correspondence to the Court prior to the Memorandum of Law in Opposition to the Motion to Vacate was that Transfield stated it had reason to believe that some of the payments attached in this case would demonstrate yet another instance where Zhejiang Fuchuen has paid the debt of Fuchuen Dihai, and which tends to prove the alter ego relationship. *See*, Letter from Lennon, Murphy & Lennon dated July 11, 2007. Zhejiang objected to that attempt at discovery, *see*, Letter from Chalos, O'Connor & Duffy dated July 13, 2007, and it still does. Nevertheless, so as to prevent non-issues from becoming issues, we produce herewith the documentation related to the payment that has been attached by garnishee Standard Chartered bank. *See*, Duffy Affidavit dated July 23, 2007 at Exhibits B, C, D, E & F.

As evidenced by the documents included as Exs. B to F to the Duffy Affidavit dated July 23, 2007, Zhejiang entered into a fixture note with Sang Thai Maritime 1988 Co. Ltd for the carriage of cargo onboard the M/V SANG THAI GLORY. Pursuant to that fixture note, Zhejiang owed Sang Thai Maritime 1988 Co. Ltd. the sum of US$ 193,658.65, which it wire transferred to Sang Thai Shipping Agency's account at the Standard Chartered Bank, Singapore Branch. *See*, Duffy Affidavit dated July 23, 2007 at Ex. B to F. These are the funds that have been attached by the garnishee The Standard Chartered Bank in New York and, completely contrary to Transfield's insinuations, the

payment does not in any way demonstrate yet another instance where Zhejiang Fuchuen

has paid the debt of Fuchuen Dihai, and which tends to prove the alter ego relationship.

To conclude on this point, Transfield's factual allegations in support of its claim

to hold Zhejiang liable as an alter ego of Fuchuen Dihai are, for the most part, factually

wrong and, in any event, woefully insufficient. All things considered, the only factual

point that Transfield has any support for is the fact that FD BVI was operating from space

within the offices of Zhejiang. Transfield does not, nor can it, present any other facts to

support its claim for alter ego and, therefore, Transfield has not presented a valid *prima*

*facie* claim for alter ego.


## POINT IV

### THE ATTACHMENT SHOULD BE VACATED
### BECAUSE ZHEJIANG FUCHUEN IS ENTITLED TO SOVEREIGN IMMUNITY

As is now common ground, the starting point for analyzing sovereign immunity

issues is Dole v. Patrickson, 538 U.S. 468 (2003). *See*, Memorandum of Law in

Opposition at page 14. In Dole, the United States Supreme Court made clear that any

ruling regarding whether or not an entity is an instrumentality of a foreign sovereign is to

"be determined at the time suit is filed." 538 U.S. at 478. Furthermore, the United States

Supreme Court made it equally clear that "Majority ownership by a foreign state, not

control, is the benchmark of instrumentality status." 538 U.S. at 477.

As an initial matter, Dole involved a situation where two Israeli companies (the

Dead Sea companies) asserted that they were instrumentalities of a foreign state, i.e.

Israel, for the purposes of the Foreign Sovereign Immunities Act (hereinafter "FSIA").

The Supreme Court recognized that some of the FSIA's provisions can be invoked by a corporate entity that is an "instrumentality" of a foreign state as defined by the FSIA. 538 U.S. at 470. The issue presented in that case was whether a corporate subsidiary could claim instrumentality status where the foreign state did not own a majority of its shares, but did own a majority of the shares of the corporate parent one or two tiers above the subsidiary. *Id.* The Court found that the State of Israel did not have direct ownership of shares in either of the Dead Sea companies at any time pertinent to the suit. 538 U.S. at 473. Rather, these companies were, at various times, separated from the State of Israel by one or more intermediate corporate tiers. For example, from 1984-1985, Israel wholly owned a company called Israeli Chemicals, Ltd.; which owned a majority of shares in another company called Dead Sea Works, Ltd.; which owned a majority of shares in Dead Sea Bromine Co., Ltd.; which owned a majority of shares in Bromine Compounds, Ltd. 538 at 473-74. Under these circumstances, the Dead Sea Companies were not entitled to sovereign immunity. 538 at 474.

Zhejiang's claim for sovereign immunity status is completely different from the claim presented by the Dead Sea companies in Dole. Zhejiang is not owned by any intermediate corporate entity; it is fully and wholly owned directly by The Zhejiang Provincial People's Government, which itself is a political subdivision of the government of the People's Republic of China. *See,* Duffy Affidavit, dated June 27, 2007 at ¶ 15. Indeed, and in addition to the unrebutted declarations of the Zhejiang's Managing Director, *see,* Duffy Affidavit, dated June 27, 2007 at Exhibit 18, the dispositive evidence of the unassailable fact that Zhejiang is state owned is the Certification from the

Economic Affairs Department of the Liaison Office of the Central People's Government in HK SAR, certifying:

> **It is hereby certified that Zhejiang Fuchuen Company is a Chinese-owned enterprise (state-owned enterprise) in Hong Kong representing Zhejiang Province. The company is also a liason company in Hong Kong representing The People's Government of Zhejiang Province.**

*See*, Duffy Affidavit dated June 27, 2007 at Ex. 18, Declaration of Weng Changrong at ¶ 5, Certification from the Economic Affairs Department of the Liaison Office of the Central People's Government in HK SAR dated 18 June 2007.

The folly of Transfield's attempt to challenge the fact that Zhejiang is a state-owned enterprise, and somehow subject to a <u>Dole</u> analysis of tiering, is, perhaps, best exemplified by Transfield's own advertising. On its website, Transfield advertises that

> "Today, we [Transfield] are widely recognized as the specialist in dry bulk shipping business, focusing in China market as our base with expansion well into the international market. Transfield ER serves a wide range of customers *that includes most of the state-owned companies and enterprises in China*, international grain houses, fertilizer traders and steel mills."

*See*, Duffy Affidavit dated July 23, 2007 at Ex. I.

Accordingly, as a company that advertises itself to be tuned into the Chinese market and used to working for Chinese state-owned companies, Transfield is disingenuous when it seeks to claim that Zhejiang is not a state-owned enterprise.

With its Opposition to the Motion to Vacate, the Plaintiff seeks to obfuscate both the analysis and the facts demonstrating the obvious evidence of the ownership status of Defendant Zhejiang by pointing to irrelevant evidence, self-serving affidavits not based upon the facts at the time the suit was filed and unsupported suggestions of ownership by

entities that may be owned by agencies or instrumentalities of provincial governments within the People's Republic of China. *See*, Memorandum of Law in Opposition to Motion to Vacate at page 14.

As but one initial example of the irrelevant lengths that Transfield has gone to obfuscate things, the Court is referred to the Declaration of Song Dihuang, Transfield's self professed Chinese legal expert, who espouses on the fact that Chinese corporate legal concepts are different than those employed in the United States. *See*, Song Declaration at ¶ 12. However, if Transfield had really considered the Supreme Court's decision in <u>Dole v. Patrickson</u>, it would have recognized that Mr. Song's opinions on Chinese law are really irrelevant because as the Supreme Court noted in <u>Dole v. Patrickson</u>, "[w]e need not delve into Israeli law or examine the extent of Israel's involvement in the Dead Companies' operations." 538 U.S. at 654. Mindful of that caution, i.e. that U.S. courts make the determinations for the FSIA based on evidence of ownership, this Court must recognize that the majority of the points raised by Song Dihuang are not relevant as he delves into Chinese law to make his analysis of whether Zhejiang is entitled to immunity under the U.S. FSIA. *See e.g.*, Declaration of Song Dihuang, dated July 15, 2007 at ¶ 5 ("I have been asked by Transfield's New York counsel to provide this declaration *to address the status of ZF under PRC law*, and specifically whether ZF would be considered "owned by the PRC" or an "agency or instrumentality of the PRC.").

Furthermore, the majority of the information presented by Song Dihuang is just plain speculation from a shipping lawyer and, therefore, his opinions can not be credited with any weight. For example, Song Dihuang spends a great deal of effort to explain that State Owned enterprises may be "wholly state-owned company" or an "enterprise owned

by the whole people" (EWP). *See e.g.*, Declaration of Song Dihuang, dated July 15, 2007 at ¶s 12 to 16. In the end, the best he could come up with was that "it is very likely that Zhejiang Fuchuen is not a company directly owned by the State or the Zhejiang Provincial Government, but actually owned by different EWPs or subsidiaries of EWPs", and that opinion was based on the inspection of document that is nearly 20 years old. *See*, Declaration of Song Dihuang, dated July 15, 2007 at ¶ 19 (c). Simply put, attorney Song Dihuang has no idea who owns Zhejiang and he is simply making guesses to support Transfield's challenge.

Indeed, Song Dihuang's declaration is rife with qualifying phrases such as: "we may have to look into the company documents before we reach any conclusion"; "this appears inconsistent"; "This Agreement appears to indicate"; "it appears very likely"; "suggesting that"; "This document indicates that …may"; "therefore, perhaps"; "it thus appears to me that Zhejiang Fuchuen has not disclosed all the information concerning its company structure"; "I am not in a position to comment whether these documents truly represent the current status"; and, ultimately that "it is very likely that Zhejiang Fuchuen was formed by a few SOEs". *See*, Declaration of Song Dihuang, dated July 15, 2007 at ¶s 16, 19(a), 19(c), 19(d), 20, 21.  Simply put, attorney Song Dihuang has no idea who owns Zhejiang at the time the complaint was filed or now, which is the dispositive issue for FSIA purposes. He simply made guesses in an improvident attempt to muddy the waters and, therefore, the Court should give no credit to his "*evidence*" or "*opinion*."

Beyond that, much of Song Dihuang's evidence is just plain wrong or outdated. As one example, he goes on to say that "Zhejiang was supposed to pay interest rather than dividends." *See*, Declaration of Song Dihuang, dated July 15, 2007 at ¶ 19(a).

However, Chinese state owned companies do not need to pay dividends, although the Chinese government may start to charge dividends from next year. *See*, Duffy Affidavit, dated July 23, 2007 at ¶ 11, Ex. G. Additionally, as noted above, Song Dihuang goes on and on about EWPs. *See e.g.*, Declaration of Song Dihuang, dated July 15, 2007 at ¶s 12(2), 14, 16, 19 (a). Indeed, at one point, he concludes that it is likely that Zhejiang is actually owned by different EWPs or subsidiaries of EWPs. *See*, Declaration of Song Dihuang, dated July 15, 2007 at ¶ 19(c). Unfortunately for attorney Song Dihuang, that type of an entity, i.e. an EWP, no longer exists in China. *See*, Duffy Affidavit, dated July 23, 2007 at ¶ 11, Ex. H, document from the Natioanl Bureau of Statistics of China regulations as regarding economy components. Given that attorney Song Dihuang's evidence is clearly wrong on several key and obvious points, his entire declaration should be ignored.

Song Dihuang's evidence aside, this Court needs to keep its focus on the point that Zhejiang is asserting that it is statutorily exempt from a Rule B prejudgment attachment because it is wholly (not majority) owned by a political subdivision of the government of the People's Republic of China. *See*, 28 U.S.C. § 1610. An agency of a foreign state is defined by the statute as:

> (b) An "agency or instrumentality of a foreign state" means any entity--
>    (1) which is a separate legal person, corporate or otherwise, and
>    (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
>    (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title [28 U.S.C.S. § 1332(c) and not created under the laws of any third country.

28 U.S.C. § 1603(b).

Zhejiang has introduced sufficient evidence to demonstrate that it is a separate legal person, and it is neither a citizen of the United States nor created under the laws of a third country. *See*, 28 U.S.C. § 1603(b)(1) and (3), above. However, the issue has been raised over whether Zhejiang is an entity "a majority of whose shares ... is owned by a foreign state or a political subdivision thereof" (28 U.S.C. § 1603(b)(2)), because it is owned by the provincial government of Zhejiang Province and not the central government of the People's Republic of China itself.

In the first instance, statutes should be interpreted according to the plain language of the statute itself. Black's Law Dictionary defines "political subdivision" as the "A division of the state made by the proper authorities thereof, acting within their constitutional powers, for purpose of carrying out a portion of those functions of state which by long usage and inherent necessities of government have always been regarded as public." Black's Law Dictionary, page 1159, Sixth Edition 1992.[2] This definition has been used by the courts of the Second Circuit. *See*, e.g., <u>Commissioner v. Shamberg's Estate</u>, 144 F.2d 998, 1004 (2d Cir. 1944) (quoting from 30 Opp. Atty. Gen. 252, 253 [U.S. 1914]): "The term 'political subdivision' is broad and comprehensive and denotes any division of the State made by the proper authorities thereof, acting within their constitutional powers, for the purpose of carrying out a portion of those functions of the State which by long usage and the inherent necessities of government have always been regarded as public. The words 'political' and 'public' are synonymous in this connection. (Dillon Municipal Corporations, 5th ed., sec. 34.) It is not necessary that such legally

---

[2] *See also*, BALLENTINE'S LAW DICTIONARY (Third Edition) (1969): "A subordinate political body. A county, township, or municipal corporation. <u>A territorial division</u> to the electors of which there is committed to some extent the power <u>of local government</u>" (emphasis added).

28

constituted 'division' should exercise all the functions of the State of this character. It is

sufficient if it be authorized to exercise a portion of them." *See also*, Commissioner v.

White's Estate, 144 F.2d 1019, 1020 (2d Cir. 1944) (holding that the Triborough Bridge

Authority is in effect an instrumentality of the City of New York, a political subdivision

of the state of New York).

 In this regard, the Zhejiang province is listed in the Central Intelligence Agency

World Factbook as an "Administrative division" of the People's Republic of China. *See*,

https://www.cia.gov/library/publications/the-world-factbook/geos/ch.html at page 5.

Equally important, Zhejiang province is a smaller part of the same government of the

People's Republic of China because, unlike states in the United States, provincial

governments in China directly elect the federal government. *See id.* at page 6

(Legislative branch of the People's Republic of China is a unicameral National People's

Congress or Quanguo Renmin Daibiao Dahui (2,985 seats, members elected by

municipal, regional and ***provincial*** people's congresses to serve five-year

terms)(emphasis added).  As such, the dictionary definition, the Second Circuit definition

and the view of the United States government is that Zhejiang province is a "political

subdivision" of the People's Republic of China. Therefore, if the Zhejiang province has a

majority ownership interest in the Defendant, Zhejiang Fuchuen Co. Ltd., then Zhejiang

Fuchuen is entitled to the protections of the Foreign Sovereign Immunities Act and

immunity from attachment.

 While no court in the United States has issued an opinion directly on point

regarding a province of the People's Republic of China, the federal district courts, and

even the Ninth Circuit Court of Appeals, have regularly upheld the sovereign immunity

status of Canadian provinces. *See*, <u>Gates v. Victor Fine Foods</u>, 54 F.3d 1457, 1461 (9th Cir. 1995) ("we conclude that Alberta Pork is an agency or instrumentality of the Province of Alberta [under 28 U.S.C. 1603(b)(2)]"); <u>Rutkowski v. Occidental Chemical Corp.</u>, 1988 U.S. Dist. LEXIS 11414, *3 (N.D. Ill. Oct. 5, 1988)(there is no question that, by holding majority positions, [the Province of] Quebec controlled each of the corporations down this chain. Because we focus on substance rather than the corporate form employed by Canada, we hold that ACL is an 'instrumentality' of Canada")(internal citations omitted); <u>Pitstick v. Potash Corp. of Saskatchewan Sales, Ltd.</u>, 698 F. Supp. 131, 132 (S.D. Ohio 1988) (Defendant is a wholly-owned subsidiary of Potash Corporation of Saskatchewan, which is a Canadian corporation owned by the Province of Saskatchewan, Canada. Defendant therefore falls within the definition of "foreign state" found in 28 U.S.C. § 1603, which includes an "agency or instrumentality of a foreign state" within the definition of "foreign state," and further defines an "agency or instrumentality of a foreign state" to encompass a separate legal corporation which is largely owned by a political subdivision of a foreign state and which is not a citizen of a state of the United States."); <u>Cimino v. Raymark Indus.</u>, 751 F. Supp. 649, 659 (E.D. Tex. 1990) ("A majority of the shares of ACL is owned by the Province of Quebec, Canada. This fact establishes ACL's status as a foreign instrumentality under the Foreign Sovereign Immunites Act. See 28 U.S.C. § 1603(b).").

While some of the Canadian cases cited herein would be decided differently under the Supreme Court decision in <u>Dole Food Co. v. Patrickson</u>, the issue that arose there, that of subsidiary ownership or "tiering," is not present in the case at hand. 538 U.S. 468 (2003). In the case at hand, Defendant Zhejiang has presented sufficient, dispositive and

unchallenged evidence that it is an entity, a majority of whose shares is owned by a political subdivision of the People's Republic of China and that the Zhejiang Provincial People's Government was its sole owner at the time that the Complaint was filed in this action because the Zhejiang Provincial People's Government owns all of the shares of the company. *See*, Duffy Affidavit dated June 27, 2007 at Ex. 18, Declaration of Weng Changrong at ¶ 12. This dispositive fact is reinforced by the Certification from the Economic Affairs Department of the Liaison Office of the Central People's Government in HK SAR, which is the voice of the PRC in Hong Kong, when it stated:

> **It is hereby certified that Zhejiang Fuchuen Company is a Chinese-owned enterprise (state-owned enterprise) in Hong Kong representing Zhejiang Province. The company is also a liason company in Hong Kong representing The People's Government of Zhejiang Province.**

*See*, Duffy Affidavit dated June 27, 2007 at Ex. 18, Declaration of Weng Changrong at ¶ 5, Certification from the Economic Affairs Department of the Liaison Office of the Central People's Government in HK SAR dated 18 June 2007.

The Defendant Zhejiang has presented more than sufficient evidence to establish that is a state-owned enterprise or, in terms of the FSIA, an agency or instrumentality of a foreign state (28 U.S.C. § 1603(b)) entitled to immunity from prejudgment attachment under 28 U.S.C. § 1610. As such, the Process of Maritime Attachment as to Zhejiang must be vacated.

31

**POINT V**

**THE COURT SHOULD VACATE THE ATTACHMENT
PURSUANT TO THE DISCRETIONARY GROUNDS
APPROVED BY THE COURT OF APPEALS IN AQUA STOLI**

In its Opposition to the Motion to Vacate, Plaintiff Transfield summarily dismisses Judge Sweet's recent decision in the OGI Oceangate v. R. P. Logistics case and makes much of the difference between being present in a convenient district in the United States and being present in a convenient judicial district in a foreign nation. However, the Plaintiff Transfield is unable to point to any *post*-Aqua Stoli decisions that are contrary to Judge Sweet's holding and its points regarding the difference between present in a U.S. district, as opposed to a convenient judicial district in a foreign nation, are tortured and illogical.

While there is a difference between a district in the United States and a district in a foreign nation, it is not relevant to the case at hand. This is made clear by Judge Walker's wording in Aqua Stoli wherein he refers to a defendant being "present in a convenient adjacent **jurisdiction**" at one point, but later discusses an "adjacent **district**." *Compare*, 460 F.3d at 436 (emphasis added) *and* 460 F.3d at 444 (emphasis added). The salient point is that jurisdiction exists elsewhere but that the plaintiff is attempting an end-run around the system to attach funds in the Southern District of New York rather than using the judicial resources where the action should most reasonably be heard. This leads to the absurd result that a Chinese Plaintiff with an office in Hong Kong is litigating its claim against Chinese Defendants who also have an office in Hong Kong, regarding claims surrounding contracts entered into in Hong Kong and/or settlement agreements that were entered into in Hong Kong, in the Southern District of New York and there is

32

no other connection with the United States other than that the alter ego defendant makes and receives payments in U.S. dollars that are processed electronically in New York by intermediary banks. As Judge Sweet recognized, EFT payments may be fair game for a Rule B attachment, but not in circumstances like this when the Court of Appeals has articulated that an attachment would be properly vacated "if the plaintiff and defendant are both present in the same jurisdiction and would be subject to jurisdiction there, but the plaintiff goes to attach the defendant's assets." OGI Oceangate v. RP Logistics Pvt. Ltd., 2007 U.S. Dist. LEXIS 46841 * 16 (S.D.N.Y. June 21, 2007).

As was pointed out by Judge Sweet, this type of absurd litigation also raises the issue of international comity, which, was recently ruled upon by the Second Circuit. See, Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88 (2d Cir. 2006) (indicating proper consideration of international comity principles requires evaluation of various factors, "such as the similarity of the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction"), applied to a Rule B case by Judge Sweet in OGI Oceangate Transp. Co. v. RP Logistics Pvt. Ltd., 2007 U.S. Dist. LEXIS 46841, *17 (S.D.N.Y. June 21, 2007).

To review, in the Aqua Stoli case the Second Circuit was reviewing a district court's vacatur of a maritime attachment pursuant to a "needs-plus-balancing." 460 F.3d at 439. While the Aqua Stoli court held that the "needs-plus-balancing" test was inappropriate, Judge Walker, writing for the court, specifically stated that "[i]t does not

follow, however, that district courts are without any equitable discretion to vacate

maritime attachments that comply with Rule B."  While the exact scope of a court's

equitable vacatur power was not before the Aqua Stoli court, its review of the prior case

law indicated that a district court may vacate an attachment if the defendant shows at the

Rule E hearing that:

> 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

*Id.* at 460 F.3d at 445.

The three equitable factors discussed by Judge Walker in Aqua Stoli did not arise

from a vacuum.  Instead they were based upon the prior case law regarding Supplemental

Rule B attachment cases.  However, before the rise of the cottage industry of Rule B

attachments following the holding of Winter Storm,[3] it would be a rare case indeed where

a foreign plaintiff would file an attachment action against a foreign defendant in the

Southern District of New York or anywhere else in the United States of America.  Only

since Winter Storm have courts been forced into the absurdity of hearing cases where

jurisdictions outside of the United States were the *situs* of the action and the only relation

to either party was the passing of an Electronic Funds Transfer through the Southern

District of New York. Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263 (2d Cir. N.Y.

2002) *cert. denied* 539 U.S. 927 (2003).  As such, the prior case law did not necessarily

involve jurisdictions outside of the districts of the United States court system and,

therefore, provides little guidance whereas OGI Oceangate does.

---

[3] *See*, COMMENT: No Calm After the Storm: The Rise of the Rule B Attachment Cottage Industry, 31 Tul. Mar. L. J. 95 (2006).

In his opinion in <u>OGI Oceangate</u>, Judge Sweet stated that while vacatur was appropriate because Plaintiff had failed to show that it had a *prima facie* admiralty claim against the Defendants, vacatur was also appropriate under the limited circumstances articulated in <u>Aqua Stoli</u>. *See*, <u>OGI Oceangate Transp. Co. v. RP Logistics Pvt. Ltd.</u>, 2007 U.S. Dist. LEXIS 46841, *15 (S.D.N.Y. June 21, 2007). The Court in <u>OGI Oceangate</u> ruled that vacatur of the attachment was appropriate in that case because the Second Circuit in <u>Aqua Stoli</u> had articulated that an "attachment would be properly vacated 'if the plaintiff and defendant are both present in the same district and would be subject to jurisdiction there, but the plaintiff goes to another district to attach the defendant's assets.'" *See*, <u>OGI Oceangate</u>, *16, *citing* <u>Aqua Stoli</u>, 460 F.3d at 444-445. Therefore, because both Plaintiff and the Defendants were present in the same jurisdiction during the vessel arrest proceedings in that case, namely Kolkata, India, vacatur was justified. This was exactly the type of situation that was contemplated by the Second Circuit in <u>Aqua Stoli</u>, albeit with reference to judicial districts instead of nations. Additionally, it is similar to the situation in this case, where there is no dispute that the Plaintiff Transfield and the defendants, Fuchuen Dihai and Zhejiang are all present in Hong Kong in the People's Republic of China.

In the case at hand, Plaintiff attempts to convince this Court that it should not exercise its discretion in following <u>Aqua Stoli</u> and refusing to hear a case where all of the parties are subject to the jurisdiction of the People's Republic of China in Hong Kong by reference to Judge Stein's statement in the unreported case of <u>Aifos Trade SA v. Midgulf Int'l Ltd.</u>, 06-203 (S.D.N.Y. May 1, 2006)(a *pre-*<u>Aqua Stoli</u> decision). However, all that Plaintiff can point to is that Judge Stein stated that "Rule B contemplates a measure of

35

inconvenience for the defendant." *See*, Memorandum of Law in Opposition , page 28. This may be true, but it does not detract one iota from Judge Walker's explicit statement in Aqua Stoli that a District Court may choose not to hear a Rule B case where "the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located ... but the plaintiff goes to another district to attach the defendant's assets." Aqua Stoli, 460 F.3d at 444-445.

Under the circumstances of this case, Defendant Zhejiang, therefore, respectfully requests that this Court should exercise it equitable powers as enumerated under Aqua Stoli and vacate the attachment in this case.

## CONCLUSION

For any of the multiple reasons stated above, the Process of Maritime Attachment and Garnishment must be vacated and/or should be vacated, and the Court should enter an Order directing the garnishees in New York to release any funds that have been restrained pursuant to the Process of Maritime Attachment and Garnishment.

Dated:  Port Washington, New York
       July 23, 2007

Respectfully submitted,
CHALOS, O'CONNOR & DUFFY
Attorneys for Defendant
Zhejiang Fuchuen Co. Ltd.

By: _____
Owen F. Duffy (OD-3144)
366 Main Street
Port Washington, New York 11050
Telephone: 516-767-3600
Telefax:    516-767-3605

To:     Lennon, Murphy & Lennon LLP
        Attorneys for Plaintiff, Transfield ER Cape Limted
        420 Lexington Avenue, Suite 300
        New York, New York 10170

        Telephone: 212-490-6050
        Telefax:    212-490-6070

        Attn: Patrick F. Lennon, Esq.


To:     Law Offices of Rahul Wanchoo
        Attorneys for Defendant, Fuchuen Dihai Shipping Co. Ltd.
        Empire State Building
        350 Fifth Avenue, Suite 3304
        New York, New York 10118

        Telephone: 201 882-0303
        Telefax:    201 301-3576

        Attn: Rahul Wanchoo, Esq.